No. 19-3068

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

### UNITED STATES OF AMERICA
Plaintiff-Appellee

v.

### WESLEY WAGNER
Defendant-Appellant

_____

**Appeal from the United States District Court For the District of Kansas**
**The Honorable Daniel D. Crabtree, U.S. District Judge**
**District Court Case No. 17-CR-40097-DDC**

_____

### APPELLEE'S SEALED SUPPLEMENTAL APPENDIX VOLUME I

_____

**Stephen R. McAllister**
**United States Attorney**
**District of Kansas**
**500 State Ave., Suite 360**
**Kansas City, Kansas  66101**
**Phone:  (913) 551-6730**


**Bryan C. Clark**
**Assistant United States Attorney**
**500 State Ave., Suite 360**
**Kansas City, Kansas  66101**
**Phone:  (913) 551-6730**

# INDEX

## Volume I

Doc. 25 Motion to Suppress.................................................................1

Doc. 25-1 Appendix Table of Content....................................................54

Doc. 25-2 Search Warrant Affidavit......................................................55

Doc. 25-3 Search Warrant....................................................................88

Doc. 25-4 Response to Order Compelling Discovery .............................91

Doc. 25-5 Transcript of Motion Hearing ............................................180

Doc. 25-6 Index from PlayPen Website ...............................................47

Doc. 25-7 Search Warrant Application................................................183

Doc. 26 Motion to Suppress..............................................................215

Doc. 26-1 Appendix Table of Contents ...............................................247

Doc. 26-2 Search Warrant Application................................................248

Doc. 26-3 Search Warrant..................................................................279

Doc. 26-4 Index from PlayPen Website ...............................................284

## Volume II

Doc. 39 Gov't Response to Motion to Suppress...................................287

Doc. 40 Gov't Response to Motion to Suppress...................................325

Doc. 47 Memorandum and Order .......................................................343

## **Volume III**

Doc. 45 Transcript Motion Hearing ........................................................................361

Gov't Exhibit 8-2 ...................................................................................................449

Gov't Exhibit 10-4 .................................................................................................450

Gov't Exhibit 10-6 .................................................................................................462

Gov't Exhibit 10-8 .................................................................................................465

Doc. 70 Jury Instructions #1, #10, #11 .................................................................466

Doc. 96 Memorandum and Order ...........................................................................469

Gov't Exhibit 9 .......................................................................................................480

Gov't Exhibit 3 .......................................................................................................481

Monnat & Spurrier, Chartered
200 West Douglas, Suite 830
Olive W. Garvey Building
Wichita, Kansas 67202
Telephone: (316) 264-2800
Facsimile: (316) 264-4785

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 17-40097-DDC |
| | ) |
| WESLEY WAGNER, | ) |
| Defendant | ) |

---

### MR. WAGNER'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF THE "NIT" WARRANT AND MEMORANDUM OF LAW IN SUPPORT THEREOF

COMES NOW the Defendant, Wesley Wagner, by and through his attorney of record, Trevor D. Riddle of Monnat & Spurrier, Chartered, and respectfully moves this Court for an order suppressing any and all evidence obtained directly or indirectly from the searches and seizures conducted pursuant to the search warrant issued by a Magistrate Judge in the District Court of Eastern Virginia on February 20, 2015, authorizing FBI agents located in Virginia to secretly deploy a malware program on Mr. Wagner's computer. In support hereof, Mr. Wagner states as follows:

# SUMMARY OF ARGUMENT

Mr. Wagner respectfully moves this Court for an order suppressing the following evidence:

A.      All physical evidence obtained directly or indirectly from the searches and seizures conducted pursuant to the search warrant issued on February 20, 2015, authorizing FBI agents located in Virginia to secretly deploy a malware program, described by the Government as a Network Investigative Technique ("NIT"), on Mr. Wagner's computer and the computers of countless other individuals, for the purpose of seizing private identifying information, at some unspecified date and time after February 20, 2015;

B.      All statements made by Mr. Wagner on or about September 17, 2015, at 800 Adolph, White City, Kansas;

C.  Any tangible or intangible evidence of any kind derived directly or indirectly from the evidence described in paragraphs A and B.

Mr. Wagner asserts that said evidence is the fruit of illegal, unreasonable and unconstitutional searches and seizures in the following respects:

(1)      the NIT warrant was not supported by probable cause and violated the Fourth Amendment because it failed to provide a sufficient nexus that evidence of a crime would be found in the places to be searched[1];

---

[1] The application in support of the NIT warrant is attached hereto as <u>Exhibit A</u>. The NIT warrant is attached hereto as <u>Exhibit B</u>.

2

Case 5:17-cr-40097-DDC Document 25 *SEALED* Filed 02/01/18 Page 3 of 53 Sealed

(2)    the NIT warrant was not supported by probable cause when omitted facts are considered pursuant to *Franks v. Delaware*;

(3)    the NIT Warrant explicitly limited searches to property located in the Eastern District of Virginia and any searches conducted outside that territorial jurisdiction therefore constituted a *de facto* warrantless search;

(4)    the warrant failed to particularly describe the places to be searched, was overly broad, and granted impermissible discretion to the executing agents;

(5)    the NIT warrant failed to set forth a sufficient methodology to employ the search and seizure, which rendered the warrant a general one that violated the Fourth Amendment's particularity and probable-cause requirements;

(6)    notwithstanding that the warrant violated the particularity requirements of the Fourth Amendment, the government will be unable to bear its burden in demonstrating that the search methodologies employed to actually carry out the searches and seizures in this case were "reasonable" under the Fourth Amendment;

(7)    the warrant violated the Fourth Amendment's Reasonableness Clause by victimizing children portrayed in Playpen's content;

(8)    the Magistrate Judge in the Eastern District of Virginia lacked authority under Federal Rule of Criminal Procedure 41(b), 28 U.S.C. § 636(a) and the Fourth Amendment to issue the NIT warrant;

3

(9)     the "good faith" exception to the Fourth Amendment exclusionary rule of *United States v. Leon*, 468 U.S. 897 (1984), does not apply to the search warrant for Mr. Wagner's residence; and

(10)    any and all evidence derived directly or indirectly from the execution of the warrant for Mr. Wagner's residence issued on September 15, 2015, including any statements and/or admissions made by Mr. and Mrs. Wagner on or about September 17, 2015, are fruit of constitutional violations, and must be suppressed. *Wong Sun v. United States*, 371 U.S. 471 (1963).

## PRELIMINARY INFORMATION

### *Factual Background*

This case, and hundreds of others like it spanning across the country, stems from the FBI's investigation of "Website A"—also known as "Playpen"—a website that was hosting legal and illegal content, including child pornography. When a foreign law enforcement agency alerted the FBI to the website in 2014, the government's investigation into Playpen soon morphed into a global sting operation in which the U.S. government became responsible for the distribution of a quantity of child pornography that the government cannot calculate, while Playpen users posted 43 series of new child pornography and 13,000 links to external sources.[2] The number of images viewed,

---

[2] Government response to order compelling discovery, *United States v. Michaud,* Case No. 15-CR-5351 (W.D. Wash., Jan. 8, 2016) at 4, attached hereto as Exhibit C.

downloaded, and redistributed while the FBI managed the website remains unknown.[3]

Today, this government "investigation" is well known by its "perverse name 'Operation Pacifier.'"[4]

Determination of the claims raised in this Motion requires careful scrutiny of how the government came to "hack" the personal computers of so many individuals worldwide,[5] including Mr. Wagner's, and the illegality of the government's invasive investigation tactics to do so.

*A. The "Dark Web"*

Operation Pacifier involved the hacking into an unknown number of computers worldwide using government-developed malware, or what it euphemistically calls a

---

[3] Exh. C at 2-4.

[4] Colin Fieman, *Inside 'Operation Pacifier' and the FBI's Global Computer Hacking*, THE CHAMPION 21 (Nov. 2017) [hereinafter *Inside Operation Pacifier*]. This case involves a vast and highly publicized investigation of child pornography on the "dark web." *See, e.g.,* Orin Kerr, *Government 'Hacking' and the Playpen Search Warrant*, WASH. POST, Sept. 27, 2016; Ellen Nakashima, *This is How the Government is Catching People Who Use Child Porn Sites*, WASH. POST., Jan. 21, 2016; Joseph Cox, *The FBI Hacked Over 8,000 Computers in 120 Countries Based on One Warrant*, MOTHERBOARD (Nov. 22, 2016); Elizabeth E. Joh, *The Government Shouldn't Distribute Child Pornography*, N.Y.TIMES (Jan. 17, 2016).

[5] While the precise number is currently unknown to counsel, expert testimony elicited in other cases has established that during the period in which the FBI ran the illegal website, the NIT targeted tens of thousands of activating computers located in over 120 countries throughout the use of a satellite provider. *See Michaud*, 15-cr-5351, 2106 WL 337263 (W.D. Wash. Jan. 28, 2016) ECF No. 126, at 18-19; *United States v. Tippens*, 16-cr-5110, ECF No. 103 at 17-18 (W.D. Wash. Nov. 1, 2016).

network investigative technique ("NIT"),[6] in order to surreptitiously access target

computers remotely on the "dark web."[7] The impetus behind the government's

development of the NIT in this case was its desire to remotely hack computers by

bypassing certain privacy-enhancing software—in this case the Tor Network (short for

"the Onion Router"), which is intended to provide online anonymity to users.

The Tor network, originally developed as a project of the United States Naval

Research Laboratory,[8] is now available and widely used by the public the world over[9] to

protect user privacy online and circumvent restrictions on speech.[10] To connect to the Tor

---

[6] *See* Exh. C **Michaud** discovery response at 2-3. The NIT is similar to a class of malware known in the technical community as a Remote Access Trojan ("RAT"), which often includes keystroke logging, file system access and remote control, including control of devices such as microphones and webcams. *See* Roger A. Grimes, *Danger: Remote Access Trojans*, Microsoft TechNet (Sept. 2002), https://technet.microsoft.com/en- us/library/dd632947.aspx.

[7] *See* Brian L. Owsley, *Beware of Government Agents Bearing Trojan Horses*, 48 Loy. L. Rev. 315, 316 (2015).

[8] Tor began as a project of the United States Naval Research Lab in the 1990s. *See* Tor Project, Inception, https://www.torproject.org/about/torusers.html.en. Recognizing the privacyenhancing value of the technology, amicus provided financial support for Tor in 2004 and 2005. *See* Tor Project, Sponsors, https://www.torproject.org/about/sponsors.html.en. The Tor Project is now an independent non-profit. *Id.*

[9] Millions of people, businesses, organizations, and institutions now routinely use Tor network to, for example, avoid being targeted by advertising, protect their personal data from marketing companies and scammers, or circumvent censorship in countries like Iran or China. *See, e.g.,* James Ball, *Guardian Launches Secure Drop System for Whistleblowers to Share Files*, THE GUARDIAN (June 5, 2014) (describing the newspaper's use of Tor as a secure means for communicating with Whistleblowers); Colin Fieman, *Inside Operation Pacifier, supra* at 21 (noting that Tor network users include Peaceniks, human rights groups, as well as journalists).

[10] *See* Exh. A at ¶¶7-8 (noting that the network is designed to "protect user privacy online"); *see also* https://www.torproject.org ("Tor is free software and an open network that helps you defend against traffic analysis, a form of network surveillance that threatens personal freedom and

network, users download and run Tor software on their devices, and this software allows

users to share information over public Internet networks without compromising their

privacy. Using Tor, individuals can also host web sites known as "hidden

services," which do not reveal the location of the site. Other Tor users can connect

to these hidden services, without knowing the actual address of the site and

without the site knowing information about visitors that would ordinarily be

disclosed in the course of web browsing, including the public Internet Protocol

(IP) address assigned to them by their Internet Service Provider (ISP).[11]

As described by researcher and University of California at Hastings Law School

Professor Ahmed Ghappour, the "dark web," which includes the Tor network, provides a

"private global network of computers that enables users to conduct anonymous

transactions without revealing any trace of their location," thereby protecting the

confidentiality of users' Internet Protocol (IP) addresses and other identifying

information:

> The Tor Network protects its users from two types of surveillance. First, it
> protects users from a common form of surveillance called "traffic analysis,"
> which is the real time interception and examination of communications in
> order to deduce information. Second, it prevents governments from using
> communications "metadata"–information about a communication, such as
> its source, destination, and size–acquired from third-party service providers

---

privacy, confidential business activities and relationships, and state security").

[11] For a visual representation of how Tor works to protect web traffic, *see Tor and HTTPS*, EFF, https://www.eff.org/pages/tor-and-https.

to draw conclusions about the communicators and their behavior . . . .

Thus, someone located in Seattle who has anonymized his communications using a series of proxies, the last of which is located in Italy, will appear to the destination webpage to be a user in Italy. Likewise, someone in Iran who has run his communications through a series of proxies, the last of which is located in San Francisco, will appear to the destination website as a web surfer from San Francisco and to the local ISP in Iran as though he were attempting to communicate with a proxy computer.

Ahmed Ghappour, Searching Places Unknown: Law Enforcement Jurisdiction on the Dark Web, 69 Stan. L. Rev. 1075, 1087–90 (2017); *see also* Exh. A at ¶¶6-9.

Using the Tor network is therefore comparable to having the Internet equivalent of an unlisted phone number and caller I.D. blocking. It is estimated that the Tor network has over 40,000,000 users today.[12]

### B.   The FBI's takeover and distribution of pornography from Playpen.

The events leading authorities to investigate Mr. Wagner in 2015 began when, operating on a tip from a foreign law enforcement agency in December 2014, the FBI obtained the IP address of the website called "Playpen," which operated as a hidden service on the Tor network; however, due to a momentary configuration error, the website could be accessed on the regular internet. (*See* Exh. A at ¶28.[13]) Special Agent Daniel Alfin used the IP address to locate the Playpen server in Lenoir, North Carolina, by

---

[12]  *See* Colin Fieman, *Inside Operation Pacifier, supra* at 21.

[13]  *See also* Transcript, **United States v. Anzalone**, Case No. 15-10347 (D. Mass. Oct. 14, 2016) ("**Anzalone**") at 23, attached hereto as Exhibit D. File hosting allowed users to upload larger files, generally encrypted archives that contained either multiple images or larger videos, without causing the Playpen website to run more slowly. *Id.* at 25-26, 55.

December 23, 2014. (Exh. D at 21, 26-27.) On December 23, 2014, the FBI connected to

the Playpen website through the Tor network and discovered that it hosted an active

message board allegedly dedicated to advertising and distributing child pornography. The

FBI seized a copy of the website's data from that server on January 15, 2015, without

interrupting Playpen's operation. (Exh. D. at 24-27.)

On January 15, 2015, FBI Agent Alfin applied for a warrant to search the

Centrilogic server, and seize, among other things, the Playpen URL and any information

that may identify the Playpen administrator. Through the execution of that warrant and

additional investigations, the FBI was able to locate the operator of the site and raided his

home in Naples, Florida, on February 19, 2015. (*See* Exh. A at ¶30.) And once in physical

possession of the servers, the government had access to all data stored on the server,

including a list of registered users and logs of their activity on the site.  (*See* Exh. A at

¶¶29, 30, n.7.)

Rather than shut down the website right then and there, the FBI chose to take

control of Playpen by moving its server[14] to a government facility in Virginia.

Thereafter, the agents swiftly imported a feature to facilitate distribution of child

pornography, Playpen's file-hosting feature, from a server located in Canada.[15] The FBI

---

[14] A "server" is basically a computer that stores data for other computers, connects individual computers to Internet networks, and runs various programs that allows web sites to connect to the Internet. *See* Exh. A at ¶5(e); *see also* https://techterms.com/definition/server.

[15] Exh. D. at 50-56. File hosting allowed users to upload larger files, generally encrypted archives that contained either multiple images or larger videos, without causing the Playpen website to run

Appellate Case: 19-3068   Document: 010110218567   Date Filed: 08/26/2019   Page: 13   Sealed

learned of its location on February 20, 2015, and notified Canadian authorities, who shut

down the server and sent a copy of the feature to the FBI.[16] Agents installed the file-

hosting feature on a government computer in Virginia and announced its resumption the

following day.[17] Users soon reported improved performance, although Daniel Alfin,

Pacifier's primary case agent, said the FBI made no upgrades to the website.[18]

C.      The NIT Warrant

        Although the government was now in control of and operating Playpen, due to the

anonymous nature of Tor and the privacy it intended to offer to its users, the FBI was, for

the most part, unable to identify IP addresses (and, thus, identities) of users of Playpen

through traditional techniques:

> Due to the unique nature of the Tor network and the method by
> which the network protects the anonymity of its users by routing
> communications through multiple computers or nodes . . . other
> investigations of this type have been tried and have failed or
> reasonably appear to be unlikely to succeed if they are tried.

(*See* Exh. A NIT Warrant Aff., ¶¶28-29, 31, & n.7.)

        To circumvent the anonymity provided by Tor to search for data directly on the

personal computers and other digital devices of anyone who visited the Playpen site, on

---

more slowly. *Id*. at 25-26, 55.

[16] *Id*. at 50-51, Exh. D.

[17] *Id*. at 55, Exh. D.

[18] *Id*. at 7, 16-17, Exh. D. Whether the capabilities of the FBI server in Newington, VA, were greater than the server hosting Playpen in Lenoir, North Carolina, is not known at this time.

Sealed Supp App Vol 1 pg 10

February 20, 2015, "higher up" FBI and DOJ executives made the decision to apply for a

warrant to utilize the NIT, (Exh. D. at 45-46.), and agents did so before Magistrate Judge

Theresa Carroll Buchanan of the Eastern District of Virginia.

     In the application, the affiant incorrectly states that "the entirety" of Playpen is

"dedicated to child pornography," Exh. A at ¶27, and also describes the site as a "website

whose primary purpose is the advertisement and distribution of child pornography." Exh.

A at ¶11. More accurately, though, Playpen offered a mix of chat forums, private

messaging services, both legal and illegal pictures and videos, and links to pictures and

videos. (*See* Exh. A at ¶14; *see also* Screenshots of Playpen web site, attached hereto as

Exhibit E.) The NIT was to search "activating computers," which were defined as the

computers "of any user or administrator who logs onto the TARGET WEBSITE by

entering a username or password." Exh. A at ¶32. Notably, the username and password

could be made up and entered on the spot; there was no verification or other steps

required to enter the site, and the site was free.

     According to the application, the NIT worked by deploying "additional computer

instructions," or code, that government agents would send to the unidentified targets

when they landed on the home page and typed in a username or password:

> When a user's computer successfully downloads those instructions from the
> TARGET WEBSITE, located in the Eastern District of Virginia, the
> instructions, which comprise the NIT, are designed to cause the user's
> "activating" computer to transmit certain information to a computer
> controlled by or known to the government.

Sealed Supp App Vol 1 pg 11

Case 5:17-cr-40097-DDC   Document 25 *SEALED*   Filed 02/01/18   Page 12 of 53

(Exh. A at ¶33.) Since this code was "hidden," visitors to the site had no knowledge that their computers were infected with it when they visited Playpen. Once the government had inserted the NIT onto a visitor's computer, the NIT functioned as a form of malware, forcing the individual's computer to transmit back to the government-controlled server identifying packets of information including: (1) the computer's IP address; (2) a unique identifier to distinguish the data from that of other computers; (3) the computer's operating system; (4) information about whether the NIT had already been delivered to the computer; (5) the computer's "Host Name"; (6) the computer's active operating system username; and (7) the computer's "Media Access Control" (MAC) address. *See* Exh. B (Warrant Attach. B); *see also* Exh. A at ¶¶ 30-34.

The NIT warrant application stated that the property subject to the search warrant, identified in "Attachment A" was located in the Eastern District of Virginia, and read as follows:

> I, a federal law enforcement officer or attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property . . . *located in the Eastern District of Virginia*, there is now concealed . . . see attachment B.

Exh. A at p. 1 (emphasis added).

On February 20, 2015, Magistrate Judge Theresa Carroll Buchanan of the Eastern District of Virginia granted the NIT warrant under the terms requested by the FBI: both Attachment A and Attachment B, which the NIT warrant incorporated, are identical in content to the attachments submitted in the warrant application. Consistent with the

12

aforementioned statement from the application, the warrant itself specifies the location to be searched as "property located in the Eastern District of Virginia." Exh. B. The warrant then refers to "Attachment A," indicating the NIT would be deployed to search all "activating computers" that are computers "of any user or administrator who logs into the TARGET WEBSITE by entering a username and password." Exh. B; *see also* Exh. A at ¶32. However, the attachment does not identify any locations other than the Eastern District of Virginia, nor does it state that "activating computers" may be located outside the district or otherwise modify the affiant's averment on the application's first page that searches would extend only to targets within the district.

Thereafter, the FBI maintained and operated Playpen as an active distributor of child pornography until at least March 4, 2015. Thus, for at least 13 days following the raid of the operator's home in Naples, Florida, the FBI-operated site continued to distribute child pornography, and the government took no measures to limit or block the uploading, downloading or redistribution of the thousands of illicit pictures and videos.

Additionally, as of February 20, the site, which according to the government had been operating since August 2014, had 158,094 members from all over the world. Exh. A at ¶11. According to the discovery, then, it appears that approximately 56,000 new members joined the site after the FBI took it over, and approximately 100,000 people visited the site during the government's ownership. (*See* derivative search-warrant affidavit for Mr. Wagner's residence, computers, and computer media, attached hereto as

13

Case 5:17-cr-40097-DDC   Document 25 *SEALED*   Filed 02/01/18   Page 14 of 53     Sealed

Exhibit F at ¶25; noting that as of March 4, 2015, the site had 214,898 members).) This is

a dramatic increase to the approximately 11,000 weekly visitors the site had before the

FBI took it over. *See* Exh. A at ¶19.

> D.     *Investigations leading the government to Mr. Wagner's residence.*

The information in the NIT's transmission, as well as the associated IP address,

formed the basis for all further investigation and evidence obtained in this case. On or

about February 28, 2015, FBI agents sent the NIT malware to a computer connected to

someone with the username "soldiermike" and seized data from it. *See* F at ¶¶ 39-40. In

March 2015, the FBI used data collected from its NIT investigation to prepare an

administrative subpoena to Tri-County Telephone Association for identifying information

related to that data. *See* Exh. C at ¶¶ 44-45. Tri-County Telephone Association responded

with Mr. Wagner's subscriber information, name, and home address. *Id.*

Armed with information seized pursuant to the NIT warrant, on September 15,

2015, FBI Task Force Officer Angie Jones applied for a search warrant in the District of

Kansas for the authorization to search Mr. Wagner's residence at 800 Adolph St., White

City, Kansas, and any computers and computer media found therein, and to seize all items

from the listicle set forth in Attachment A to her affidavit. (Exh. C., ¶ 3, Attachment A.)

On Thursday, September 17, 2015, at 7:00 in the morning, six FBI and local law

enforcement officers arrived at his home to execute the warrant, blocking his driveway

with their vehicles. While executing the search warrant, FBI agents interrogated Mr.

Wagner and his wife and obtained statements from each of them.

The government has charged Mr. Wagner by Indictment on September 20, 2017, with Receipt of Child Pornography and Possession of Child Pornography.

## ARGUMENTS AND AUTHORITIES

Mr. Wagner now respectfully moves this Court to suppress all evidence obtained from the search of his home computer by the FBI on or about February 28, 2015, and all evidence derived therefrom, including any statements he made to government agents on September 17, 2015. *Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

At the outset, Mr. Wagner prefaces his arguments by noting that the warrant in this case and the claims he raises are particularly salient given that they deal with the global search and seizure of personal computers and electronically stored information—places and things that "in today's world, . . . [are] especially vulnerable to a worrisome exploratory rummaging by the government." *United States v. Christie*, 717 F.3d 1156, 1164 (10th Cir. 2013) (recognizing that with the rapid advancement in technology, computers "can and often do hold much information touching on many different areas of a person's life" including information, or at least access to, "our diaries, calendars, files, and correspondence").

## I.    The NIT search of Mr. Wagner's computer required a warrant.

As a preliminary matter, the execution of the NIT on Mr. Wagner's computer constituted a "search" for purposes of the Fourth Amendment.

The Fourth Amendment to the U.S. Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When "the Government obtains information by physically intruding" on persons, houses, papers, or effects, "a 'search' within the original meaning of the Fourth Amendment has "undoubtedly occurred." *Florida v. Jardines*, 133 S.Ct. 1409, 1414 (2013). "The fact that the electronic device employed to achieve [the search] did not happen to penetrate the [defendant's physical space] can have no constitutional significance." *Katz v. United States*, 389 U.S. 347, 353 (1967).

An individual has a privacy interest in his or her personal computer. *See, e.g., United States v. Christie*, 717 F.3d 1156, 1162 (10th Cir. 2013) (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *United States v. Angevine*, 281 F.3d 1130, 1133-34 (10th Cir. 2002)); *United States v. Turner*, 839 F.3d 429, 434 (5th Cir. 2016) (finding "a privacy interest exists in the electronic contents of computers and cell phones"); *see also Riley v. California*, ___ U.S. ___, 134 S.Ct. 2473, 2495 (2014) ("Our answer to the question of what police must do before searching a [computerized device] . . . is accordingly simple—get a warrant"; characterizing cell phones as "mini computers that also happen to have the capacity to be used as a telephone").

Mr. Wagner therefore had a reasonable expectation of privacy in his personal computer, his IP address and all other information on his personal computer that may have been accessed by way of the government's malware. Thus, when government agents

16

sent malware to Mr. Wagner's computer that searched his computer, and then transmitted

information from the search of his computer back to law enforcement, it constituted a

search and seizure for Fourth Amendment purposes.

**II.** **The NIT warrant was not supported by probable cause and violated the Fourth Amendment because it failed to provide a sufficient nexus that evidence of a crime would be found in the places to be searched.**

To protect against unreasonable searches and seizures, the Fourth Amendment

mandates that a search warrant be grounded in "probable cause to believe that the

legitimate object of a search is located in a particular place," which is intended to

"safeguard[] an individual's interest in the privacy of his home and possession against the

unjustified intrusion of the police." *Steagald v. United States*, 451 U.S. 204, 212-13

(1981) (citing U.S. Const. amend. IV). Moreover, a search must be confined in scope so

as to be "reasonable" under the Fourth Amendment. As the Tenth Circuit has held, "[i]t is

not enough that the warrant makes reference to a particular offense; the warrant must

'ensure[] that [the] search is confined in scope to particularly described evidence relating

to a specific crime for which there is demonstrated probable cause." *Cassady v. Goering*,

567 F.3d 628, 636 (10th Cir. 2009) (quoting *Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th

Cir. 1985)).

Here, the government sought authorization to conduct a very invasive search of the

personal computers belonging to everyone who visited the home (or "log in") page of a

web site called "Playpen." (*See* Exh. A, ¶32 (seeking authority to "investigate any user or

administrator *who logs into* the TARGET WEBSITE by entering a user name and password").) The user name and password could be made up and entered on the spot, and the site did not charge any fees. Nor did it verify user information or otherwise require affirmative steps to access the site.

Because there was no particularized information in the warrant application about site visitors and it did not include an expert "collector profile," probable cause for the computer searches of more than 100,000 computers turned on the mere contents of the home (or "log in") page, and whether it was likely that anyone who saw that page would know that its contents were illegal before proceeding to actually take a look at the contents.

A website's home page may establish probable-cause findings where it "unabashedly  announces" its illegal content. This standard has been met by presenting images of nude and partially-dressed girls, some prepubescent, along with this text: "Lolitagurls.com offers hard to find pics! With weekly updates and high quality pix inside, you cant go wrong if you like young girls!" *United States v. Gourde*, 440 F.3d 1065,1067 (9th Cir. 2006) (en banc).[19] The homepage for Lust Gallery displayed thumbnail images featuring unclothed minors and promised "A Secret Lolitas Archive" where "[a]ll models inside are 14 or younger." *United States v. Wilder*, 526 F.3d 1, 9-10

---

[19] Other websites satisfied the test by offering lengthy descriptions of their content prior to log-in. *See United States v. Shields*, 458 F.3d 269, 271 (3d Cir. 2006); *United States v. Martin*, 426 F.3d 68, 75 (2d Cir. 2005); *United States v. Froman*, 355 F.3d 882, 890-91 (5th Cir. 2004).

Sealed Supp App Vol 1 pg 18

(1st Cir. 2008).

But here, setting aside for the moment the inaccuracy of the warrant application and taking it at face value, the only facts that would support the conclusion that the site was obviously dedicated to child pornography are the description of two pictures that appear on the site's banner, "located to either side of the site name," "depicting partially clothed prepubescent females with their legs spread apart." (Exh. A at ¶ 12.) Playpen's home page also did not describe the site's content and its nature couldn't be discerned without obtaining a membership and logging in. The page most prominently advertised the existence of Playpen chat. The Playpen logo that appeared was of initially two girls, but at the time of the FBI takeover, one girl. *See **United States v. Michaud**, 2016 U.S. Dist. LEXIS 11033, *8* (W.D. Wash. Jan. 28, 2016) ("While the warrant application for the NIT describes a main page featuring two prepubescent females with legs spread apart, at ¶12, by the time that the FBI submitted the warrant application, on February 20, 2015, the main page had been changed to display only one young female with legs together."). None of the images were child pornography or even overtly suggestive as such.

As the Second Circuit recently concluded when reversing the conviction of a police officer charged with the planning to attack and cannibalize women, "[a]lthough it is increasingly challenging to identify that line [between fantasy and intent] in the Internet age, it still exists and it must be rationally discernible in order to ensure that 'a person's inclinations and fantasies are his own and beyond the reach of the government.'" ***United***

*States v. Valle*, 807 F.3d 508, 511 (2d Cir. 2015) (reversing conviction of defendant

known as "Girlmeat Hunter" who engaged in gruesome exchanges on fetish websites)

(citation omitted). The court went on the emphasize that "[w]e are loathe to give the

government the power to punish us for our thoughts and not our actions. That includes the

power to criminalize an individual's expression of sexual fantasies, no matter how

perverse or disturbing." *Id.* (citation omitted). Indeed, the right to anonymity while

engaging in speech related activities such as using Tor and messaging services "is an

aspect of free speech protected by the First Amendment." *McIntyre v. Ohio Elections*

*Commission*, 514 U.S. 334, 355 (1995); *see also Ashcroft v. Free Speech Coal.*, 535

U.S. 234, 245 (2002) (it is "well established that speech may not be prohibited because it

concerns subjects offending our sensibilities").

 Here, the NIT warrant application was devoid of facts to support a determination

that a fair probability existed that evidence of a crime would be found in the places to be

searched (i.e., thousands of personal computers from which somebody had entered a

username and password to access the Playpen website).

 In short, given the facts alleged in the affidavit, there can be no reasonable dispute

that the critical information for probable cause purposes was the claim that the site

displayed "partially clothed prepubescent females with their legs spread apart" and the

suggestion, at least, that these images were illegal. Thus, when one considers what the

website actually looked like, and the lack of information showing that the site advertised

20

itself as a source of child pornography, there can be no dispute that the warrant lacked

probable cause and violated the Fourth Amendment's Reasonableness Clause, especially

given the application's request to search 100,000 or more personal computers all over the

world, and that the Tenth Circuit made certain five years ago that "[i]n today's world, if

any place or thing is especially vulnerable to a worrisome exploratory rummaging by the

government, it may be our personal computers." *Christie*, 717 F.3d at 1165. Mr.

Wagner's Motion to Suppress should therefore be sustained because the NIT warrant

ought not have been issued, and the searches and seizures carried out pursuant thereto

were unconstitutional.

> **III.    Evidence should be suppressed because the NIT warrant was not supported by probable cause when omitted facts are considered pursuant to *Franks v. Delaware*.**
>
> > *A.    By understating the likelihood of an innocent or inadvertent visit to the website, the warrant affidavit failed to supply probable cause.*

The facts alleged in the warrant application cannot be taken at face value,

however, because several critical allegations were false or misleading. In ***Franks v.***

***Delaware***, 438 U.S. 154, 156 (1978), the Supreme Court held that "where the defendant

makes a substantial preliminary showing that a false statement knowingly and

intentionally, or with reckless disregard for the truth, was included by the affiant in the

warrant affidavit, and if the allegedly false statement is necessary to the finding of

probable cause, the Fourth Amendment requires that a hearing be held at the defendant's

request."

Appellate Case: 19-3068 Document: 010110218507 Date Filed: 08/26/2019 Page: 25 Sealed

In this case, false and omitted statements were plainly material to a judicial

officer's probable-cause determination. The warrant insinuated that probable cause of

criminality existed once a person logged on to Playpen by entering a username and

password. More specifically, the government aimed to persuade the Magistrate Judge that

the site was not only entirely "dedicated" to child pornography,[20] but that this purpose

would be apparent to anyone who viewed its public home page and therefore would know

what he or she was getting into. The affidavit accomplished that (if it did so at all) by

including a patently inaccurate description of the site in the supporting affidavit. Here, the

description of the home page was a pivotal component of the affiant's allegations in

support of probable cause. The affiant's burden, after all, was not just to show that

Playpen contained child pornography. If that is all that were required, then someone could

have his home searched simply for entering a bookstore that sold child pornography from

under the counter, even though all he was looking for was a copy of Playboy.

These are critical omissions because the warrant sought to advise Magistrate Judge

Buchanan that probable cause existed by minimizing the possibility of inadvertent access

to the website. (Exh. A, ¶¶7-10.) The NIT Warrant affidavit emphasized the steps

required to access Playpen—use TOR browser and acquisition of the site's TOR

address—and unequivocally stated, "[a] user may only access the TARGET WEBSITE

---

[20] Exh. A at ¶127 (claiming that "the entirety" of Playpen is "dedicated to child pornography.") The affiant fails to mention that one of the most prominent aspects of the site is its chat forum, which implicate substantial First Amendment rights); *see*, §II., *supra*.

Sealed Supp App Vol 1 pg 22

through the TOR network." (Exh. A, ¶10.) But that is not true. Law enforcement knew by December 2014 that Playpen could be accessed and its true IP address discerned through the regular internet. The FBI did not correct the configuration error that permitted regular internet access, so Playpen remained accessible without using the TOR browser until the agents shut down the website months later.[21] Law enforcement never checked to find out whether Playpen could be located by using a regular internet search engine.[22]

Because Playpen's home page did not convey at all the message that its content was illegal to potential visitors, merely logging into the website failed to provide probable cause to deploy the NIT to search the activating computer. *See* §II., *supra*. Based on the government's omissions and misstatements, the NIT warrant overbroadly based probable cause on mere presence, due to its affidavit's understatement of the likelihood of an inadvertent user's log-in to the site.

Inclusion of these omissions, and potentially others, deducted two foundational blocks from the affidavit's probable-cause showing. Incidences of inadvertent visitors become increasingly possible, directly decreasing the paltry quantum of probable cause to insufficiency. On the facts of this case, good faith cannot apply because Magistrate Judge Buchanan was misled by the agents' omission of information from the NIT warrant, either made deliberately or with reckless disregard of the truth. ***United States v. Leon***,

---

[21] Exh. D at 33-34.

[22] *See, e.g,* Transcript, ***United States v. Jean***, Case No. 15-CR-50087 (W.D. Ark. June 23, 2016), at 70-71.

Case 5:17-cr-40097-DDC Document 25 *SEALED* Filed 02/01/18 Page 24 of 53

468 U.S. 897, 905 (1984) (citing *Franks, supra*).

IV.     **The NIT Warrant explicitly limited searches to property located in the Eastern District of Virginia and any searches conducted outside that territorial jurisdiction therefore constituted a *de facto* warrantless search;**

To protect against unreasonable searches and seizures, the Fourth Amendment mandates two requirements for search warrants: a warrant must be supported by probable cause, and it must describe with particularity "the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *Groh v. Ramirez*, 540 U.S. 551, 557 (2004); *see also Marron v. United States*, 275 U.S. 192, 196 (1927) ("The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.").

Here, the NIT warrant explicitly limited the searches to property located in the Eastern District of Virginia. The NIT warrant states the FBI has asked to search property "located in the Eastern District of Virginia":

To:    Any authorized law enforcement officer

    An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the         Eastern         District of         Virginia
*(identify the person or describe the property to be searched and give its location):*
See Attachment A

    The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*
See Attachment B

    I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

(Exh. B.) The NIT Warrant incorporates the identical "Attachment A" submitted with the

application. (Exh. A (Attachment A) & Exh. B (Attachment A).) Like the application, the

NIT Warrant qualifies whatever is in Attachment A with "located in the Eastern District

of Virginia."[23]

    It is foreseen that the Government will contend that language in the supporting

affidavit, specifically paragraph 46a, expands the search to computers located outside of

the Eastern District of Virginia. Paragraph 46a of the supporting affidavit states:

> 46.    Accordingly, it is respectfully requested that this Court
> issue a search warrant authorizing the following:
>
>     a.    The NIT may cause an activating computer –
> wherever located – to send a computer controlled by or
> known to the government, network level messages
> containing information that may assist in identifying the
> computer, its location, other information about the
> computer and the user of the computer, as described
> above and in Attachment B;

---

[23] The operative language of Attachment A is its identification of "activating computers" as "those of any user or administrator who logs into" playpen.

Sealed Supp App Vol 1 pg 25

(Exh. A, ¶46.)

But the Tenth Circuit has made clear that supporting documents cannot salvage a warrant from its facial invalidity: "[b]ecause the Fourth Amendment by its terms 'requires particularity in the warrant, not in the supporting documents,' an application for a warrant which meets the particularity requirements 'does not save the warrant from its facial invalidity.'" *United States v. Russian*, 848 F.3d 1239, 1244-45 (10th Cir. 2017) (quoting *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)); *United States v. Angelos*, 433 F.3d 738, 746 (10th Cir. 2006) ("It is the description in the search warrant, not the language of the affidavit, which determines the place to be searched"); *id.* (concluding that a search congruent with the affidavit but beyond the explicit terms of the warrant exceeded the warrant's scope).

Moreover, the language in paragraph 46a of the affidavit is not sufficient to contradict the plain language of the NIT Warrant. The phrase "[t]he NIT may cause an activating computer – wherever located – to send a computer . . . network level messages" does not specifically state that the activating computers will be searched. While someone with extensive computer knowledge might infer this, such an inference is neither apparent nor common sense. Agents could not permissibly rely on a passage buried deep in the affidavit to broaden the warrant's geographic scope or narrow the places to be searched. If the FBI wanted authorization to search computers outside of Virginia, it could have, and should have, clearly and plainly stated this request.

Additionally, even if the affidavit had clearly asked for authorization to search computers outside Virginia, it cannot be assumed the Magistrate Judge agreed to authorize this. *See Groh*, 540 U.S. at 561 ("The mere fact that the Magistrate issued a warrant does not necessarily establish that he agreed that the scope of the search should be as broad as the affiant's request."). This is especially true where Rule 41(b) limits a Magistrate's territorial jurisdiction. *See, infra* §VIII.

As the Tenth Circuit held in *Angelos*, the *Leon* good faith exception is not available where officers impermissibly exceed the scope of the warrant:

> That conclusion, in turn, requires us to decide whether the officers executing the warrant acted reasonably in exceeding the scope of the warrant and seizing items throughout the house. Although the government makes reference to the good faith exception announced by the Supreme Court in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), we conclude that exception is inapplicable here. In *Leon*, the Court held that evidence obtained pursuant to a constitutionally defective search warrant is admissible at trial if the officers executing the search warrant reasonably relied on the warrant and there is no evidence the officers mislead the magistrate issuing the warrant. *Id.* at 920–21, 104 S.Ct. 3405. Notably, the Court in Leon made reference to officers "properly execut[ing][a] warrant and search[ing] only those places and for those objects that it was reasonable to believe were covered by the warrant." 468 U.S. at 918, n. 19, 104 S.Ct. 3405. In turn, we have held that "[t]he Leon good faith exception will not save an improperly executed warrant." *United States v. Rowland*, 145 F.3d 1194, 1208 n. 10 (10th Cir.1998). Given the circumstances of the search of the Fort Union house, it is apparent that the problem lies in the execution, and not the constitutionality, of the search warrant.
>
> Angelos contends there are only two possible explanations for why the officers in this case exceeded the scope of the search warrant: either they "knew the limits of the warrant and decided to disregard them, or [they] never bothered to read the warrant itself." Aplt. Br. at 76. Either way, he

27

argues, the officers are not entitled to rely on any type of good faith exception. We agree. Assuming the agents executing the warrant actually read it, they reasonably should have noticed its limited scope. In turn, the agents could have, upon realizing that the scope of the warrant was narrower than requested by Agent Becerra, contacted the issuing judge by phone in an attempt to receive authorization to expand the scope of the search to include the entire premises . . . . By failing to do so, the officers cannot be said to have acted reasonably.

433 F.3d at 746.

Because the search of "activating computers" beyond Virginia exceeded the scope of the warrant, the search constituted a *de facto* warrantless search and renders all evidence obtained therefrom inadmissible. **Wong Sun**, 371 U.S. 471.

>    **V.    Even if the Court does not find that the search exceeded the scope of the warrant, the NIT warrant application failed to particularly describe the places to be searched, was overly broad, and granted impermissible discretion to the executing agents in violation of the Fourth Amendment.**

As set forth above, "[i]t is not enough that the warrant makes reference to a particular offense; the warrant must 'ensure[] that [the] search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause." **Cassady**, 567 F.3d at 636 (quoting **Voss**, 774 F.2d at 404). In that way, "the requirement of particularity is closely tied to the requirement of probable cause." 2LaFave, *Search & Seizure* § 4.6(a). A warrant that describes the objects in unduly "general terms . . . raises the possibility that there does not exist a showing of probable cause to justify a search for them." *Id.*; *see also* **Cassady**, 567 F.3d at 636 ("The difference between a valid warrant an overbroad warrant lies in whether the government

28

could have phrased the warrant more specifically.") (internal quotations omitted) (quoting

***United States v. Le***, 173 F.3d 1258, 1275 (10th Cir. 1999)).

Here, the warrant violated the Fourth Amendment's particularity requirements

because it impermissibly granted a general search warrant to the FBI, and

unconstitutionally delegated discretion to the executing officers.

The NIT warrant described the place to be searched as the "activating computers . .

. of any user or administrator who logs into [Playpen] by entering a username or

password." (Exh. A (Attachment A).) This description does not identify any particular

person or place to search, nor any specific user of the targeted website, nor any series or

group of particular users. Nor does it identify any particular device to be searched, or

even a particular type of device. Instead, the NIT Warrant's description broadly

encompassed the computer of any visitor to the site—a group that, at the time the warrant

was issued, encompassed over 150,000 registered accounts, no matter where that

computer might be located. (Exh. A, ¶ 11.) The FBI could have, and should have been

more specific. The FBI possessed the server that hosted the site and had a clear window

into user activity. Based on this activity, the government could track: (1) which users

were posting and accessing specific information; (2) the frequency with which those

users were doing so; and (3) the nature of the information they posted or accessed. (Exh.

A, ¶¶29, 37; Exh. F, ¶¶38-43.)

29

A lawful warrant cannot authorize searches of numerous places and leave to the agents' discretion which places should be searched and how many times to search them. That is far too close to the operation of a writ of assistance: specifying the object of a search and leaving which places should be searched to the discretion of the police. *Steagald v. United States*, 451 U.S. 204, 220 (1981). "The manifest purpose of th[e] particularity requirement was to prevent general searches." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). "By limiting the authorization to search the specific areas . . . , the requirement ensures that the search will be *carefully tailored to its justifications*, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Id.* (emphasis added); *see also Berger v. New York*, 388 U.S. 41, 98-99 (1967) (the central purpose of the particularity requirement is to restrict the discretion exercised by government agents).

The NIT warrant at issue in this case was a general one, and it violated the Fourth Amendment. Rather than obtaining a narrowly tailored warrant, aimed at identifying particular individuals and based on specific and particularized showing of probable cause, the government sought—and received by way of the NIT warrant—authorization to cast an electronic net as broadly as possible, in violation of the Fourth Amendment's requirements, which "reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of

30

a general warrant." *Stanford v. Texas*, 379 U.S. 476, 481 (1965).

When the government conducts a search pursuant to a warrant that does not particularly describe the things to be seized or justify the scope of the seizure, the appropriate remedy is for the court to exclude the evidence and all "fruits" derived therefrom. *Groh*, 540 U.S. 559 ("The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional."). Here, the lack of sufficient showing as to probable-cause, as well as the unconstitutional overbreadth of the warrant in violation of the Fourth Amendment's particularity requirements bring the warrant beyond the reach of the good-faith exception in this case. *See, e.g., United States v. Williamson*, 1 F.3d 1134 (10th Cir. 1993) (rejecting good-faith exception's application where "no reasonable officer could have concluded that this warrant—which provides no meaningful description of the premises—was valid").

**VI.** **The warrant also failed to set forth a sufficient methodology to employ the search and seizure, which rendered the warrant a general one that violated the Fourth Amendment's particularity requirements.**

As discussed, the Fourth Amendment's particularity requirement mandates that a search warrant sufficiently describe both the place(s) to be searched and the thing(s) to be seized. U.S. Const. amend. IV. The particularity requirement ensures that the warrant supplies enough information to guide and control the law enforcement officer's discretion, and also to ensure that the category of items to be seized is not so broad as to

31

include items that should *not* be seized. *See, e.g, **Marron v. United States**,* <u>275 U.S. 192, 196</u> (1927).

The constitutionality of searches and seizures of electronic devices, as well as the validity of any application and affidavit for a new search warrant, to ensure that they conform to the particularity requirements of the Fourth Amendment must be viewed in light of the Supreme Court's holding in **Riley v. California**, ___U.S.___, <u>134 S.Ct. 2473</u> (2014), and its progeny. That is, courts across the nation are recognizing that the Fourth Amendment's particularity requirements require that search warrants seeking authorization to conduct forensic testing on electronic devices must not only specify the information to be seized with particularity in addition to the probable-cause basis to do so, but also must sufficiently describe the search methodology the government plans to employ to lawfully execute the search..

In his contemporaneously filed "Motion to Suppress Evidence Obtained From the Execution of the Search Warrant for the Residence at 800 Adolph and Memorandum of Law in Support Thereof," Mr. Wagner has set forth the legal argument supporting the proposition that a search warrant that fails to set forth a sufficient protocol that constitutionally limits the searches and seizures of electronic devices and information stored therein constitutes a general search warrant that violates the particularity requirements of the Fourth Amendment, and he respectfully incorporates herein by reference the law supporting this assertion.

32

Case 5:17-cr-40097-DDC Document 25 *SEALED* Filed 02/01/18 Page 33 of 53 Sealed

Here, because the warrant failed to set forth a methodology that sufficiently limited the breadth of the government's search under the warrant, it constituted a general warrant that violated the Fourth Amendment's particularity and probable-cause guarantees, rendering the search warrant fatally defective. U.S. Const. amend. IV.

Additionally, notwithstanding that the warrant violated the particularity clause of the Fourth Amendment, the government will be unable to bear its burden in demonstrating that the search methodologies employed to actually carry out the searches and seizures in this case were "reasonable" under the Fourth Amendment. *See **Christie**,* 717 F.3d at 1166 (holding that Fourth "Amendment's protection against 'unreasonable' searches surely allows courts to assess the propriety of the government's search methods (the *how*) *ex post* in light of the specific circumstances of each case.") (emphasis in original) (citing ***United States v. Ramirez***, 523 U.S. 65, 71 (1998) ("The general touchstone of reasonableness . . . governs the method of execution of the warrant.")); *see also **United States v. Walser***, 275 F.3d 981, 986 (10th Cir. 2001) ("Officers must be clear as to what they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant.").

## VII. The warrant violated the Fourth Amendment's Reasonableness Clause by victimizing children portrayed in Playpen's content.

For thirteen days, the government continually committed every crime alleged by the NIT warrant affidavit: possession, receipt, advertisement and distribution of child pornography, and engaging in a child exploitation enterprise. (Exh. A, ¶4 (listing 18

33

U.S.C. §§2251(d)(1) and (e), 2252A(a)(2) and (b)(1), 2252A(a)(5)(B) and (b)(2), and 2252A(g)).) That list does not encompass the agents' countless violations of 18 U.S.C. §3509(m) by releasing child pornography from government custody in violation of DOJ policy and innumerable international laws.[24]

Advised by DOJ lawyers,[25] FBI agents committed an exponentially greater number of crimes than did the persons reportedly arrested. The FBI's wholesale distribution of an incalculable quantity of child pornography dwarfs their offenses. But the government most egregiously violated the Reasonableness Clause by revictimizing the children portrayed in the website's content.

The DOJ lawyers and FBI agents certainly foresaw that Operation Pacifier would distribute an immense quantity of child pornography. They undoubtedly understood that every viewing of every image distributed by the FBI would cause "a repetition of the victim's abuse." ***Paroline v. United States***, 134 S. Ct. 1710, 1727 (2014). As the Justice Department reported to Congress, "The child victims are . . . victimized again when these images of their sexual assault are traded over the Internet in massive numbers

---

[24] International law prohibits the government from undertaking law enforcement functions without those countries' consent. *See U.S. Attorney's Criminal Resource Manual*, at § 267. No record indicates that the government sought any foreign sovereign's aid or consent before deploying the NIT malware on computers located abroad.

[25] Ex. D at 42-45.

34

by like-minded people across the globe."[26]

The absence of effort to mitigate that re-victimization emphasizes the government's hypocrisy and cruelty. In other investigations, the FBI deployed the NIT upon activation of links with explicit titles where only an error message would appear.[27] Investigators reportedly use "spoofing" to secretly redirect website visitors to a sanitized facsimile of the site, or utilize child erotica or "virtual" child pornography to avoid tipping off suspects.

The FBI kept nearly the entire Playpen website available. The FBI didn't delete or disable any links to external sources, although very capable of doing so. For example, the agents shut down Producer's Pen, a little used sub-forum for producers of child pornography, but that did not affect users' ability to post, view and redistribute new and pre-existing content. (Exh. D at 19-20.) The Fourth Amendment's Reasonableness Clause requires that agents conduct a search in a reasonable manner. *See, e.g., **United States v. Ramirez**,* 523 U.S. 65, 71 (1998). Fourth Amendment reasonableness controls both the manner and scope of executing of a warrant. *See **United States v. Ganias**,* 824 F.3d 199, 209 & n.21 (2d Cir. 2016). The manner in which a warrant is executed is certainly subject

---

[26] DOJ, *Report to Congress: The National Strategy for Child Exploitation Prevention and Interdiction* at 3 (Aug. 2010); https://www.justice.gov/psc/docs/natstrategyreport.pdf (visited June 10, 2017).

[27] *See* "FBI Admits It Controlled Servers Behind Mass Malware Attack," Wired, September 13, 2013, at https://www.wired.com/2013/09/freedom-hosting-fbi/ (visited June 10, 2016)(FBI-controlled hidden service sites displayed "down for maintenance" message).

35

to later judicial review as to its reasonableness. *Dalia v. United States*, 441 U.S. 238, 258 (1979); *Christie*, 717 F.3d at 1167.

Determining whether police action is reasonable under the Fourth Amendment requires an objective analysis of the facts known to the police at the time of the action. *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006). Those facts include agents' knowledge that 50,000 users would access child pornography on Playpen 500,000 times each week that the FBI ran the website. (Exh. D at 10.) Under the circumstances here, the government's actions that knowingly perpetuated that victimization cannot be characterized as reasonable under the Fourth Amendment.

Courts have warned that official conduct far less expansive than the Playpen warrant's execution is unacceptable. In *United States v. Sherman*, 268 F.3d 539, 549 (7th Cir. 2001), the Seventh Circuit criticized investigators' delivery of one child pornography photo set and one videotape to Sherman's home:

> the government's participation in criminal activity in the course of an investigation should rarely, if ever, involve harming actual, innocent victims. . . . Moreover, the government's dissemination of the pornographic materials to Sherman could hardly be described as a "controlled" delivery of the materials.

> Given the length of time that Sherman was allowed to possess these materials before he was arrested, the government's conduct here could easily have led to further victimization of the children depicted because the defendant had an opportunity to copy the materials and disseminate them to others.

36

In *Pacifier*, the government repudiated every concern expressed by the Court in *Sherman*. The FBI didn't use two items for bait, then retrieve both. The Bureau distributed an unknown number of images, re-victimizing actual, innocent victims countless times while ignoring the DOJ's own investigative principle, "[b]ecause digital information can be easily copied and communicated, it is difficult to control distribution in an online operation and so limit the harm that may arise from the operation."[28]

The reasonableness of executing a warrant balances the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). Mr. Wagner's privacy expectations are self-evident. The government's interest in enforcing the laws against possession and dissemination of child pornography is equally apparent.

This Court should denounce and deter the government's execution of the NIT warrant, which dismissed as a cost of doing business the distribution of a mind-blowing quantity of child pornography. Because the agents unreasonably executed the NIT warrant, the Fourth Amendment's Reasonableness Clause requires that this Court order suppression of all evidence gained through or derived from its execution.

---

[28] DOJ, *Online Investigative Principles for Federal Law Enforcement Agents* at 44 (1999), available at .https://info.publicintelligence.net/DoJ-OnlineInvestigations.pdf (visited June 10, 2017).

**VIII. All evidence should be suppressed because the Magistrate Judge in the Eastern District of Virginia lacked authority under <u>Federal Rule of Criminal Procedure 41(b)</u>, <u>28 U.S.C. § 636(a)</u> and the Fourth Amendment to issue the NIT warrant.**

*A.     Rule 41(b) did not authorize the NIT warrant.*

Pursuant to <u>Fed. R. Crim. P. 41</u>, searches in one district cannot be executed with a warrant that has been issued by a magistrate in another district, save very limited exceptions that do not apply in this case. R. 41(b)(a) (2015) ("a magistrate judge with authority in the district . . . has authority to issue a warrant to search for and seize a person or property located within the district") (emphasis supplied); ***United States v. Krueger***, <u>809 F.3d 1109, 1113</u> (10th Cir. 2015); ***In re Warrant to Search a Target Computer at Premises Unknown***, <u>958 F. Supp. 2d 753</u> (S.D. TExh. 2013) ("***In re Warrant***") (rejecting a NIT malware warrant application because issuing the warrant would have violated Rule 41).

On December 1, 2016, an amendment to Rule 41 went into effect. The amendment adds a provision, 41(b)(6), which provides magistrate judges "in any district where activities related to a crime may have occurred" with the authority to issue warrants "to use remote access to search electronic storage media and to seize or copy electronically stored information located within or outside that district" if the district "where the media or information is located has been concealed through technological means." However, this amendment to the Rule took place after the date relevant to this case, and is therefore immaterial to the issues currently before this Court.

<div align="center">38</div>

Rule 41's jurisdictional limitations at the time relevant to this case is not a mere procedural or technical requirement. Rather, Rule 41, and more importantly, the Federal Magistrates Act (28 U.S.C. § 636), is rooted in the Fourth Amendment's prohibition on general warrants and its restraints on governmental overreaching when exercising its law enforcement powers. ***Krueger***, *id.* at 1125 (Gorsuch, J., concurring); ***In re Warrant***, 958 F. Supp. 2d at 758.

At the time the NIT Warrant was issued, Rule 41(b) provided a limited number of ways that a search could occur outside of the district where the warrant was issued:

> **(b) Authority to Issue a Warrant.** At the request of a federal law enforcement officer or an attorney for the government:
>
> . . .
>
> > **2)** . . . if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed;
> >
> > **3)** . . . in any district in which activities related to terrorism may have occurred has the authority to issue a warrant for a person or property within or outside that district;
> >
> > **4)** . . . to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both; and
> >
> > **5)** . . . for property that is located outside the jurisdiction of any state or district but within . . . a United States territory, possession, or commonwealth . . . .

Fed. R. Crim. P. 41(b) (2015). In this case, the warrant was issued pursuant to Rule 41(b)(1)—requesting a search or seizure of property "located in the Eastern District of Virginia." *See* Exh. B. Of course, we now know the property searched in this case, as well

39

as most cases subject to this original NIT Warrant, were outside this magistrate's authority that limited such authority to that located within its district. Moreover, none of the jurisdiction exceptions listed in Rule 41(b)(2)-(5) apply in this case. *See generally **In re Warrant***, <u>958 F. Supp. 2d at 753</u>. Here, the property searched was Mr. Wagner's computer, which was located in the District of Kansas.

First, the information seized was never located in Virginia. The careful analysis in ***In re Warrant*** provides a helpful framework for considering the potential Rule 41 issues. There, the Government was investigating a fraud and identity theft case perpetrated with an "unknown computer at an unknown location." <u>958 F. Supp. 2d at 755</u>. Like the warrant here, the warrant sought in that case would have "surreptitiously install[ed] data extraction software" on a computer somewhere in the world using an older version of the NIT that was used to hack Mr. Wagner's personal computer. *Id.*

In ***In re Warrant***, the government primarily relied on Rule 41(b)(1), which "allows a 'magistrate judge with authority in the district . . . to issue a warrant to search for and seize a person or property located within the district.'" *Id.* at 756 (quoting Rule 41). The government's argument was puzzling because it had conceded that the location of the target computer was unknown (as it has likewise conceded that the locations of the computers targeted in this case were unknown). Nevertheless, the government posited that "this subsection authorizes the warrant 'because information obtained from the Target Computer will first be examined in this judicial district.'" *Id.* (quoting warrant

application).

Not surprisingly, the court rejected the government's novel theory that a search did not occur until investigators "examined" whatever information they had already seized. "Contrary to the current metaphor often used by Internet-based service providers, digital information is not actually stored in clouds; it resides on a computer or some other form of electronic media that has a physical location." *Id.* at 757. The search and seizure of data occurs "not in the airy nothing of cyberspace, but in physical space with a local habitation and a name." *Id.* Accordingly, the warrant sought by the government would have permitted "FBI agents to roam the world in search of a container of contraband, so long as the container is not opened until the agents haul it off to the issuing district." *Id.* at 757. Since the search for and collection of digital evidence would occur on a computer that would likely be located outside the district, the court had little difficulty concluding that a warrant was not permitted under Rule 41(b)(1) (or any other provision of the Rule), regardless of where seized data was later reviewed.

The Tenth Circuit concurred with *In re Warrant* in 2015 when it decided *United States v. Krueger*, 809 F.3d 1109 (10th Cir. 2015). There, applying principles of constitutional avoidance, the majority chose not to reach the Fourth Amendment issue, and ruled that the Kansas warrant did not give authority for the search and seizure of evidence in Oklahoma. Further, it found Mr. Krueger was prejudiced by the execution of this warrant in violation of Rule 41(b) of the Federal Rules of Criminal Procedure. Judge

Gorsuch concurred in the result, but found a Fourth Amendment violation occurred as well as a statutory violation of the Federal Magistrates Act.

Recently, the Eighth Circuit found the NIT Warrant issued from the Eastern District of Virginia exceeded the Magistrate's jurisdiction and violated the Fourth Amendment. *See* **United States v. Horton**, 863 F.3d 1041, 1048 (8th Cir. 2017) ("We agree with the majority of courts that have reviewed the NIT warrant. These courts concluded that 'the plain language of Rule 41 and the statutory definition of tracking device do not . . . support so broad a reading as to encompass the mechanism of the NIT used in this case.' *Id.* Thus, we hold that the NIT warrant exceeded the magistrate judge's jurisdiction.") (internal quotations omitted); *see also, id.* at 1049 ("We agree with the district court and find that the NIT warrant was void *ab initio*, rising to the level of a constitutional infirmity.") (citation omitted).

In this case, the Government sought to obtain information on computers outside of Virginia. The data that it seized, like Mr. Wagner's computer's host username and IP address, did not travel to Virginia to be first searched. The search and seizure occurred when the extraterritorial NIT infiltrated Mr. Wagner's computer in Kansas. As we now know, his computer was infiltrated in Kansas in order for the Government to obtain that information for the administrative subpoena that ultimately gave the location of Mr. Wagner and his computer. **Krueger**, 809 F.3d at 1113; *see also* **United States v. Workman**, 863 F.3d 1313, 1321 (10th Cir. 2017), *petition for cert. filed*, (U.S. Dec. 5,

42

2017) (Case No. 17-7042) ("For purposes of our discussion, we assume (without deciding) that the extraction of data from a user's computer in another district would violate the Federal Magistrates Act and the Federal Rules of Criminal Procedure."). Subsection (b)(1) of Rule 41 did not permit the NIT Warrant to reach into Kansas.

Further, none of the other exceptions apply here. Neither Mr. Wagner or his computer or computer equipment were ever in the Eastern District of Virginia; the alleged offense conduct does not relate to terrorism; nor does the NIT qualify as a tracking device pursuant to 18 U.S.C. § 3117(b); nor was the property searched and seized outside any state or district. As a result, the Magistrate Judge from the Eastern District of Virginia lacked the authority to grant the FBI permission to search Mr. Wagner's computer in Kansas.

  *B.*  *The Federal Magistrates Act did not authorize the NIT warrant.*

Likewise, the NIT Warrant was issued in violation of 28 U.S.C. § 636(a) of the Federal Magistrates Act. Section 636(a) establishes "*jurisdictional* limitations on the powers of magistrate judges[.]" ***Krueger***, 809 F.3d at 1122 (Gorsuch, J., concurring) (emphasis in original). It provides:

> **(a)** Each United States magistrate judge . . . shall have within the district in which sessions are held by the [district] court that appointed the magistrate judge, at other places where that [district] court may function, and elsewhere as authorized by law —
>
> > **(1)** all powers and duties conferred or imposed upon United States commissioners by law or by the Rules of Criminal Procedure . . .

<div align="center">43</div>

28 U.S.C. § 636(a)(1). There is no authority under Section 636(a) for the magistrate judge

in this case to issue a warrant to search property outside the Eastern District of Virginia.

History shows, as well, that territorial restraints on the powers of magistrate judges are

nothing new. In fact, Congress has always taken care to impose relatively tight territorial

limits on the powers of magistrate judges and their predecessors (commissioners).[ ] . . .

[E]ven Rule 41(b) is consistent with the notion that § 636(a) imposes independent

territorial restrictions on the powers of magistrate judges; that rule grants to magistrate

judges the power to do certain specified things—but only if they first have "authority

within the district," a question the rules themselves do not purport to answer and that can

be answered only by circling back to § 636(a). ***Krueger***, 809 F.3d at 1121 (Gorsuch J.,

concurring) (citations and footnote omitted). Thus, as Judge Gorsuch noted, "the warrant

on which the government seeks to justify its search in this case was no warrant at all when

looking to the statutes of the United States." ***Krueger***, 809 F.3d at 1118 (Gorsuch, J.,

concurring).

> C.   *Violations of Rule 41(b) and Section 636(a) also violate the Fourth*
> *Amendment, rendering the warrant void ab initio.*

Suppression is appropriate because the NIT Warrant was issued by a magistrate

judge who did not have the jurisdiction to do so. This is a substantive violation that

causes the warrant to be invalid on its face and, more importantly, does not make it

amenable to application of the good faith exception to the exclusionary rule.

When interpreting the Fourth Amendment we start by looking to its original public

Case 5:17-cr-40097-DDC    Document 25 *SEALED*    Filed 02/01/18    Page 45 of 53

meaning—asking what "traditional protections against unreasonable searches and seizures" were afforded "by the common law at the time of the framing." ***Atwater v. City of Lago Vista***, 532 U.S. 318, 326 (2001) (internal quotation mark omitted). Whatever else it may do, the Fourth Amendment embraces the protections against unreasonable searches and seizures that existed at common law at the time of its adoption, and the Amendment must be read as "provid[ing] *at a minimum*" those same protections today. ***United States v. Jones***, __ U.S. __, 132 S. Ct. 945, 953 (2012).

That principle poses an insurmountable problem for the government in this case. For looking to the common law at the time of the framing it becomes quickly obvious that a warrant issued for a search or seizure beyond the territorial jurisdiction of a magistrate's powers under positive law was treated as no warrant at all—as *ultra vires* and *void ab initio* to use some of the law's favorite Latin phrases—as null and void without regard to potential questions of "harmlessness" (such as, say, whether another judge in the appropriate jurisdiction would have issued the same warrant if asked). ***Krueger***, 809 F.3d at 1123 (Gorsuch, J., concurring) (emphasis in original).

A valid warrant under the Fourth Amendment requires probable cause, particularity, and issuance by a neutral and detached magistrate. ***Dalia v. United States***, 441 U.S. 238, 255 (1979). Issuance by a neutral and detached magistrate presupposes that the magistrate is authorized to issue the warrant. A search warrant is void *ab initio* if the magistrate judge lacks jurisdiction to issue the warrant. "Time and again state and circuit

45

courts have explained that this means a warrant issued in defiance of positive law's restrictions on the territorial reach of the issuing authority *will not qualify as a warrant for Fourth Amendment purposes.*" ***Krueger***, 809 F.3d at 1124 (Gorsuch, J., concurring) (footnote omitted) (emphasis supplied). More importantly, when a warrant is invalid on its face, the good-faith exception can never apply. ***Angelos***, 433 F.3d at 746 (citing ***Leon***, *supra*).

Judge Gorsuch asserted that "Section 636(a)'s territorial restrictions are *jurisdictional* limitations on the power of magistrate judges and the Supreme Court has long taught that a violation of a statutory jurisdictional limitation — quite unlike the violation of a more prosaic rule or statute — is *per se* harmful." ***Krueger***, 809 F.3d at 1122 (Gorsuch, J., concurring) (emphasis in original). Indeed, "[o]ur whole legal system is predicated on the notion that good borders make for good government, that dividing government into separate pieces bounded both in their powers and geographic reach is of irreplaceable value when it comes to securing the liberty of the people." *Id.* at 1125 (citing ***Bond v. United States***, 564 U.S. 211 (2011); The Federalist Nos. 28, 32 (Alexander Hamilton), Nos. 46, 51 (James Madison)). Whether termed a Rule 41(b) violation, a violation of the Federal Magistrates Act, or of the Fourth Amendment, it is a "jurisdictional flaw" that cannot "be excused as a 'technical defect.'" ***United States v. Glover***, 736 F.3d 509, 515 (D.C. Cir. 2013) (explaining that a warrant issued in "blatant disregard" of a judge's territorial jurisdiction cannot be excused as a mere "technical"

46

defect).

This is not a violation that is merely "ministerial in nature." Rule 41(b) involves "substantive judicial authority" and unlike violations of other provisions of Rule 41, which may be characterized as ministerial or technical, the absence of authority to issue the NIT Warrant made it void *ab initio*. *See* **Krueger**, 809 F.3d at 1115 n.7; **United States v. Levin**, 186 F.Supp.3d 26, 41 (D. Mass. 2016) ("To hold that the good-faith exception is applicable here would collapse the distinction between a voidable and a void warrant . . . the former involves 'judicial error' . . . while the latter involves 'judicial authority'[.]").

     *E.*    *Leon's good-faith exception is not applicable given these violations.*

This Court is of course bound by Tenth Circuit precedent. **United States v. Spedalieri**, 910 F.2d 707, 709 n.2 (10th Cir. 1990) ("A district court must follow the precedent of this circuit, regardless of its views concerning the advantages of the precedent of our sister circuits."). However, there is no binding precedent on the issue at this time. In **Workman**, the district court granted the defendant's motion to suppress on the grounds that the Magistrate Judge lacked both statutory and rule-based jurisdiction to issue the NIT warrant. 863 F.3d at 1317 (citing 28 U.S.C. § 636(a) and Fed. R. Crim. P. 41(b)). The government appealed, and the Tenth Circuit reversed. *Id.* The **Workman** court assumed for the purposes of its decision that the Magistrate Judge did lack authority to issue the warrant, but that suppression was inappropriate under the good-faith exception. *Id.* at 1321.

Case 5:17-cr-40097-DDC   Document 25 *SEALED*   Filed 02/01/18   Page 48 of 53

The defendant in *Workman* has filed a petition for certiorari with the United States Supreme Court. *See Workman*, *supra*, *petition for cert. filed*, (U.S. Dec. 5, 2017) (No. 17-7042). Therein, the defendant requests review of the Tenth Circuit's decision on the following two issues:

> Mr. Workman seeks a writ of certiorari on two related issues: (1) whether the good-faith exception is unavailable in the case of a warrant that was void *ab initio* because the issuing judge lacked jurisdiction, and (2) if not, whether it was reasonable in this case for the agents to rely on this warrant where it was both sought and issued under Rule 41(b)(1), which authorizes only within-district searches.

*Workman*, *supra*, Def.'s Opening Br., at 9.

The defendant noted that granting writ may be especially pertinent in this case given specific aspects about the Tenth Circuit's holding:

> First, the court held that the good-faith exception is available even when the law enforcement officers relied on a warrant that was void *ab initio* because the issuing judge lacked jurisdiction. Second, the court held that the agents reasonably relied on the warrant. In so doing, the court did not acknowledge that the warrant was both sought and issued under Rule 41(b)(1), not under Rule 41(b)(4). And the court focused solely on the agents who executed the warrant, not the agent who sought it in the first place. The executing agents, according to the court, acted in reasonable reliance on the warrant because they "lacked precedent" on whether magistrate judges could "authorize the search of electronic data" in other districts.

*Id*. at pp. 8-9 (internal citations omitted).

The deadline for the government's response is February 12, 2018. *Id*. Therefore, at this time *Workman* has not reached final judgment and does not establish precedent that this Court is bound to follow. *See, e.g., Griffith v. Kentucky*, <u>479 U.S. 314, 321</u> n.6

(1987) (holding that a criminal case is not final until "a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied."). And as this Court is well aware, it is not duty-bound to follow either the decisions of other co-equal courts in this district or appellate courts in other jurisdictions. *See, e.g.,* ***Garcia v. Tyson Foods, Inc.***, 534 F.3d 1320, 1329 (10th Cir.2008); ***Spedalieri***, 910 F.2d at 709 n.2.

Importantly, the touchstone of ***Leon's*** exception is that it turns on whose mistakes produced the Fourth Amendment violation. *See, e.g.,* ***United States v. Herrera***, 444 F.3d 1238, 1250-51 (10th Cir. 2006) ("***Leon's*** good-faith exception to the exclusionary rule turns to a great extent on whose mistake produces the Fourth Amendment violation. And because the purpose underlying this good-faith exception is to deter *police* conduct, logically *Leon's* exception most frequently applies where the mistake was made by someone other than the officer executing the search that violated the Fourth Amendment.") (citing 1 Lfave, *Search and Seizure* § 1.3(f) (noting that ***Leon*** "does not allow law enforcement authorities to rely on an error of their own making").

Here, as set forth above, there is evidence that the FBI acted in reckless disregard of the truth in the language it used in its warrant application and affidavit. "Good faith in this context implies not only that Rule 41 was not knowingly and intentionally violated, but also that the officers did not act in reckless disregard or conscious indifference to whether it applied and was complied with." ***United States v. Comstock***, 805 F.2d 1194,

1207 (5th Cir. 1986). The Government knew that such nation-wide warrants were not

permissible, as evidenced by the government's campaign to change Rule 41.[29]As

discussed previously, In **In re Warrant**, the court denied a government application for an

NIT warrant because it would violate Rule 41. In a detailed analysis of Rule 41, the

decision put the Government on notice that using a warrant issued by a Magistrate Judge

in one district to execute malware searches in another is not legal. The Magistrate Judge

not only abandoned her judicial role on a warrant that was void *ab initio*, but the FBI

knew or should have known their warrant was facially deficient.

For the reasons set forth above, Mr. Wagner respectfully asserts that suppression is

warranted on these grounds, as well.

### IX.     *Leon's* good-faith doctrine cannot salvage the unlawfully obtained evidence under these circumstances.

If the **Leon** good-faith doctrine is asserted in this case in an effort to salvage the

unlawfully obtained evidence, it is the government's burden of proving the doctrine's

applicability under the facts of this case. *See, e.g.,* **United States v. Gant**, 759 F.2d 484,

---

[29] *See, e.g.,* Adv. Comm. On Crim. Rules, Minutes (April 7-18, 2014), p. 6, 13, *available at* http://www.uscourts.gov/sites/default/files/fr_import/criminal-min-04-2014.pdf (last visited Jan. 31, 2018) (discussing the proposed territorial-requirement and notice-requirement changes to Rule 41, and questioning whether it was better to litigate the issue through the courts rather than amend the rules: DOJ Representative Jonathan Wroblewski, Esq., explained "it might be possible to litigate and hope the courts will create an exception to a rule that on its face does not work with these realities. But the better approach is to come to the Committee and change the rule that is creating the issue.").

487 (5th Cir. 1985); *see also* **United States v. Vigeant**, <u>176 F.3d 565, 572</u> (1st Cir.1999).

For all of the foregoing reasons, it is clear that the government cannot claim the protection of the *Leon* good faith exception to the exclusionary rule. "Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble." **United States v. Zimmerman**, <u>277 F.3d 426, 437</u> (3rd Cir. 2002) (quoting **United States v. Reilly**, <u>76 F.3d 1271, 1280</u> (2nd Cir. 1996)). The evidence seized as a result of the defective search warrants issued in this case must be suppressed.

### X.     All evidence derived from the unlawful searches and seizures must also be suppressed.

Mr. Wagner respectfully asserts that any and all evidence derived directly or indirectly from the execution of the warrant for Mr. Wagner's residence issued on September 15, 2015, including any statements and/or admissions made by Mr. and Mrs. Wagner on or about September 17, 2015, are fruit of the unlawful searches and seizures, and must be suppressed. **Wong Sun v. United States**, <u>371 U.S. 471</u> (1963).

WHEREFORE, Mr. Wagner respectfully prays that the Court issue an order suppressing the aforesaid evidence for the reasons set forth herein, any memorandum of law that may later be submitted, and all other matters that may be presented prior to or at the time of the hearing of said motion; and for such other and further relief as to the Court seems just.

Respectfully submitted,

By:     MONNAT & SPURRIER, CHARTERED

s/ Trevor Riddle
TREVOR RIDDLE, #22224
Attorney for Defendant Wesley Wagner
Monnat & Spurrier, Chartered
200 West Douglas, Suite 830
Wichita, Kansas 67202
(316) 264-2800
Fax: (316) 264-4785
trevor.riddle@monnat.com

52

<u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on February 1, 2018, I electronically filed the foregoing with the clerk fo the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Christine Kenney
christine.kenney@usdoj.gov

      <u>s/ Trevor Riddle</u>
      TREVOR RIDDLE, #22224
      Attorney for Defendant Wesley Wagner
      Monnat & Spurrier, Chartered
      200 West Douglas, Suite 830
      Wichita, Kansas 67202
      (316) 264-2800
      Fax: (316) 264-4785
      trevor.riddle@monnat.com

Case 5:17-cr-40097-DDC   Document 25-1 *SEALED*   Filed 02/01/18   Page 1 of 1

*United States v. Wesley Wagner*, **Case No. 17-40097-DDC**
**APPENDIX TABLE OF CONTENTS**

**Exhibit**    **Document**

A.    Warrant application, Case No. 15-SW-89 (E.D. Va. Feb. 20, 2015) ("NIT warrant").

B.    NIT Warrant, Case No. 15-SW-89 (E.D. Va. Feb. 20, 2015).

C.    Government response to order compelling discovery, ***United States v. Michaud,*** Case No. 15-CR-5351 (W.D. Wash., Jan. 8, 2016)("***Michaud*** discovery response").

D.    Transcript, ***United States v. Anzalone,*** Case No. 15-10347 (D. Mass. Oct. 14, 2016).

E.    Screenshots of Playpen.

F.    Warrant application, Case No. 15-mj-5106-KGS (D. Kan. Sept. 15, 2015) (derivative residential warrant).

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FEB 2 0 2015

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF COMPUTERS THAT ACCESS upf45jv3bziuctml.onion | ) **FILED UNDER SEAL**<br>)<br>) **Case No. 1:15-SW-89** |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Douglas Macfarlane, being first duly sworn, hereby depose and state:

### INTRODUCTION

1.     I have been employed as a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") since April, 1996, and I am currently assigned to the FBI's Violent Crimes Against Children Section, Major Case Coordination Unit ("MCCU"). I currently investigate federal violations concerning child pornography and the sexual exploitation of children and have gained experience through training in seminars, classes, and everyday work related to these types of investigations. I have participated in the execution of numerous warrants involving the search and seizure of computers, computer equipment, software, and electronically stored information, in conjunction with criminal investigations pertaining to child pornography the sexual exploitation of children. I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media. I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I make this affidavit in support of an application for a search warrant to use a network investigative technique ("NIT") to investigate the users and administrators of the website upf45jv3bziuctml.onion (hereinafter "TARGET WEBSITE") as further described in this affidavit and its attachments.[1]

3.      The statements contained in this affidavit are based in part on: information provided by FBI Special Agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents, including foreign law enforcement agencies as described below; information gathered from the service of subpoenas; the results of physical and electronic surveillance conducted by federal agents; independent investigation and analysis by FBI agents/analysts and computer forensic professionals; my experience, training and background as a Special Agent with the FBI, and communication with computer forensic professionals assisting with the design and implementation of the NIT. This affidavit includes only those facts that I believe are necessary to establish probable cause and does not include all of the facts uncovered during the investigation.

## RELEVANT STATUTES

4.      This investigation concerns alleged violations of: 18 U.S.C. § 2252A(g), Engaging in a Child Exploitation Enterprise; 18 U.S.C. §§ 2251(d)(1) and (e), Advertising and Conspiracy to Advertise Child Pornography; 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1), Receiving and Distributing/Conspiracy to Receive and Distribute Child Pornography; and 18 U.S.C. §

---

[1] The common name of the TARGET WEBSITE is known to law enforcement. The site remains active and disclosure of the name of the site would potentially alert users to the fact that law enforcement action is being taken against the site, potentially provoking users to notify other users of law enforcement action, flee, and/or destroy evidence. Accordingly, for purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms.

02-000142
Sealed Supp App Vol 1 pg 56

2252A(a)(5)(B) and (b)(2), Knowing Possession, Access or Attempted Access With Intent to View Child Pornography.

> a.  18 U.S.C. § 2252A(g) prohibits a person from engaging in a child exploitation enterprise. A person engages in a child exploitation enterprise if the person violates, inter alia, federal child pornography crimes listed in Title 18, Chapter 110, as part of a series of felony violations constituting three or more separate incidents and involving more than one victim, and commits those offenses in concert with three or more other persons;
>
> b.  18 U.S.C. §§ 2251(d)(1) and (e) prohibits a person from knowingly making, printing or publishing, or causing to be made, printed or published, or conspiring to make, print or publish, any notice or advertisement seeking or offering: (A) to receive, exchange, buy, produce, display, distribute, or reproduce, any visual depiction, if the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct, or (B) participation in any act of sexually explicit conduct by or with any minor for the purpose of producing a visual depiction of such conduct;
>
> c.  18 U.S.C. §§ 2252A(a)(2) and (b)(1) prohibits a person from knowingly receiving or distributing, or conspiring to receive or distribute, any child pornography or any material that contains child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; and

3

d.    18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) prohibits a person from knowingly possessing or knowingly accessing with intent to view, or attempting to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS OF TECHNICAL TERMS USED IN THIS AFFIDAVIT

5.    The following definitions apply to this Affidavit:

a.    "Bulletin Board" means an Internet-based website that is either secured (accessible with a password) or unsecured, and provides members with the ability to view postings by other members and make postings themselves. Postings can contain text messages, still images, video images, or web addresses that direct other members to specific content the poster wishes. Bulletin boards are also referred to as "internet forums" or "message boards." A "post" or "posting" is a single message posted by a user. Users of a bulletin board may post messages in reply to a post. A message "thread," often labeled a "topic," refers to a linked series of posts and reply messages. Message threads or topics often contain a title, which is generally selected by the user who posted the first message of the thread. Bulletin boards often also provide the ability for members to communicate on a one-to-one basis through "private messages." Private

4

messages are similar to e-mail messages that are sent between two members of a bulletin board. They are accessible only by the user who sent/received such a message, or by the bulletin board administrator.

b.     "Child erotica," as used herein, means any material relating to minors that serves a sexual purpose for a given individual, including fantasy writings, letters, diaries, books, sexual aids, souvenirs, toys, costumes, drawings, and images or videos of minors that are not sexually explicit.

c.     "Child Pornography," as used herein, is defined in 18 U.S.C. § 2256(8) as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

d.     "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

e.     "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users. A "web server," for example, is a

5

computer which hosts the data associated with a website. That web server receives requests from a user and delivers information from the server to the user's computer via the Internet. A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

f.    "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g.    "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital

02-000146

form. It commonly includes programs to run operating systems, applications, and utilities.

h. "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

i. "Computer passwords, pass-phrases and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password or pass-phrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

j. "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

k. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet,

7

Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 65   Sealed

connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

l.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an ISP over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

m.      "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be "dynamic," meaning that the Internet Service Provider ("ISP") assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static,"

8

if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. IP addresses are also used by computer servers, including web servers, to communicate with other computers.

n.    "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

o.    The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

p.    "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of

9

Case 5:17-cr-40097-DDC   Document 25-2 *SEALED*   Filed 02/01/18   Page 10 of 33

any person. See 18 U.S.C. § 2256(2).

q.    "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

r.    "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language ("HTML") and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol ("HTTP").

## PROBABLE CAUSE

6.    The targets of the investigative technique described herein are the administrators and users of the TARGET WEBSITE - upf45jv3bziuctml.onion - which operates as a "hidden service" located on the Tor network, as further described below. The TARGET WEBSITE is dedicated to the advertisement and distribution of child pornography, the discussion of matters pertinent to child sexual abuse, including methods and tactics offenders use to abuse children, as well as methods and tactics offenders use to avoid law enforcement detection while perpetrating online child sexual exploitation crimes such as those described in paragraph 4 of this affidavit. The administrators and users of the TARGET WEBSITE regularly send and receive illegal child pornography via the website.

### The Tor Network

7.    The TARGET WEBSITE operates on an anonymity network available to Internet users known as "The Onion Router" or "Tor" network. Tor was originally designed, implemented, and deployed as a project of the U.S. Naval Research Laboratory for the primary purpose of

10

protecting government communications. It is now available to the public at large. Information documenting what Tor is and how it works is provided on the publicly accessible Tor website at www.torproject.org. In order to access the Tor network, a user must install Tor software either by downloading an add-on to the user's web browser or by downloading the free "Tor browser bundle" available at www.torproject.org.[2]

8.      The Tor software protects users' privacy online by bouncing their communications around a distributed network of relay computers run by volunteers all around the world, thereby masking the user's actual IP address which could otherwise be used to identify a user. It prevents someone attempting to monitor an Internet connection from learning what sites a user visits, prevents the sites the user visits from learning the user's physical location, and it lets the user access sites which could otherwise be blocked. Because of the way Tor routes communications through other computers, traditional IP identification techniques are not viable. When a user on the Tor network accesses a website, for example, the IP address of a Tor "exit node," rather than the user's actual IP address, shows up in the website's IP log. An exit node is the last computer through which a user's communications were routed. There is no practical way to trace the user's actual IP back through that Tor exit node IP. In that way, using the Tor network operates similarly to a proxy server – that is, a computer through which communications are routed to obscure a user's true location.

9.      Tor also makes it possible for users to hide their locations while offering various kinds of services, such as web publishing, forum/website hosting, or an instant messaging server. Within the Tor network itself, entire websites can be set up as "hidden services." "Hidden services,"

---

2 Users may also access the Tor network through so-called "gateways" on the open Internet such as "onion.to" and "tor2web.org," however, use of those gateways does not provide users with the anonymizing benefits of the Tor network.

11

like other websites, are hosted on computer servers that communicate through IP addresses and operate the same as regular public websites with one critical exception. The IP address for the web server is hidden and instead is replaced with a Tor-based web address, which is a series of algorithm-generated characters, such as "asdlk8fs9dflku7f" followed by the suffix ".onion." A user can only reach these "hidden services" if the user is using the Tor client and operating in the Tor network. And unlike an open Internet website, is not possible to determine through public lookups the IP address of a computer hosting a Tor "hidden service." Neither law enforcement nor users can therefore determine the location of the computer that hosts the website through those public lookups.

### Finding and Accessing the TARGET WEBSITE

10.     Because the TARGET WEBSITE is a Tor hidden service, it does not reside on the traditional or "open" Internet. A user may only access the TARGET WEBSITE through the Tor network. Even after connecting to the Tor network, however, a user must know the web address of the website in order to access the site. Moreover, Tor hidden services are not indexed like websites on the traditional Internet. Accordingly, unlike on the traditional Internet, a user may not simply perform a Google search for the name of one of the websites on Tor to obtain and click on a link to the site. A user might obtain the web address directly from communicating with other users of the board, or from Internet postings describing the sort of content available on the website as well as the website's location. For example, there is a Tor "hidden service" page that is dedicated to pedophilia and child pornography. That "hidden service" contains a section with links to Tor hidden services that contain child pornography. The TARGET WEBSITE is listed in that section. Accessing the TARGET WEBSITE therefore requires numerous affirmative steps by the user, making it extremely unlikely that any user could simply stumble upon the TARGET WEBSITE without understanding its

12

purpose and content. In addition, upon arrival at the TARGET WEBSITE, the user sees images of prepubescent females partially clothed and whose legs are spread with instructions for joining the site before one can enter. Accordingly, there is probable cause to believe that, for the reasons described below, any user who successfully accesses the TARGET WEBSITE has knowingly accessed with intent to view child pornography, or attempted to do so.

<u>Description of the TARGET WEBSITE and Its Content</u>

11.     Between September 16, 2014 and February 3, 2015, FBI Special Agents operating in the District of Maryland connected to the Internet via the Tor Browser and accessed the Tor hidden service the TARGET WEBSITE at its then-current Uniform Resource Locator ("URL") muff7i44irws3mwu.onion.[3] The TARGET WEBSITE appeared to be a message board website whose primary purpose is the advertisement and distribution of child pornography. According to statistics posted on the site, the TARGET WEBSITE contained a total of 95,148 posts, 9,333 total topics, and 158,094 total members. The website appeared to have been operating since approximately August 2014 which is when the first post was made on the message board.

12.     On the main page of the site, located to either side of the site name were two images depicting partially clothed prepubescent females with their legs spread apart, along with the text underneath stating, "No cross-board reposts, .7z preferred, encrypt filenames, include preview, Peace out." Based on my training and experience, I know that: "no cross-board reposts" refers to a prohibition against material that is posted on other websites from being "re-posted" to

---

3 As of February 18, 2015, the URL of the TARGET WEBSITE had changed from muff7i44irws3mwu.onion to upf45jv3bziuctml.onion. I am aware from my training and experience that it is possible for a website to be moved from one URL to another without altering its content or functionality. I am also aware from the instant investigation that the administrator of the TARGET WEBSITE occasionally changes the location and URL of the TARGET WEBSITE in an effort to , in part, avoid law enforcement detection. On February 18, 2015, I accessed the TARGET

13

the TARGET WEBSITE; and ".7z" refers to a preferred method of compressing large files or sets of files for distribution. Two data-entry fields with a corresponding "Login" button were located to the right of the site name. Located below the aforementioned items was the message, "Warning! Only registered members are allowed to access the section. Please login below or 'register an account' (a hyperlink to the registration page) with [TARGET WEBSITE name]." Below this message was the "Login" section, consisting of four data-entry fields with the corresponding text, "Username, Password, Minutes to stay logged in, and Always stay logged in."

      13.    Upon accessing the "register an account" hyperlink, the following message was displayed:

"VERY IMPORTANT. READ ALL OF THIS PLEASE.

I will add to this as needed.

The software we use for this forum requires that new users enter an email address, and checks that what you enter looks approximately valid. We can't turn this off but the forum operators do NOT want you to enter a real address, just something that matches the xxx@yyy.zzz pattern. No confirmation email will be sent. This board has been intentionally configured so that it WILL NOT SEND EMAIL, EVER. Do not forget your password, you won't be able to recover it.

After you register and login to this forum you will be able to fill out a detailed profile. For your security you should not post information here that can be used to identify you.

Spam, flooding, advertisements, chain letters, pyramid schemes, and solicitations are forbidden on this forum.

Note that it is impossible for the staff or the owners of this forum to confirm the true identity of users or monitor in realtime all messages posted, and as such we are not responsible for the content posted by those users. You remain solely responsible for the content of your posted messages.

---

WEBSITE in an undercover capacity at its new URL, and determined that its content has not changed.

02-000154

The forum software places a cookie, a text file containing bits of information (such as your username and password), in your browser's cache. This is ONLY used to keep you logged in/out. This website is not able to see your IP and can not collect or send any other form of information to your computer except what you expressly upload. For your own security when browsing or Tor we also recommend that you turn off javascript and disable sending of the 'referer' header."

14.     After accepting the above terms, registration to the message board then requires a user to enter a username, password, and e-mail account; although a valid e-mail account was not required as described above.  After successfully registering and logging into the site, the following sections, forums, and sub-forums, along with the corresponding number of topics and posts in each, were observed:

| Section – Forum | Topics | Posts | |
|---|---|---|---|
| General Category | | | |
|     [the TARGET WEBSITE] information and rules | | 25 | 236 |
|     How to | 133 | 863 | |
|     Security & Technology discussion | 281 | 2,035 | |
|     Request | 650 | 2,487 | |
|     General Discussion | 1,390 | 13,918 | |
|     The INDEXES | 10 | 119 | |
|     Trash Pen | 87 | 1,273 | |
| [the TARGET WEBSITE] Chan | | | |
|     Jailbait[4] – Boy | 58 | 154 | |
|     Jailbait – Girl | 271 | 2,334 | |
|     Preteen – Boy | 32 | 257 | |
|     Preteen – Girl | 264 | 3,763 | |
| Jailbait Videos | | | |
|     Girls | 643 | 8,282 | |
|     Boys | 34 | 183 | |
| Jailbait Photos | | | |
|     Girls | 339 | 2,590 | |
|     Boys | 6 | 39 | |

---

[4] Based on my training and experience, I know that "jailbait" refers to underage but post-pubescent minors.

| | | |
|---|---|---|
| Pre-teen Videos | | |
| Girls HC[5] | 1,427 | 20,992 |
| Girls SC/NN | 514 | 5,635 |
| Boys HC | 87 | 1,256 |
| Boys SC/NN | 48 | 193 |
| | | |
| Pre-teen Photos | | |
| Girls HC | 433 | 5,314 |
| Girls SC/NN | 486 | 4,902 |
| Boys HC | 38 | 330 |
| Boys SC/NN | 31 | 135 |
| | | |
| Webcams | | |
| Girls | 133 | 2,423 |
| Boys | 5 | 12 |
| | | |
| Potpourri | | |
| Family [TARGET WEBSITE] – Incest | 76 | 1,718 |
| Toddlers | 106 | 1,336 |
| Artwork | 58 | 314 |
| | | |
| Kinky Fetish | | |
| Bondage | 16 | 222 |
| Chubby | 27 | 309 |
| Feet | 30 | 218 |
| Panties, nylons, spandex | 30 | 369 |
| Peeing | 101 | 865 |
| Scat | 17 | 232 |
| Spanking | 28 | 251 |
| Vintage | 84 | 878 |
| Voyeur | 37 | 454 |
| Zoo | 25 | 222 |
| | | |
| Other Languages | | |
| Italiano | 34 | 1,277 |
| Portugues | 69 | 905 |
| Deutsch | 66 | 570 |
| Espanol | 168 | 1,614 |
| Nederlands | 18 | 264 |
| Pyccknn – Russian | 8 | 239 |

---

[5] Based on my training and experience, I know that the following abbreviations respectively mean: HC – hardcore, i.e., depictions of penetrative sexually explicit conduct; SC – softcore, i.e., depictions of non-penetrative sexually explicit conduct; NN – non-nude, i.e., depictions of subjects who are fully or partially clothed.

16

| Stories | | |
|---|---|---|
| Fiction | 99 | 505 |
| Non-fiction | 122 | 675 |

15.    An additional section and forum was also listed in which members could exchange usernames on a Tor-network-based instant messaging service that I know, based upon my training and experience, to be commonly used by subjects engaged in the online sexual exploitation of children.

16.    A review of the various topics within the above forums revealed each topic contained a title, the author, the number of replies, the number of views, and the last post. The last post section included the date and time of the post as well as the author. Upon accessing a topic, the original post appeared at the top of the page, with any corresponding replies to the original post included the post thread below it. Typical posts appeared to contain text, images, thumbnail-sized previews of images, compressed files (such as Roshal Archive files, commonly referred to as ".rar" files, which are used to store and distribute multiple files within a single file), links to external sites, or replies to previous posts.

17.    A review of the various topics within the "[the TARGET WEBSITE] information and rules," "How to," "General Discussion," and "Security & Technology discussion" forums revealed the majority contained general information in regards to the site, instructions and rules for how to post, and welcome messages between users.

18.    A review of topics within the remaining forums revealed the majority contained discussions, as well as numerous images that appeared to depict child pornography ("CP") and child erotica of prepubescent females, males, and toddlers. Examples of these are as follows:

On February 3, 2015, the user "Mr. Devi" posted a topic entitled "Buratino-06" in

17

02-000157

the forum "Pre-teen – Videos - Girls HC" that contained numerous images depicting CP of a prepubescent or early pubescent female. One of these images depicted the female being orally penetrated by the penis of a naked male.

On January 30, 2015, the user "MoDoM" posted a topic entitled "Sammy" in the forum "Pre-teen Photos – Girls HC" that contained hundreds of images depicting CP of a prepubescent female. One of these images depicted the female being orally penetrated by the penis of a male.

On September 16, 2014, the user "tutu01" posted a topic entitled "9yo Niece - Horse.mpg" in the "Pre-teen Videos - Girls HC" forum that contained four images depicting CP of a prepubescent female and a hyperlink to an external website that contained a video file depicting what appeared to be the same prepubescent female. Among other things, the video depicted the prepubescent female, who was naked from the waist down with her vagina and anus exposed, lying or sitting on top of a naked adult male, whose penis was penetrating her anus.

19.    A list of members, which was accessible after registering for an account, revealed that approximately 100 users made at least 100 posts to one or more of the forums. Approximately 31 of these users made at least 300 posts. Analysis of available historical data seized from the TARGET WEBSITE, as described below, revealed that over 1,500 unique users visited the website daily and over 11,000 unique users visited the website over the course of a week.

20.    A private message feature also appeared to be available on the site, after registering, that allowed users to send other users private messages, referred to as "personal messages or PMs," which are only accessible to the sender and recipient of the message. Review of the site demonstrated that the site administrator made a posting on January 28, 2015, in response to another user in which he stated, among other things, "Yes PMs should now be fixed. As far as a limit, I have not deleted one yet and I have a few hundred there now...."

21.    Further review revealed numerous additional posts referencing private messages

18

or PMs regarding topics related to child pornography, including one posted by a user stating, "Yes i can help if you are a teen boy and want to fuck your little sister. write me a private message."

    22.    Based on my training and experience and the review of the site by law enforcement agents, I believe that the private message function of the site is being used to communicate regarding the dissemination of child pornography and to share information among users that may assist in the identification of the users.

    23.    The TARGET WEBSITE also includes a feature referred to as "[the TARGET WEBSITE] Image Hosting". This feature of the TARGET WEBSITE allows users of the TARGET WEBSITE to upload links to images of child pornography that are accessible to all registered users of the TARGET WEBSITE. On February 12, 2015, an FBI Agent accessed a post on the TARGET WEBSITE titled "Giselita" which was created by the TARGET WEBSITE user "Dark Ghost". The post contained links to images stored on "[the TARGET WEBSITE] Image Hosting". The images depicted a prepubescent female in various states of undress. Some images were focused on the nude genitals of a prepubescent female. Some images depicted an adult male's penis partially penetrating the vagina of a prepubescent female.

    24.    The TARGET WEBSITE also includes a feature referred to as "[the TARGET WEBSITE] File Hosting". This feature of the TARGET WEBSITE allows users of the TARGET WEBSITE to upload videos of child pornography that are in turn, only accessible to users of the TARGET WEBSITE. On February 12, 2015, an FBI Agent accessed a post on the TARGET WEBSITE titled "Vicky Coughing Cum" which was created by the TARGET WEBSITE user "clitflix". The post contained a link to a video file stored on "[the TARGET WEBSITE] File

<div align="center">19</div>

Hosting". The video depicted an adult male masturbating and ejaculating into the mouth of a nude, prepubescent female.

25.    The TARGET WEBSITE also includes a feature referred to as "[the TARGET WEBSITE] Chat". On February 6, 2015, an FBI Special Agent operating in the District of Maryland accessed "[the TARGET WEBSITE] Chat" which was hosted on the same URL as the TARGET WEBSITE. The hyperlink to access "[the TARGET WEBSITE] Chat" was located on the main index page of the TARGET WEBSITE. After logging in to [the TARGET WEBSITE] Chat, over 50 users were observed to be logged in to the service. While logged in to [the TARGET WEBSITE] Chat, the following observations were made:

> User "gabs" posted a link to an image that depicted four females performing oral sex on each other. At least two of the females depicted were prepubescent.
>
> User "Rusty" posted a link to an image that depicted a prepubescent female with an amber colored object inserted into her vagina.
>
> User "owlmagic" posted a link to an image that depicted two prepubescent females laying on a bed with their legs in the air exposing their nude genitals.
>
> Other images that appeared to depict child pornography were also observed.

26.    The images described above, as well as other images, were captured and are maintained as evidence.

## THE TARGET WEBSITE SUB-FORUMS

27.    While the entirety of the TARGET WEBSITE is dedicated to child pornography, the following sub-forums of the TARGET WEBSITE were reviewed and determined to contain the most egregious examples of child pornography and/or dedicated to retellings of real world

hands on sexual abuse of children.

- Pre-teen Videos - Girls HC
- Pre-teen Videos - Boys HC
- Pre-teen Photos - Girls HC
- Pre-teen Photos - Boys HC
- Potpourri - Toddlers
- Potpourri - Family Play Pen - Incest
- Spanking
- Kinky Fetish - Bondage
- Peeing
- Scat[6]
- Stories - Non-Fiction
- Zoo
- Webcams - Girls
- Webcams - Boys

## Identification and Seizure of the Computer Server Hosting the TARGET WEBSITE

28.    In December of 2014, a foreign law enforcement agency advised the FBI that it suspected IP address 192.198.81.106, which is a United States-based IP address, to be associated with the TARGET WEBSITE. A publicly available website provided information that the IP Address 192.198.81.106 was owned by Centrilogic, a server hosting company headquartered at 801 Main Street NW, Lenoir, NC 28645-3907.  Through further investigation, FBI verified that the TARGET

21

WEBSITE was hosted from the previously referenced IP address. A Search Warrant was obtained and executed at Centrilogic in January 2015 and a copy of the server (hereinafter the "TARGET SERVER") that was assigned IP Address 192.198.81.106 was seized. FBI Agents reviewed the contents of the Target Server and observed that it contained a copy of the TARGET WEBSITE. A copy of the TARGET SERVER containing the contents of the TARGET WEBSITE is currently located on a computer server at a government facility in Newington, VA, in the Eastern District of Virginia. Further investigation has identified a resident of Naples, FL, as the suspected administrator of the TARGET WEBSITE, who has administrative control over the computer server in Lenoir, NC, that hosts the TARGET WEBSITE.

29.     While possession of the server data will provide important evidence concerning the criminal activity that has occurred on the server and the TARGET WEBSITE, the identities of the administrators and users of the TARGET WEBSITE would remain unknown without use of additional investigative techniques. Sometimes, non-Tor-based websites have IP address logs that can be used to locate and identify the board's users. In such cases, a publicly available lookup would be performed to determine what ISP owned the target IP address, and a subpoena would be sent to that ISP to determine the user to which the IP address was assigned at a given date and time. However, in the case of the TARGET WEBSITE, the logs of member activity will contain only the IP addresses of Tor "exit nodes" utilized by board users. Generally, those IP address logs cannot be used to locate and identify the administrators and users of the TARGET WEBSITE.[7]

30.     Accordingly, on February 19, 2015, FBI personnel executed a court-authorized

---

6 Based on my training and experience, "scat" refers to sexually explicit activity involving defecation and/or feces.
[7] Due to a misconfiguration of the TARGET WEBSITE that existed for an unknown period of time, the true IP Addresses of a small number of users of the TARGET WEBSITE (that amounted to less than 1% of registered users

22

search at the Naples, FL, residence of the suspected administrator of the TARGET WEBSITE. That individual was apprehended and the FBI has assumed administrative control of the TARGET WEBSITE. The TARGET WEBSITE will continue to operate from the government-controlled computer server in Newington, Virginia, on which a copy of TARGET WEBSITE currently resides. These actions will take place for a limited period of time, not to exceed 30 days, in order to locate and identify the administrators and users of TARGET WEBSITE through the deployment of the network investigative technique described below. Such a tactic is necessary in order to locate and apprehend the TARGET SUBJECTS who are engaging in the continuing sexual abuse and exploitation of children, and to locate and rescue children from the imminent harm of ongoing abuse and exploitation.

### THE NETWORK INVESTIGATIVE TECHNIQUE

31.     Based on my training and experience as a Special Agent, as well as the experience of other law enforcement officers and computer forensic professionals involved in this investigation, and based upon all of the facts set forth herein, to my knowledge a network investigative technique ("NIT") such as the one applied for herein consists of a presently available investigative technique with a reasonable likelihood of securing the evidence necessary to prove beyond a reasonable doubt the actual location and identity of those users and administrators of the TARGET WEBSITE described in Attachment A who are engaging in the federal offenses enumerated in paragraph 4. Due to the unique nature of the Tor network and the method by which the network protects the anonymity of its users by routing communications through multiple other computers or "nodes," as described herein, other investigative procedures that are usually employed in criminal investigations of this

---

of the TARGET WEBSITE) were captured in the log files stored on the Centrilogic server.

23

type have been tried and have failed or reasonably appear to be unlikely to succeed if they are tried.

32.    Based on my training, experience, and the investigation described above, I have concluded that using a NIT may help FBI agents locate the administrators and users of the TARGET WEBSITE. Accordingly, I request authority to use the NIT, which will be deployed on the TARGET WEBSITE, while the TARGET WEBSITE operates in the Eastern District of Virginia, to investigate any user or administrator who logs into the TARGET WEBSITE by entering a username and password.[8]

33.    In the normal course of operation, websites send content to visitors. A user's computer downloads that content and uses it to display web pages on the user's computer. Under the NIT authorized by this warrant, the TARGET WEBSITE, which will be located in Newington, Virginia, in the Eastern District of Virginia, would augment that content with additional computer instructions. When a user's computer successfully downloads those instructions from the TARGET WEBSITE, located in the Eastern District of Virginia, the instructions, which comprise the NIT, are designed to cause the user's "activating" computer to transmit certain information to a computer controlled by or known to the government. That information is described with particularity on the warrant (in Attachment B of this affidavit), and the warrant authorizes obtaining no other information. The NIT will not deny the user of the "activating" computer access to any data or functionality of the user's computer.

34.    The NIT will reveal to the government environmental variables and certain registry-

---

[8] Although this application and affidavit requests authority to deploy the NIT to investigate any user who logs in to the TARGET WEBSITE with a username and password, in order to ensure technical feasibility and avoid detection of the technique by suspects under investigation, in executing the requested warrant, the FBI may deploy the NIT more discretely against particular users, such as those who have attained a higher status on Website 1 by engaging in substantial posting activity, or in particular areas of TARGET WEBSITE, such as the TARGET WEBSITE sub-

24

type information that may assist in identifying the user's computer, its location, and the user of the computer, as to which there is probable cause to believe is evidence of violations of the statutes cited in paragraph 4. In particular, the NIT will only reveal to the government the following items, which are also described in Attachment B:

    a.    The "activating" computer's actual IP address, and the date and time that the NIT determines what that IP address is;

    b.    A unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish the data from that of other "activating" computers. That unique identifier will be sent with and collected by the NIT;

    c.    The type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x 86);

    d.    Information about whether the NIT has already been delivered to the "activating" computer;

    e.    The "activating" computer's "Host Name." A Host Name is a name assigned to a device connected to a computer network that is used to identify the device in various forms of electronic communication, such as communications over the Internet;

    f.    the "activating" computer's active operating system username; and

    g.    The "activating" computer's Media Access Control ("MAC") address. The equipment that connects a computer to a network is commonly referred to as a network adapter. Most network adapters have a MAC address assigned by the

---

forums described in Paragraph 27.

02-000165

manufacturer of the adapter that is designed to be a unique identifying number. A unique MAC address allows for proper routing of communications on a network. Because the MAC address does not change and is intended to be unique, a MAC address can allow law enforcement to identify whether communications sent or received at different times are associated with the same adapter.

35.    Each of these categories of information described above, and in Attachment B, may constitute evidence of the crimes under investigation, including information that may help to identify the "activating" computer and its user. The actual IP address of a computer that accesses the TARGET WEBSITE can be associated with an ISP and a particular ISP customer. The unique identifier and information about whether the NIT has already been delivered to an "activating" computer will distinguish the data from that of other "activating" computers. The type of operating system running on the computer, the computer's Host Name, active operating system username, and the computer's MAC address can help to distinguish the user's computer from other computers located at a user's premises.

36.    During the up to thirty day period that the NIT is deployed on the TARGET WEBSITE, which will be located in the Eastern District of Virginia, each time that any user or administrator logs into the TARGET WEBSITE by entering a username and password, this application requests authority for the NIT authorized by this warrant to attempt to cause the user's computer to send the above-described information to a computer controlled by or known to the government that is located in the Eastern District of Virginia.

37.    In the normal course of the operation of a web site, a user sends "request data" to the web site in order to access that site. While the TARGET WEBSITE operates at a government

26

facility, such request data associated with a user's actions on the TARGET WEBSITE will be collected. That data collection is not a function of the NIT. Such request data can be paired with data collected by the NIT, however, in order to attempt to identify a particular user and to determine that particular user's actions on the TARGET WEBSITE.

### REQUEST FOR DELAYED NOTICE

38.     Rule 41(f)(3) allows for the delay of any notice required by the rule if authorized by statute. 18 U.S.C. § 3103a(b)(1) and (3) allows for any notice to be delayed if "the Court finds reasonable grounds to believe that providing immediate notification of the execution of the warrant may have an adverse result (as defined in 18 U.S.C. § 2705) . . . ," or where the warrant "provides for the giving of such notice within a reasonable period not to exceed 30 days after the date of its execution, or on a later date certain if the facts of the case justify a longer period of delay." Because there are legitimate law enforcement interests that justify the unannounced use of a NIT, I ask this Court to authorize the proposed use of the NIT without the prior announcement of its use. Announcing the use of the NIT could cause the users or administrators of the TARGET WEBSITE to undertake other measures to conceal their identity, or abandon the use of the TARGET WEBSITE completely, thereby defeating the purpose of the search.

39.     The government submits that notice of the use of the NIT, as otherwise required by Federal Rule of Criminal Procedure 41(f), would risk destruction of, or tampering with, evidence, such as files stored on the computers of individuals accessing the TARGET WEBSITE. It would, therefore, seriously jeopardize the success of the investigation into this conspiracy and impede efforts to learn the identity of the individuals that participate in this conspiracy, and collect evidence

27

02-000167

of, and property used in committing, the crimes (an adverse result under 18 U.S.C. §3103a(b)(1) and 18 U.S.C. § 2705).

40.    · Furthermore, the investigation has not yet identified an appropriate person to whom such notice can be given. Thus, the government requests authorization, under 18 U.S.C. §3103a, to delay any notice otherwise required by Federal Rule of Criminal Procedure 41(f), until 30 days after any individual accessing the TARGET WEBSITE has been identified to a sufficient degree as to provide notice, unless the Court finds good cause for further delayed disclosure.

41.    The government further submits that, to the extent that use of the NIT can be characterized as a seizure of an electronic communication or electronic information under 18 U.S.C. § 3103a(b)(2), such a seizure is reasonably necessary, because without this seizure, there would be no other way, to my knowledge, to view the information and to use it to further the investigation. Furthermore, the NIT does not deny the users or administrators access to the TARGET WEBSITE or the possession or use of the information delivered to the computer controlled by or known to the government, nor does the NIT permanently alter any software or programs on the user's computer.

## TIMING OF SEIZURE/REVIEW OF INFORMATION

42.    Rule 41(e)(2) requires that the warrant command FBI "to execute the warrant within a specified period of time no longer than fourteen days" and to "execute the warrant during the daytime, unless the judge for good cause expressly authorizes execution at another time." After the server hosting the TARGET WEBSITE is seized, it will remain in law enforcement custody. Accordingly, the government requests authority to employ the NIT onto the TARGET WEBSITE at any time of day, within fourteen days of the Court's authorization. The NIT will be used on the TARGET WEBSITE for not more than 30-days from the date of the issuance of the warrant.

28

43.    For the reasons above and further, because users of the TARGET WEBSITE communicate on the board at various hours of the day, including outside the time period between 6:00 a.m. and 10:00 p.m., and because the timing of the user's communication on the board is solely determined by when the user chooses to access the board, rather than by law enforcement, I request authority for the NIT to be employed at any time a user's computer accesses the TARGET WEBSITE, even if that occurs outside the hours of 6:00 a.m. and 10:00 p.m.  Further, I seek permission to review information transmitted to a computer controlled by or known to the government, as a result of the NIT, at whatever time of day or night the information is received.

44.    The government does not currently know the exact configuration of the computers that may be used to access the TARGET WEBSITE.  Variations in configuration, e.g., different operating systems, may require the government to send more than one communication in order to get the NIT to activate properly.  Accordingly, I request that this Court authorize the government to continue to send communications to the activating computers for up to 30 days after this warrant is authorized.

45.    The Government may, if necessary, seek further authorization from the Court to employ the NIT on the TARGET WEBSITE beyond the 30-day period authorized by this warrant.

## SEARCH AUTHORIZATION REQUESTS

46.    Accordingly, it is respectfully requested that this Court issue a search warrant authorizing the following:

    a.    the NIT may cause an activating computer – wherever located – to send to a
          computer controlled by or known to the government, network level messages
          containing information that may assist in identifying the computer, its location,

29

other information about the computer and the user of the computer, as described above and in Attachment B;

b.    the use of multiple communications, without prior announcement, within 30 days from the date this Court issues the requested warrant;

c.    that the government may receive and read, at any time of day or night, within 30 days from the date the Court authorizes of use of the NIT, the information that the NIT causes to be sent to the computer controlled by or known to the government;

d.    that, pursuant to 18 U.S.C. § 3103a(b)(3), to satisfy the notification requirement of Rule 41(f)(3) of the Federal Rules of Criminal Procedure, the government may delay providing a copy of the search warrant and the receipt for any property taken for thirty (30) days after a user of an "activating" computer that accessed the TARGET WEBSITE has been identified to a sufficient degree as to provide notice, unless notification is further delayed by court order.

## REQUEST FOR SEALING OF APPLICATION/AFFIDAVIT

47.    I further request that this application and the related documents be filed under seal. This information to be obtained is relevant to an ongoing investigation. Premature disclosures of this application and related materials may jeopardize the success of the above-described investigation. Further, this affidavit describes a law enforcement technique in sufficient detail that disclosure of this technique could assist others in thwarting its use in the future. Accordingly, I request that the affidavit remain under seal until further order of the Court.[9]

---

[9] The United States considers this technique to be covered by law enforcement privilege. Should the Court wish to

30

## CONCLUSION

48.     Based on the information identified above, information provided to me, and my experience and training, I have probable cause to believe there exists evidence, fruits, and instrumentalities of criminal activity related to the sexual exploitation of children on computers that access the TARGET WEBSITE, in violation of 18 U.S.C. §§ 2251 and 2252A.

49.     Based on the information described above, there is probable cause to believe that the information described in Attachment B constitutes evidence and instrumentalities of these crimes.

50.     Based on the information described above, there is probable cause to believe that employing a NIT on the TARGET WEBSITE, to collect information described in Attachment B, will result in the FBI obtaining the evidence and instrumentalities of the child exploitation crimes described above.

Sworn to under the pains and penalties of perjury.

_Douglas Macfarlane_
Douglas Macfarlane
Special Agent

Sworn to and subscribed before me
this 20 day of February          /s/
            Theresa Carroll Buchanan
            United States Magistrate Judge
Honorable Theresa Carroll Buchanan
UNITED STATES MAGISTRATE JUDGE

---

issue any written opinion regarding any aspect of this request, the United States requests notice and an opportunity to be heard with respect to the issue of law enforcement privilege.

Sealed Supp App Vol 1 pg 85
02-000171

### ATTACHMENT A

#### Place to be Searched

This warrant authorizes the use of a network investigative technique ("NIT") to be deployed on the computer server described below, obtaining information described in Attachment B from the activating computers described below.

The computer server is the server operating the Tor network child pornography website referred to herein as the TARGET WEBSITE, as identified by its URL -upf45jv3bziuctml.onion - which will be located at a government facility in the Eastern District of Virginia.

The activating computers are those of any user or administrator who logs into the TARGET WEBSITE by entering a username and password. The government will not employ this network investigative technique after 30 days after this warrant is authorized, without further authorization.

Sealed Supp App Vol 1 pg 86

92-000172

**ATTACHMENT B**

**Information to be Seized**

From any "activating" computer described in Attachment A:

1.      the "activating" computer's actual IP address, and the date and time that the NIT determines what that IP address is;

2.      a unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish data from that of other "activating" computers, that will be sent with and collected by the NIT;

3.      the type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x 86);

4.      information about whether the NIT has already been delivered to the "activating" computer;

5.      the "activating" computer's Host Name;

6.      the "activating" computer's active operating system username; and

7.      the "activating" computer's media access control ("MAC") address;

that is evidence of violations of 18 U.S.C. § 2252A(g), Engaging in a Child Exploitation Enterprise; 18 U.S.C. §§ 2251(d)(1) and or (e), Advertising and Conspiracy to Advertise Child Pornography; 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1), Receipt and Distribution of, and Conspiracy to Receive and Distribute Child Pornography; and/or 18 U.S.C. § 2252A(a)(5)(B) and (b)(2), Knowing Access or Attempted Access With Intent to View Child Pornography.

02-000173

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* OF COMPUTERS THAT ACCESS upf45jv3bziuctml.onion | ) ) ) ) ) | Case No. 1:15-SW-89 **UNDER SEAL** |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ Virginia _____
*(identify the person or describe the property to be searched and give its location):*
See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*
See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____ March 6, 2015 _____
*(not to exceed 14 days)*
~~in the daytime 6:00 a.m. to 10 p.m.~~ ~~at any time in the day or night as I find reasonable cause has been established.~~

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
_____ Honorable Theresa Carroll Buchanan _____ .
*(name)*

☑ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☑ for ___30___ days *(not to exceed 30).*
☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  2/20/2015  11:45

/s/
Theresa Carroll Buchanan
~~United States Magistrate Judge~~
*Judge's signature*

City and state:  Alexandria, Virginia

Honorable Theresa Carroll Buchanan, U.S. Magistrate Judge
*Printed name and title*

02-000138

## ATTACHMENT A

### Place to be Searched

This warrant authorizes the use of a network investigative technique ("NIT") to be deployed on the computer server described below, obtaining information described in Attachment B from the activating computers described below.

The computer server is the server operating the Tor network child pornography website referred to herein as the TARGET WEBSITE, as identified by its URL -upf45jv3bziuctml.onion - which will be located at a government facility in the Eastern District of Virginia.

The activating computers are those of any user or administrator who logs into the TARGET WEBSITE by entering a username and password. The government will not employ this network investigative technique after 30 days after this warrant is authorized, without further authorization.

## ATTACHMENT B

### Information to be Seized

From any "activating" computer described in Attachment A:

1.  the "activating" computer's actual IP address, and the date and time that the NIT determines what that IP address is;

2.  a unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish data from that of other "activating" computers, that will be sent with and collected by the NIT;

3.  the type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x 86);

4.  information about whether the NIT has already been delivered to the "activating" computer;

5.  the "activating" computer's Host Name;

6.  the "activating" computer's active operating system username; and

7.  the "activating" computer's media access control ("MAC") address;

that is evidence of violations of 18 U.S.C. § 2252A(g), Engaging in a Child Exploitation Enterprise; 18 U.S.C. §§ 2251(d)(1) and or (e), Advertising and Conspiracy to Advertise Child Pornography; 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1), Receipt and Distribution of, and Conspiracy to Receive and Distribute Child Pornography; and/or 18 U.S.C. § 2252A(a)(5)(B) and (b)(2), Knowing Access or Attempted Access With Intent to View Child Pornography.

2



Judge Robert J. Bryan

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR15-5351RJB |
| Plaintiff, | |
| v. | UNITED STATES' RESPONSE TO ORDER COMPELLING DISCOVERY |
| JAY MICHAUD, | |
| Defendant. | |

The United States of America, by and through Annette L. Hayes, United States Attorney for the Western District of Washington, Matthew P. Hampton, Assistant United States Attorney for said District, and Keith A. Becker, Trial Attorney, hereby files this response to the Court's December 15, 2015, order compelling discovery (Dkt. 81):

**A.    Number of pictures, videos, and links**

The Court first ordered the government to provide the defense with the number of child pornography pictures, videos, and links to pictures and videos that were posted on Website A between February 20 and March 4, 2015, "[p]rovided however, if the plaintiff cannot produce the exact picture, video and link totals listed above with reasonable effort, the plaintiff should provide a good faith estimate of the totals." Dkt. 81, pp. 1-3.

Website A was an online bulletin board through which users provided the content of the site by posting messages and/or replies to messages within categories set up by the site

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 1

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Sealed Supp App Vol 1 pg 91

Appellate Case: 18-3068     Document: 010110243390     Date Filed: 02/01/18     Page: 2 of 10     Sealed
Case 5:17-cr-40097-DDC   Document 25-4 *SEALED*   Filed 02/01/18   Page 2 of 10
Case 3:15-cr-05351-RJB   Document 109   Filed 01/08/16   Page 2 of 10

1  administration.  In accordance with the site rules and guidelines, users generally posted textual

2  messages in which "preview" images (generally consisting of still frames taken from a video or a

3  selection of images) were embedded, and that included a link to a URL, the address of a website

4  or server at which the videos or images could be downloaded, along with any password

5  necessary to download and decrypt the videos or images.

6      During the course of the investigation of Website A, before and after its seizure, the FBI

7  expended significant efforts to document and capture as many of the images/videos posted in this

8  fashion by site users as practicable.  Given the significant number of users and activity on the

9  website, it was not possible to capture all of that content.  To access the images and videos, the

10  agents had to access the website or link contained in the message, download the files or a file

11  "archive" – that is, a compressed file containing numerous other files – and then enter a

12  password in order to access the files.  This process could not be automated, meaning that it was

13  necessary for an agent physically to take these steps rather than simply direct a computer to do

14  the work.  Moreover, images and videos that were made available by Website A users were

15  generally only available for a limited time.  Thus, if the agents were not able to complete

16  accessing all of the website's advertised materials at or near the time of posting, those materials

17  might no longer be available. With that understanding, we provide the following good faith

18  estimates based upon FBI agents' downloads of files made available by the users of Website A

19  through their posts and through the seizure of data from the Website A image and file hosts.

20      Through the efforts described above, the FBI recovered approximately 48,000 images

21  and 200 videos that were made available by the site's at least 184,000 users between the

22  inception of Website A in August 2014 and its seizure on February 20, 2015.  In addition, the

23  FBI was able to recover approximately 9,000 images and 200 videos that were made available by

24  Website A users while it operated under FBI administrative control between February 20 and

25  March 4, 2015.  The vast majority of those images/videos appeared to depict child pornography

26  or child erotica.  In some instances, particularly with respect to sets of images pertaining to a

27  particular child, children were depicted in various states of undress progressing to nudity and/or

28  sexually explicit activity.  This is common among child pornography images.

    Website A users posted approximately 110,000 links on the website between August

    2014 and February 20, 2015.  During the period from February 20 through March 4, 2015,

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 2

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Website A users posted approximately 13,000 links on the website.  As noted above, links posted

2  by Website A users typically pointed either to encrypted archives containing multiple image or

3  video files of child pornography, or to particular image files depicting child pornography.

4  Although FBI cannot specify exactly how many images and videos were contained within each

5  of those encrypted archives, as noted above, FBI was able to recover approximately 9,000

6  images and 200 videos that were made available by Website A users while it operated under FBI

7  administrative control between February 20 and March 4, 2015.

    **B.**    **Views and downloads from February 20 through March 4, 2015**

8

9        The Court next ordered the government to provide the defense with the number of child

10  pornography pictures and videos that were viewed and downloaded from Website A between

11  February 20 and March 4, 2015, or a good faith estimate of these totals.  Because of the manner

12  in which Website A works, it is not possible to give an exact total of child pornography images

13  or videos viewed or downloaded by site users during that time period.  As noted above, Website

14  A was a bulletin board on which users posted messages with embedded links and preview

15  images.  Another user may choose simply to view the preview image that is embedded on a web

16  page without clicking that image or taking an action that would be recorded by Website A.

17  Moreover, there are numerous ways for a user to save or download images contained on a

18  website such as Website A that would not be recorded by the website.  For example, a user might

19  "right click" and save an image to the user's computer.  The user could also take a "screen shot"

20  of the computer screen, or go directly to the external website where linked images or videos were

21  contained by typing the URL for the site after leaving Website A, and then entering the

22  appropriate password, and downloading the images/videos.  With that understanding, we provide

23  the following good faith estimates.

      Information about the number of links Website A users clicked on between August 2014

24  and February 20, 2015, before the FBI was in administrative control of the website, is not

25  available.  Between February 20 and March 4, 2015, Website A users clicked on approximately

26  67,000 unique links on the website.  As explained above, links on Website A typically pointed

27  either to encrypted archives containing multiple image or video files of child pornography, or to

28  particular image files depicting child pornography.  Of those 67,000 links, 25,000 were links to

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 3

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Appellate Case: 15-3008    Document: 01019218367    Date Filed: 02/01/18    Page: 4    Sealed
Case 5:17-cr-40097-DDC    Document 25-4 *SEALED*    Filed 02/01/18    Page 4 of 10
Case 3:15-cr-05351-RJB    Document 109    Filed 01/08/16    Page 4 of 10

1   image files, the majority of which appeared to depict child pornography. The remaining links
2   were to websites, which typically contained the sort of encrypted archives described above.

3   **C.    Statistics concerning Website A usage between February 20 and March
4   4, 2015**

5        The Court next ordered the government to provide the defense with the number of
6   visitors to the site between February 20 and March 4, 2015, the number of total visits, and some
7   measure of the length of visits. Between February 20 and March 4, 2015, approximately
8   100,000 unique user accounts logged in to Website A, and there were approximately one million
9   total logins. An individual could have more than one user account on the site, so it is not clear
10  how many individuals this actually represents. Website A tracked total time spent on the site by
11  each user during the course of the user's membership. From the inception of the website in
12  August of 2014 until March 4, 2015, site data indicate that its more than 200,000 users
13  aggregately spent approximately seven million hours logged into the site. Based on available
14  data and with reasonable effort, the government cannot provide an estimate of the total or
15  average length of site visits between February 20 and March 4, 2015. Providing such figures
16  would require a manual review of every single session by every single site user in order to total
17  the amount of time spent during each session, and then average that amount of time. That
18  manual analysis has been done for Mr. Michaud (via data that have been provided to the defense
19  in discovery pertaining to his use of Website A) and shows that during his fourteen total sessions
20  on Website A between February 21, 2015, and March 2, 2015, Michaud spent approximately
21  sixteen-and-a-half hours on Website A for an average of 1.18 hours per visit. As previously
22  disclosed, Michaud spent a total of approximately ninety-nine hours logged into the site between
23  October 31, 2014, and March 2, 2015.

24  **D.    Mitigation efforts**

25       The Court next ordered the government to provide the defense with a summary of any
26  measures that were taken by the FBI or other law enforcement entities to block access to the
27  pictures, videos and links available on or through the Website A between February 20 and March
28  4, 2015.

        During the brief period when the FBI assumed administrative control of Website A, the
    FBI did not post any images, videos, or links to images or videos of child pornography. Images,

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 4

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Sealed Supp App Vol 1 pg 94

1   videos and links posted by site users both before the FBI assumed administrative control and

2   afterwards, generally remained available to site users.

3        While Website A operated under FBI administrative control, FBI Special Agents

4   monitored all site postings, chat messages, and private messages twenty-four hours per day in

5   order to comply with Title III monitoring requirements and in order to assess and mitigate any

6   risk of imminent harm to children.  In the event that FBI Special Agents perceived a risk of

7   imminent harm to a child, agents took actions to mitigate that risk and immediately forwarded

8   available identifying information, including NIT results, to the appropriate FBI office.  Specific

9   actions taken in any particular instance were tailored to the specific threat of harm.  The

10   particular actions taken by law enforcement agents in response to particular circumstances are

11   protected by a qualified law enforcement privilege, which the United States hereby asserts.  In

12   particular, disclosure of this information at this point in time would alert subjects of ongoing

13   investigations to the particular investigative techniques used by law enforcement in response to

14   such circumstances, creating a risk that criminal suspects will recognize and circumvent such

15   techniques in the future and leading to increased danger of harm to the public, including

16   children.  The risk of circumvention of an investigative technique if information is released has

17   been recognized as a factor in applying law enforcement privilege to electronic surveillance.  *See*

18   *United States v. Van Horn*, <u>789 F.2d 1492, 1508</u> (11th Cir. 1986).  In any event, no such actions

    pertained to any postings or messages involving the defendant's known username, Pewter.

19   **E.**    **Reason for shutting down Website A**

20        The Court also required the government to produce the reasons the site was shut down on

21   March 4 (rather than earlier or later).  As the government explained to the two separate judges

22   who authorized the NIT and the Title III authorization to monitor site users' communications, the

23   fourteen-day period during which the FBI allowed the operation of Website A to continue was

24   necessary in order to deploy the court-authorized NIT to identify users of this site who, like Mr.

25   Michaud, used Tor to conceal their identity, location, and illegal conduct.  Without using the

26   NIT, the identities of the users of Website A would remain unknown because, unlike a non-Tor

27   website, any IP address logs of user activity on Website A would disclose only Tor "exit nodes,"

28   which could not be used to locate and identify the actual administrators or users of the site.

    Further, because of the unique nature of the Tor network and the method by which the network

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 5

Appellate Case: 18-3068   Document: 010110024530 *SEALED* Filed: 02/01/18   Page: 6 of 10   Sealed
Case 5:17-cr-40097-DDC   Document 25-4 *SEALED* Filed 02/01/18   Page 6 of 10
Case 3:15-cr-05351-RJB   Document 109   Filed 01/08/16   Page 6 of 10

1   routes communications through multiple other computers, investigative procedures that are

2   usually employed in criminal investigations of this type were tried and failed or reasonably

3   appeared to be unlikely to succeed.

4          The government demonstrated the necessity of the investigative strategy and technique

5   used in this investigation in the affidavit submitted in conjunction with its Title III authorization.

6   As the government indicated in that affidavit, agents considered seizing Website A and removing

7   it from existence immediately and permanently.  In the judgment of law enforcement agents,

8   while doing so would have ended the trafficking of child pornography taking place via Website

9   A, it would have also prevented law enforcement from attempting to locate and identify its users,

10  who were the ones who possessed, and were distributing and receiving, those illicit materials.  It

11  also would have frustrated agents' attempts to obtain information that could help identify and

12  rescue child victims from ongoing abuse.  Accordingly, it was the judgment of law enforcement

13  that the seizure and continued operation of Website A, for a limited period of time, paired with

14  the court-authorized deployment of a NIT and monitoring of user communications, was

15  necessary and appropriate in order to identify Website A users. The judges who signed the NIT

16  warrant and Title III authorization obviously agreed.

17         To be sure, shutting down a facility such as Website A would have prevented its

18  unidentified users from continuing to post and disseminate child pornography through that

19  website, but it would not prevent those users from continuing to unlawfully possess and

20  disseminate child pornography by other means.  Website A users engaged in that sort of activity

21  before the FBI seized and shut down Website A, and those users who were not identified and

22  apprehended undoubtedly continued to engage in that activity after Website A was shut down,

23  often through other online facilities.  For instance, before the February 20, 2015, seizure of

24  Website A, it contained at least 184,000 active user accounts, 103,000 posts, and facilitated

25  access to thousands of images and videos of child pornography.  There are currently child

26  pornography bulletin boards operating on the Tor network that are similar in structure and

27  function to Website A, that contain hundreds of thousands of user accounts, tens of thousands of

28  postings, and which facilitate access to thousands of images and videos of child pornography.

    Law enforcement agents can view and document those websites, their contents, and the child

    pornography images and videos trafficked through them – but because they operate as Tor

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 6

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   hidden services, the location of the computer servers hosting the websites, and the location and

2   identity of their users who are perpetrating crimes against children, and their child victims, are

3   currently unknown.

4          Stopping the unlawful possession and dissemination of child pornography materials by

5   particular individuals, and rescuing children from the ongoing abuse and exploitation of

6   individual perpetrators, therefore requires more than just shutting down one facility through

7   which such materials are disseminated.  Law enforcement must identify and apprehend the

8   perpetrators.  Here, the FBI briefly assumed administrative control over an existing facility

9   through which users were already posting and accessing child pornography, for a limited period

10  of time, in order to deploy a court-authorized investigative technique and engage in court-

11  authorized monitoring of user communications, which were necessitated by the particular

12  anonymizing technology deployed by the users of the site, in an effort to identify those

13  perpetrators.  This difficult decision, which was disclosed both to the magistrate who approved

14  the NIT and the district judge who approved the Title III monitoring, was amply justified by the

15  particular facts of the investigation.

16         During the government's operation of Website A, regular meetings were held to discuss

17  the status of the investigation and identification of site users and assess whether the site should

18  continue to operate, based upon a balancing of various factors, to include site users' continued

19  access to child pornography, the risk of imminent harm to a child, the need to identify and

20  apprehend perpetrators of those harms to children, and other factors such as those described

21  above.  On March 4, 2015, it was determined that the balance of those factors weighed in favor

22  of shutting down the website.

23  **F.      Statistics concerning charges**

24         Although it is not reflected in the Court's written order, during the December 11, 2015,

25  hearing the court also stated: "[i]f specifics are not available, I think also the number of charges

26  arising from this investigation should be – the numbers, only numbers, I am saying – should be

27  provided to the defense."  Dec. 11, 2015, Tr. at 34.  The investigation into users of Website A

28  remains ongoing.  To date, at least 137 individuals in the United States are known to have been

    charged in connection with the underlying investigation of Website A.  That includes thirty-five

    individuals who have been determined to be "hands on" child sexual offenders, and seventeen

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 7

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  individuals who have been determined to be producers of child pornography.  More importantly,

2  twenty-six child victims have been identified or recovered from abuse.  Individual charging

3  decisions are made at the discretion of United States Attorneys' Offices and/or appropriate state

4  authorities and this does not represent a complete reporting of all individuals who could be

5  charged in connection with the investigation.

6  ### G.    Documents regarding FBI administrative control of Website A

7       Although the Court also ordered the government to provide: "All documents relating to

8  review and authorization of the FBI's administrative control of the site by the Department of

9  Justice or other governmental agencies that were involved in the 'Website A' investigation and

10  deployment of the NIT at issue in our case," the Court qualified its directive, stating: "Provided

11  further, that the government need not provide to defense counsel any documents under the above

12  requirement that constitute reports, memoranda, or other internal government documents made

13  by an attorney for the government or other government agent in connection with investigating or

    prosecuting this case[.] FRCP 16(a)(2)."  Dkt. 81 at pp. 2-3.

14       Discovery materials already provided, including the NIT search warrant and the Title III

15  application paperwork, clearly indicate the scope and purpose of the operation to identify users

16  who were abusing and exploiting children online while masking their location via the Tor

17  network. The NIT search warrant affidavit, which clearly described the operation of the website

18  at a government facility for a limited time in order to identify users, was sworn to by an FBI

19  Special Agent and presented by an Assistant U.S. Attorney from the Eastern District of Virginia

20  and a Trial Attorney with the Department of Justice's Child Exploitation and Obscenity Section.

21  The Title III application and affidavit, which also clearly described the scope and purpose of the

22  operation, including the website's operation at a government facility for a limited period of time

23  in order to deploy a court-authorized NIT to identify users, was submitted by two Department of

24  Justice attorneys, based on an affidavit sworn to by an FBI Special Agent, and approved, as all

25  Title III applications are required to be, by a Deputy Assistant Attorney General of the

    Department of Justice's Criminal Division.

26       Although the United States is in possession of documents that would be responsive to the

27  first portion of the Court's order, the United States is not producing those documents at this time

28  pursuant to the second portion of the Court's order, Federal Rule of Criminal Procedure 16(a)(2),

---

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 8

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 | attorney-client, work product and deliberative process privileges. *See United States v.*

2 | *Fernandez*, 231 F.3d 1240, 1246-47 (9th Cir. 2000).

3 | DATED this 8th day of January, 2015.

4 | Respectfully submitted,

5 |

6 | ANNETTE L. HAYES                          STEVEN J. GROCKI
   | United States Attorney                    Chief

7 |

8 | */s/ Matthew P. Hampton*                   */s/ Keith A. Becker*

9 | Matthew P. Hampton                         Trial Attorney
   | Assistant United States Attorney          Child Exploitation and Obscenity

10 | 1201 Pacific Avenue, Suite 700            Section
    | Tacoma, Washington 98402                  1400 New York Ave., NW, Sixth Floor

11 | Telephone:   (253) 428-3800              Washington, DC 20530

12 | Fax:         (253) 428-3826              Phone: (202) 305-4104
    | E-mail:      matthew.hampton@usdoj.gov   Fax: (202) 514-1793

13 |                                           E-mail: keith.becker@usdoj.gov

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION          UNITED STATES ATTORNEY
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 9    1201 PACIFIC AVENUE, SUITE 700
                                                        TACOMA, WASHINGTON 98402
                                                        (253) 428-3800

Case 5:17-cr-40097-DDC   Document 25-4 *SEALED*   Filed 02/01/18   Page 10 of 10
Appellate Case: 18-3008   Document: 010110021850   Date Filed: 02/20/2019   Page: 10   Sealed
Case 3:15-cr-05351-RJB   Document 109   Filed 01/08/16   Page 10 of 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorney of record for the defendant.

*/s/ Matthew P. Hampton*
MATTHEW P. HAMPTON
Assistant United States Attorney

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 10

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Sealed Supp App Vol 1 pg 101

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS
2

3    UNITED STATES OF AMERICA,                    )
                                                  )
4              Plaintiff                          )
                                                  )
5         -VS-                                     )  Criminal No. 15-10347-PBS
                                                  )  Pages 1 - 78
6    VINCENT C. ANZALONE,                         )
                                                  )
7              Defendant                          )

8                     **MOTION HEARING**

9

10        BEFORE THE HONORABLE PATTI B. SARIS
          UNITED STATES CHIEF DISTRICT JUDGE
11

12

     A P P E A R A N C E S:
13

          DAVID C. TOBIN, ESQ., Assistant United States Attorney,
14   Office of the United States Attorney, 1 Courthouse Way,
     Room 9200, Boston, Massachusetts, 02210, for the Plaintiff.
15

          TIMOTHY G. WATKINS, ESQ., Federal Public Defender Office,
16   District of Massachusetts, 51 Sleeper Street, 5th Floor, 02210,
     for the Defendant.
17
                              United States District Court
18                            1 Courthouse Way, Courtroom 19
                              Boston, Massachusetts  02210
19                            October 14, 2016, 10:12 a.m.

20

21

22              LEE A. MARZILLI
             OFFICIAL COURT REPORTER
23          United States District Court
          1 Courthouse Way, Room 7200
24            Boston, MA  02210
                (617)345-6787
25

```
 1                        I N D E X

 2    WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

 3    DANIEL ALFIN
         By Mr. Tobin:         6
 4       By Mr. Watkins:              20
         By Mr. Tobin:                          66
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1          THE CLERK:  Court calls Criminal Action 15-10347,
2
3   United States v. Anzalone.  Could counsel please identify
4   themselves.
5          MR. TOBIN:  Good morning, your Honor.  David Tobin on
6   behalf of the United States.
7          THE COURT:  Thank you.
8          MR. WATKINS:  Good afternoon, your Honor.  Tim
9   Watkins, Federal Defender Office, on behalf of Vincent
10  Anzalone.
11         THE COURT:  Thank you.  Do we have a witness here?
12         MR. TOBIN:  We do, your Honor.
13         THE COURT:  Okay.  Let me just say my time
14  limitations, I have to be at a program at 12:30, so I am
15  hoping -- what is your sense as to how long you're going to
16  need?
17         MR. TOBIN:  I will not be particularly lengthy.  I
18  have no exhibits and one witness, and he's more of a summary
19  witness because he's already provided now two declaration.
20         THE COURT:  So say half an hour?
21         MR. TOBIN:  I'd say about a half an hour.
22         THE COURT:  And we'll take the declarations as
23  exhibits.
24         MR. TOBIN:  Of course.
25         THE COURT:  How long do you think you're going to be?

```
 1              MR. WATKINS:  I think we'll be done by noon.

 2              THE COURT:  All right, if we need another day for oral

 3    argument, but I just don't want to make him come back again.

 4              MR. TOBIN:  One preliminary matter, if I might, your

 5    Honor?

 6              THE COURT:  Yes.

 7              MR. TOBIN:  I just want to make sure that I'm on the

 8    same sheet of music as the Court and that we're all on the same

 9    sheet.  My understanding is, the purpose of this --

10              THE COURT:  Are you singing?

11              MR. TOBIN:  Well, you know, if I could carry a tune in

12    a bucket, I might, but I can't.  My understanding is, the sole

13    purpose of this hearing deals with the allegation of outrageous

14    government misconduct.

15              THE COURT:  Yes.

16              MR. TOBIN:  And specifically the representations made

17    by Special Agent Alfin in various instances that the number of

18    users on the Playpen website did not essentially increase

19    during the time the government operated it.

20              THE COURT:  I don't view it as that narrow.

21              MR. TOBIN:  You don't?

22              THE COURT:  About the case generally.  That for sure

23    is true.  It's about the allegation with respect -- I mean,

24    that's a focus, but he wrote certain things in his declaration

25    that I think are fair game to ask questions about.
```

```
 1           MR. TOBIN:  Okay, beyond the number of users?

 2           THE COURT:  Yes.

 3           MR. TOBIN:  Okay.

 4           THE COURT:  So, for example, one thing I'm interested

 5   in because I'm supposed to balance this -- I've now looked at

 6   the case law -- is he said that he saved 38 children or 36

 7   children.  It says 30 plus children were saved because of this

 8   operation.  That's a relevant statement that could be probed.

 9   There was another issue that had to do with, that I'm

10   interested in, that he closed down a certain function that

11   allowed you to post produced pornography.  So, I mean, there

12   were things that were said.

13           You have another question, I guess, about whether or

14   not there was a specific protocol that he was supposed to go

15   through under the regulations.  I mean, that's relevant, yes.

16   But it's not about -- it's not about the whole case.  It's not

17   about NIT technology.  It's not about the whole case.  It's

18   just about his motion and the balancing I'm supposed to do.

19           MR. TOBIN:  Of course.  Well, that's why I asked.  I

20   just wanted to know the parameters.  Now, more than I had

21   anticipated, so I hope that this witness can address everything

22   the Court is interested in.  If not, we can live another day.

23           THE COURT:  Yes.  Where is he from?

24           MR. TOBIN:  He's in Maryland.  I mean, he's here

25   today, but he works in Maryland.  We have planes.  He can
```

Appellate Case: 19-3068    Document: 010110255507    Date Filed: 02/01/18    Page: 6 of 79    Sealed
Case 5:17-cr-40097-DDC    Document 25-5 *SEALED*    Filed 02/01/18    Page 6 of 79

6

```
 1    always come back, or I can bring somebody else in if --
 2           THE COURT:  I know, take it from one who's on that
 3    corridor, it's not a big deal, okay?
 4           All right, so let's pull him up.  Come on up.  Thank
 5    you so much for coming.  You have a beautiful fall day up here.
 6           MR. TOBIN:  So for the record, the United States calls
 7    Special Agent Daniel Alfin.
 8                         DANIEL ALFIN
 9    having been first duly sworn, was examined and testified as
10    follows:
11    DIRECT EXAMINATION BY MR. TOBIN:
12    Q.   Good morning, sir.
13    A.   Good morning.
14    Q.   Would you kindly tell the Judge your full name and spell
15    your first and last name for our Court Reporter.
16    A.   My name is Daniel Alfin, D-a-n-i-e-l A-l-f-i-n.
17    Q.   Sir, how are you employed?
18    A.   I am a special agent with the FBI.
19    Q.   How long have you served in that capacity?
20    A.   I have been a special agent with the FBI since 2009.
21    Q.   And which unit are you currently assigned?
22    A.   I'm currently assigned to FBI headquarters Criminal
23    Investigative Division, Violent Crimes Against Children
24    Section, Major Case Coordination Unit.
25    Q.   And what are your primary duties and responsibilities in
```

```
 1    that position?
 2    A.   The Major Case Coordination Unit, I investigate
 3    individuals who use various types of technology to facilitate
 4    the production, distribution, and advertisement of child
 5    pornography.
 6    Q.   And what was your employment prior to becoming a special
 7    agent with the Federal Bureau of Investigation?
 8    A.   Prior to being employed by the FBI, I was employed by
 9    Raytheon Integrated Defense Systems as a field engineer at the
10    Naval Undersea Warfare Center in Keyport, Washington, where I
11    was responsible for managing computer networks and computer
12    servers utilized by the Navy and Marine Corps.
13    Q.   Sir, in your capacity as a special agent within the FBI,
14    in the unit that you've described, have you participated in the
15    investigation sometimes referred to as Playpen or Pacifier?
16    A.   I have.
17    Q.   And what has your role been in that investigation?
18    A.   I am the primary case agent for that investigation.
19    Q.   Have you testified in courts around the country in that
20    capacity?
21    A.   I have.
22    Q.   And have you provided various declarations and/or
23    affidavits in that capacity?
24    A.   I have.
25    Q.   And you recently provided the government with a
```

Appellate Case: 19-3068    Case 5:17-cr-40097-DDC   Document 25-5 *SEALED* Filed 02/01/18   Page 8 of 79    Sealed
Document: 010110122557   Date Filed: 08/20/18   Page: 8 of 79

8

```
 1    declaration for this case, United States v. Anzalone; isn't
 2    that accurate?
 3    A.    Yes, I did.
 4    Q.    And at some point you had provided a declaration and gave
 5    testimony in United States v. Michaud in the Western District
 6    of Washington?
 7    A.    Yes, that's correct.
 8    Q.    Are you aware that there has been some suggestion --
 9            THE COURT:  Excuse me.  Is that the only other time
10    you've testified about it in person?
11            THE WITNESS:  No, your Honor.  I have provided
12    testimony in the Western District of Washington, the Western
13    District of Arkansas, the Middle District of Florida, the
14    Eastern District of Virginia.
15    Q.    And that's all, just so it's clear, all in the Playpen or
16    Pacifier investigation and your role in it?
17    A.    Yes, that's correct, and I believe those are all of the
18    jurisdictions where I have testified thus far.
19            THE COURT:  Do you remember one more?
20            MR. WATKINS:  Western District of North Carolina?
21            THE WITNESS:  Western District of North Carolina was
22    for the trial of the individual who created the Playpen
23    website, so I consider that to be a somewhat different manner
24    because he was identified in a different manner than the other
25    defendants in the investigation, but, yes, I did testify in a
```

Appellate Case: 19-7062 Document: 010110252595 Date Filed: 02/01/2019 Page: 9 of 79    Sealed
Case 5:17-cr-40097-DDC   Document 255-5 *SEALED*   Filed 02/01/18   Page 9 of 92    Sealed

9

1  trial in the Western District of North Carolina.

2  Q.    And in either testimony or in declarations, have you

3  addressed the issue as to whether or not the number of users

4  logging into Playpen increased during the period of time that

5  the government -- I'll use the term "controlled" but maybe

6  ill-advisedly -- have you testified or written declarations as

7  to whether or not the number of Playpen users increased during

8  the tenure that the government was somewhat in control of the

9  website?

10  A.    Yes, I have.

11  Q.    Okay.  And are you aware that there is some suggestion

12  that the number of users had in fact increased while the

13  government ran that website?

14  A.    Yes, I have.

15  Q.    Okay, just so the record is clear, during which period or

16  when did the government run this website?

17  A.    The government took control of and operated the Playpen

18  website from February 20, 2015, through March 4, 2015.

19  Q.    And have you been able to analyze the data and determine

20  essentially the number of individual users or users that used

21  the website during that approximate two-week period?

22  A.    Yes.

23  Q.    And is it accurate that in your either testimony or your

24  declarations, your statement and your position has been that

25  the number of users did not essentially increase during those

1    two weeks?

2    A.    Yes, that's correct.

3    Q.    And you're comparing that to what period?

4    A.    I analyzed a copy of the Playpen website that the

5    government seized from the residence of the creator of the

6    Playpen website.  That backed-up copy of the Playpen website

7    contained certain historical data about Playpen, including when

8    members had accessed the website.  And so analyzing that copy

9    of the Playpen website, I was able to determine that for an

10   approximate two-week period between January 31, 2015, and

11   February 14, 2015, that the Playpen website saw approximately

12   50,000 unique users a week.

13   Q.    Now, just so it's clear, that is before it was seized or

14   in any way, shape, or form operated by the government?

15   A.    That's correct.

16         THE COURT:  And is that the exact number of days that

17   you operated the website?

18         MR. TOBIN:  No.  I think what he's giving us now is

19   not the days that the government operated the website.  He's

20   giving us the --

21         THE COURT:  Is the number of days he analyzed the same

22   number of days exactly as the days that you operated it?  In

23   other words, are we dealing with apples and apples?

24         THE WITNESS:  I believe the FBI operation from

25   February 20 through March 4 would constitute 13 days, your

```
1    Honor.
2            THE COURT:  Okay.
3    Q.   So the FBI, the data you have for the FBI's operation is
4    for 13 days?
5    A.   Yes.
6    Q.   And so I think the next logical question would be --
7            THE COURT:  This is 15 days, right?  No?
8            THE WITNESS:  I believe January 31 through February 14
9    should be two weeks, 14 days, your Honor.
10           THE COURT:  I guess it depends when you start and when
11   you stop.  All right.
12   Q.   I'm sorry.  I think right now we're discussing your
13   analysis of usage or number of users from January 31, 2015, to
14   February 14, 2015, a period when the FBI had no control of the
15   website.  What was the number of users?
16   A.   Approximately 50,000 a week.
17   Q.   And then have you been able to analyze and to look at the
18   number of users between February 20 and March 4, that 13-day
19   period when the government was operating, in control of, or
20   supervising the website?
21   A.   It was similarly approximately 50,000 a week, and in the
22   declaration that I submitted, there are more specific numbers
23   and specific dates and times provided.
24   Q.   And how --
25           THE COURT:  When you say unique users, so if you take
```

1    somebody who keeps coming back, repeat user, you wouldn't count

2    them separately?

3         THE WITNESS:    That's correct, your Honor.

4    Q.    And that's because you know the unique handle or the

5    unique designation or IP address?

6    A.    Well, the actual message board software only records the

7    last time that someone accessed the website, and so in

8    analyzing the seized copies of the website, we'll only see the

9    last time that a user accessed the website, so there will only

10   be one entry per user account.

11   Q.    And how did you calculate these numbers?  I think your

12   testimony seems to be that for the two-week period that you

13   analyzed before the FBI became involved, it was approximately

14   50,000 users.  How do you get this?  I mean, I assume that

15   you're not sitting there with an abacus counting one, two,

16   three, four, five, six, seven, eight, nine, ten.  Explain to us

17   in a way, how do you determine how many users?  Is it all done

18   by computer software?

19   A.    The actual message board software that Playpen ran on

20   maintained all of the records that I analyzed, so it was a very

21   simple process of just extracting that data from the database.

22   A more detailed explanation and the tools that I use are

23   contained in my declaration, but these tools are all commonly

24   freely available.  I think the specific very simple

25   calculations that I performed are also included in detail.

1    It's just a simple process of calculating an average number of

2    user log-ins over the given period of time.

3    Q.   Your declaration was filed with the court, but you had

4    provided to me along with the declaration various spreadsheets

5    which were not filed with the court but were given to the

6    defense.  Just so the Judge understands what the defense has

7    been given, can you tell us in general terms, what were on the

8    spreadsheets that you provided to me and I provided to the

9    defense?

10   A.   So the database that I analyzed contained all of the

11   relevant fields about when users had logged into the website

12   last, what their user ID was.  And so I exported all of the

13   data that I analyzed into spreadsheets so that defense can look

14   at those spreadsheets and confirm that the calculations that I

15   performed are accurate.  I also added some additional columns

16   of data to those spreadsheets to assist in that analysis to

17   make them easier to read.

18   Q.   Now, you're using the number approximately 50,000 a week,

19   but in the NIT search warrant affidavit, wasn't a different

20   number used for users on this website?

21   A.   Yes.

22   Q.   What number was used there?

23   A.   The NIT warrant affidavit stated that the Playpen website

24   saw, I believe it was just over 11,000 unique users a week.

25   Q.   But, sir, 11,000 is a far cry from approximately 50,000.

Appellate Case: 19-3008    Document: 010110252850    Date Filed: 02/01/18    Page: 4
Case 5:17-cr-40097-DDC   Document 25-5 *SEALED*   Filed 02/01/18   Page 4 of 79   Sealed

14

1    Can you explain the apparent discrepancy?

2         THE COURT:  Well, can I just start with, so one was

3    11,000 a week, but the 50,000 is for two weeks, right?

4         MR. TOBIN:  No.

5         THE WITNESS:  No, your Honor.

6         THE COURT:  50,000 a week over those two periods?

7         THE WITNESS:  Yes, your Honor.

8         THE COURT:  All right.

9    Q.   So your testimony today is that it was 50,000 a week.

10   What's this 11,000 that was in the NIT warrant?  Where does

11   that come from?

12   A.   So, in the NIT warrant, the calculation that was done

13   there calculated the average number of unique user log-ins over

14   the entire length of the time that the Playpen website had

15   existed.  And so the Playpen website came online approximately

16   August, 2014, and so understandably, in the first days and

17   weeks of any new website, membership is very low.  When the

18   website is first created, there's only one user, the person who

19   created the website.  As time goes on, as the website becomes

20   more popular, as more people find out about it, more people

21   join and access the website.  And so the average that was given

22   in the NIT affidavit that stated approximately 11,000 was

23   calculated using the entire time frame that the website had

24   existed, so it included that initial weeks and months of the

25   website where user activity was low, and that's what took that

1   average and brought it down so low.

2       Now, when the FBI had control of the website, it was

3   at the height of its popularity.  This is the final two weeks

4   that the website had operated, and so it wasn't brand-new.

5   Everyone knew about it.  It was popular.  And so if you

6   calculate average user activity just on the most two popular

7   weeks of the website, you're going to have a much higher

8   number.  This is not to say that anything in the NIT warrant

9   affidavit was incorrect.  It was one hundred percent correct.

10  It's just we're comparing two completely different formulas.

11  Q.   Now --

12       THE COURT:  At some point early on in this litigation,

13  there had been some notion that Tor was congested or needed to

14  be fixed?

15       THE WITNESS:  Yes, your Honor.  When the FBI initially

16  took control of the Playpen website, it was operating very

17  slowly.  People were having problems accessing the website, and

18  it's not a problem that we fully understand.  The Tor project

19  itself, the nonprofit who develops and maintains the Tor

20  network, they have articles on their own website that I cited

21  in one of my declarations that state as much.  Sometimes Tor

22  hidden services like Playpen are slow and no one really knows

23  why, just because of the complicated setup process for

24  connecting to a Tor hidden service.  So we encountered

25  connectivity issues.  I think they lasted for the first few

 1    days of the FBI operation, and then things got better.

 2    Q.   Let me ask you a question about that.  I believe there's

 3    been some suggestion that things got better because you folks,

 4    for lack of a better term, tinkered with it, fixed it, modified

 5    it, did something to it to allow more of these people access to

 6    it.  Can you address that?  Is that accurate?

 7    A.   It is not accurate.  In one of the motions alleging that

 8    the government, or myself personally, made improvements to the

 9    Playpen website, there is a particular post cited by an

10    undercover FBI agent.  That undercover cover FBI agent, after

11    the connectivity issues were resolved, stated that he had

12    upgraded the Token Ring to Ethernet, and that that was why the

13    website was suddenly working faster.  This was a, for lack of a

14    better description, a nerd joke.  Token Ring was a networking

15    technology that was used in the '80s.  It is generally not used

16    in modern technology.  No part of the Playpen website ever

17    relied on Token Ring.  This was just the undercover agent

18    making a joke consistent with previous activity that the

19    creator of the Playpen website would have said.  It was not any

20    reference to actual upgrades or improvements to the Playpen

21    website.

22    Q.   And you've been on this investigation since before the

23    website was taken from the server?

24    A.   Yes.

25    Q.   You've been the lead agent on the case since then?

1 | A.    Yes.

2 | Q.    And to the best of your knowledge, has the FBI or anybody

3 | in your employ or at your call done anything to increase the

4 | efficiency or to allow more people onto the website?

5 | A.    No, and as I stated, again, there was consistent activity

6 | on the website both before and after the FBI takeover.

7 | Q.    I have another question, something, for what it's worth,

8 | we haven't discussed because this goes beyond what I thought

9 | was the scope of the hearing, so I apologize that I didn't give

10 | you warning, but whatever, it is what it is.  There have been

11 | some statements made in various affidavits or declarations

12 | about the utility or the usefulness of this operation or this

13 | NIT.  As you heard the Judge momentarily a few minutes ago make

14 | reference, there's been some suggestion or talk or

15 | representation that as a result of the NIT in this

16 | investigation, a certain number of people have been rescued or

17 | saved from sexual exploitation.  Are you familiar with that?

18 | A.    Yes, I am.

19 | Q.    And just so it's clear, in any of your testimony or

20 | writings, did you make a reference to the number of children or

21 | children that have been saved from sexual exploitation because

22 | of this investigation and the NIT?

23 | A.    Yes.  In one or more of my declarations, I've stated that

24 | our investigations of members of the Playpen website have led

25 | to the rescue of at least 38 children from hands-on sexual

Appellate Case: 19-3068    Case 5:17-cr-40097-DDC    Document 25-5 *SEALED*    Filed 02/01/18    Page 18 of 79    Sealed
Document: 010110218507    Date Filed: 08/26/2019    Page: 121

18

1    abuse.  As of today, I believe the number is either 49 children

2    or higher.

3              THE COURT:  So as a result of the NIT, you're saying

4    you did searches in homes and found these children?

5              THE WITNESS:  Yes, your Honor.

6    Q.   So I'm not going to ask you to go through 49 or more

7    cases, but, generally, what do you mean that children had been

8    saved or safeguarded?  What do you mean by that?

9    A.   In general, when search warrants were executed as a result

10   of this investigation, during the course of those subsequent

11   local investigations, it was determined generally that a child

12   in the house was being sexually abused.  Whether or not there

13   was production of child pornography involved, sometimes there

14   was; sometimes there was not.  Sometimes it was just hands-on

15   abuse with no production of child pornography.  But to date,

16   our investigation has led to the identification and rescue of

17   at least 49 children in such circumstances.

18             THE COURT:  Can you estimate the number who had the

19   child pornography posted on that website; in other words,

20   pictures of the abuse being posted?

21             THE WITNESS:  To my knowledge, of those 49 children, I

22   have personal knowledge that I believe two of them had images

23   that were produced and distributed on the Playpen website.  The

24   majority of the children that were rescued I don't believe had

25   images or videos produced of them.  I think they were just

1   being abused generally by a relative.

2       THE COURT:  And just to make it clear, none of that

3   involved this defendant?

4       THE WITNESS:  To my knowledge, I don't believe there's

5   been any allegation of hands-on offenses with this defendant.

6       MR. TOBIN:  May I have just a moment, your Honor,

7   please.

8       I don't think I have any other questions.

9       THE COURT:  You've made it seem as if the production

10  capability was still on even though you had turned it off?

11      THE WITNESS:  No, so when the FBI took control --

12      THE COURT:  That function where somebody could post

13  child pornography?

14      THE WITNESS:  So while the FBI had control of the

15  website, people could still post child pornography images

16  there.  However, there was a specific section of the Playpen

17  website that was called The Producer's Pen.  This section of

18  the Playpen website encouraged members to produce new images of

19  child pornography.  The FBI shut that part of the website down

20  immediately upon taking it over, and it was never brought back.

21      THE COURT:  Was it ever used before you shut it down?

22      THE WITNESS:  Before we shut it down, there was one

23  individual who had posted images, either images or videos of

24  child pornography that he had produced exclusively for the

25  Playpen website.  That individual was identified and his

1    victims were rescued.

2            THE COURT:  As a result of this investigation?

3            THE WITNESS:  Partially.  He was located in a foreign

4    country, and some of our foreign counterparts had engaged with

5    him in undercover activity.  And so we contributed to that

6    effort, but we were not the lead investigative agency with

7    respect to that individual's arrest.

8            THE COURT:  All right, thank you.  I'm sorry.

9            MR. TOBIN:  No, no, I don't have any follow-up to

10   that, so I'll sit down.

11           MR. WATKINS:  May I, your Honor?

12   CROSS-EXAMINATION BY MR. WATKINS:

13   Q.   Good morning, Special Agent Alfin.

14   A.   Good morning.

15   Q.   I just want to get the timeline a little bit.  You were

16   already -- part of your job is monitoring child exploitation

17   websites?

18   A.   Yes.  That's fair to say.

19   Q.   And you began seeing links to Playpen in August of 2014,

20   which I think you've testified shortly after Playpen got going?

21   A.   Correct.

22   Q.   At that point you navigated yourself over to Playpen and

23   could see what was there?

24   A.   Correct.

25   Q.   And you saw that the site was growing, as you mentioned,

1    starts out slow, but you kept on through the months keeping an

2    eye on the growth of Playpen, right?

3    A.    That's fair to say, yes.

4    Q.    And, of course, because it's on the Tor network,

5    difficult, if not impossible, to find out where it is?

6    A.    Yes.

7    Q.    In December you were given an IP address for the server

8    that Playpen was on, right?

9    A.    Yes.

10   Q.    And just I'm going to break that down a little bit.   A

11   server and a site are two different things, right?

12   A.    Yes.  A server is just a computer, and the site is the

13   software that was running on that server.

14   Q.    And this case is a good example because this is a

15   server-hosting company that actually had Playpen on it, right?

16   A.    Yes.

17   Q.    They're leasing space to all kinds of people?  They're a

18   fairly large hosting operation, right?

19   A.    They were a legitimate business.  I don't know the size

20   comparatively, but it was a legitimate business in North

21   Carolina.

22   Q.    And that's what they did was lease space on that server in

23   North Carolina, and that's where the IP address resolved it?

24   A.    Well, generally, yes, but just to clarify, I believe that

25   the subject who created the website was leasing the entire

```
 1    server, not just space on one server.
 2    Q.    Okay, the company's entire space?
 3    A.    No, just -- he had one dedicated server, I believe.
 4    Q.    All right.  And, well, two things:  One, the
 5    administrator, the person who designed the site is Steven
 6    Chase, right?
 7    A.    Yes.
 8    Q.    We can say his name.  He's been convicted, right?
 9    A.    Yes.
10    Q.    And also the name of the hosting service, that's redacted
11    from the affidavit, but that's public knowledge now, right?
12    A.    I believe it is.  It was -- the name of the company was
13    Central Logic.
14    Q.    Right.  So Central Logic has a whole bunch of servers that
15    they rent space to, right?  That's common?
16    A.    Yes.
17    Q.    And one of those places was -- one of those operations was
18    Playpen?
19    A.    Well, they were leasing space to Steven Chase, and Steven
20    Chase was hosting the Playpen website on that server.
21    Q.    Turning back to the Internet protocol address, the IP
22    address that we're talking about, you were given that
23    information that despite the fact that it was on Tor, this IP
24    address had shown up at some point, right?
25    A.    Yes.
```

1   Q.   And that's because the site administrator misconfigured

2   the site for a moment where it wasn't on Tor anymore, right?

3   A.   Well, no, that's not accurate.

4   Q.   Well, tell me how it was that an IP address shows up where

5   it's supposed to be on Tor.

6   A.   So, generally, when you configure a Tor hidden service,

7   you create a normal website as you would any other website, but

8   then you make certain configurations to the software on the

9   server to insure that that website can now only be accessed

10  over the Tor network.  And so in that configuration file on the

11  server, there was a typo in one of those lines of code, and so

12  that typo caused the website to be still available on the Tor

13  network, but you could also access it through the regular

14  Internet if you knew its true IP address.

15  Q.   And that's what happened, is somebody discovered its true

16  IP address and gave that information to you?

17  A.   Yes, that's correct, and then I was able to authenticate

18  that information and verify that it was accurate.

19  Q.   That's an extremely happy day for you, right?  You're able

20  to find a large child pornography website?

21  A.   That is generally considered a good thing, yes.

22  Q.   And so in December, that's when you identify where Central

23  Logic is, and that is where Playpen is operating from?

24  A.   Yes.

25  Q.   And you begin making further efforts to identify the

1    administrator, and that leads you to Steven Chase?

2    A.    Yes, that's correct.

3    Q.    In January of 2015, you obtained a search warrant to go to

4    Central Logic and get a copy of the Playpen website?

5    A.    Yes, that's correct.

6    Q.    So even though you did not control it until February 20,

7    beginning on a date in January, the FBI had a copy of

8    everything that was on the Playpen website, right?

9    A.    As of the date that that copy was seized, yes, that's fair

10   to say.

11   Q.    And what was the date that that copy was seized in

12   January?

13   A.    It was mid-January.  I don't recall the exact date, but

14   the search warrant I think has been discussed publicly.

15   Q.    The search warrant says January sometime, but you think

16   mid-January.  So for a full at least 31 days before the

17   government took control of that website, you and other agents

18   knew exactly what was on it?

19   A.    Are you -- I just want to make sure you're referencing the

20   same time period I am.  Are you referencing the time period

21   between the January seizure and the government takeover?

22   Q.    Yes.

23   A.    Yes.

24   Q.    And so that would include access to all of the images and

25   videos that were then on the website, right?

1    A.    No.    So the Playpen website, after the first few days of

2    the website, the administrator, Steven Chase, disabled the

3    functionality of the website that would allow users to attach

4    images and videos directly to the website.    And so generally --

5           THE COURT:    So this is after he was arrested?

6           THE WITNESS:    Before he was arrested, your Honor.

7           THE COURT:    So he didn't know about you yet?

8           THE WITNESS:    He did not know about me until he was

9    arrested on February 20.

10           THE COURT:    This wasn't part of the cooperation.    He

11    disabled it on his own?

12           THE WITNESS:    He never cooperated, your Honor.

13           THE COURT:    I see.

14           THE WITNESS:    So websites like Playpen, because

15    they're operating within the Tor network, they can be very

16    slow.    And so when you have a website, a very large child

17    pornography website, if you allow individuals to attach images

18    directly to their postings, it makes the website go even slower

19    because some of those images are very large; it takes a long

20    time to download them.    And so generally with websites like

21    Playpen, what users will do, they will actually post the images

22    and videos on other websites, frequently not on the Tor

23    network; and so they'll upload their images and videos to these

24    other websites, encrypt them with a password, and then they'll

25    go to Playpen.    They'll post a small preview image and say, "If

1    you want the full thing, click on this link.  Here's the
2    password to download it.  Here's the password to decrypt it."
3    And so this was generally how content was distributed on the
4    Playpen website.

5          And, now, at certain points in time the creator,
6    Steven Chase, did create two additional features of the Playpen
7    website that are referred to as Playpen image hosting and
8    Playpen file hosting, and these were separate Tor hidden
9    services that were part of the Playpen website where users
10   could upload images and videos without making the actual
11   website go slower.  So when we seized that copy in January, we
12   did not have access to all of the images and videos that were
13   distributed through the Playpen website.  I believe that
14   seizure only included the actual -- the website itself.

15         THE COURT:  So when you say you seized it but didn't
16   control it, it means you just copied it and Chase didn't know
17   about it?

18         THE WITNESS:  Yes, your Honor.  So Chase leased, I
19   believe it was two physical servers at Central Logic in North
20   Carolina.  And so the day before we seized a copy of the
21   website, Chase had moved the website from one of his servers to
22   the other one.  So the live copy of the website was now on what
23   I'll call Server No.  2, and so we seized a copy of Server
24   No.  1, so there was no interruption to the Playpen website,
25   Chase didn't know that we had seized that copy, and the users

1    of the Playpen website never experienced any connectivity

2    issues. So we were able to surreptitiously seize a copy of the

3    website.

4          THE COURT: So you knew about its operations for

5    30 days before you seized it?

6          THE WITNESS: So I first learned that the website was

7    hosted in North Carolina, I believe it was December 23, 2014,

8    and at that point we began drafting -- well, initially we sent

9    a subpoena to the company, and then we sent -- we drafted a

10    search warrant and continued our investigation through that

11    manner.

12          THE COURT: Right, and then you copied it in January?

13    Do you remember the date?

14          THE WITNESS: It was mid-January, your Honor. I

15    believe it may have been somewhere between January 14 and 15.

16    I can certainly look that information up and get it to the

17    Court afterwards.

18          THE COURT: In any event, sometime mid-January, and

19    then you actually, just so I get the timeline in, you actually

20    seize it on February 20?

21          THE WITNESS: We took control of it on February 20.

22          THE COURT: So roughly a month, give or take?

23          THE WITNESS: In between those two, yes, your Honor.

24    Q. But you actually seized it in January, right, you seized

25    the server? That's what the search warrant --

```
 1   A.   We seized a copy of it.  We didn't take the physical
 2   server.  It was an ECPA search warrant, so we got copies of the
 3   data.  We didn't physically take any servers.
 4   Q.   And that search warrant, that wasn't in connection to a
 5   specific case?  That was a search warrant directed at Central
 6   Logic, right?
 7   A.   I'm sorry.  What do you mean, not directed towards a
 8   specific case?
 9   Q.   In other words, that particular search warrant has not
10   been released publicly in any case?
11   A.   Uhm, I'm not sure if it's still under seal or not.  I know
12   copies of it have been provided pursuant to protective orders,
13   I believe, in some of the Playpen cases.  I don't recall
14   whether or not it's still under seal.
15   Q.   Can you tell me which cases it was provided?
16   A.   I believe we provided a copy of it in U.S. v. Michaud in
17   the Western District of Washington.  I would have to verify,
18   but I'm fairly confident that we provided it pursuant to a
19   protective order, if it's not already unsealed.
20   Q.   So that's available.  That search warrant authorized you
21   to seize the entire website, right?
22   A.   It authorized us to seize copies of data from a particular
23   customer account in Central Logic.
24   Q.   Once you have seized it and know where it is, you also
25   have the ability at that point to shut it down?
```

1   A.   We have the ability to shut down that particular instance
2   of the Playpen website.  We don't have the ability to remove it
3   from existence.
4   Q.   Well, so you asked Central Logic to make a copy of that
5   website that's in North Carolina, right?
6   A.   Actually, I think we sent an FBI agent out there to make
7   the copy itself.  I don't think Central Logic had the
8   capability to do that.
9   Q.   You already know what's on the website because you've been
10  monitoring it, right?
11  A.   Well, I had already logged into the website and confirmed
12  that the Playpen website was there, so, yes, I knew that the
13  Playpen website was on that particular server.
14  Q.   And you have an FBI agent down there confirming that this
15  is indeed a website that has links to child pornography all
16  over the country, all over the world?
17  A.   The FBI agent that went out to seize the copy, his only
18  job was to go and copy the data from the server.  He wasn't
19  responsible for analyzing that data.
20  Q.   Sure.  You've analyzed that data since then, right?
21  A.   I have.
22  Q.   And that data confirmed what you saw in the months leading
23  up to December, right, to January?
24  A.   We confirmed that the Playpen website was being hosted at
25  Central Logic at that time.

1    Q.    And it also confirmed that there are child porn images and

2    videos and links for child porn images and videos on that site,

3    right?

4    A.    Yes.

5    Q.    So as of that date, there would have been no impediment to

6    simply unplugging Playpen in North Carolina and stopping it?

7    A.    We could have unplugged it in North Carolina, that's

8    accurate.

9    Q.    And once it's unplugged in North Carolina, that's it for

10   Playpen?  People can't go to the website anymore?

11   A.    No.  Well, they can't go into it in North Carolina

12   anymore, but based on my training and experience, I think it

13   would have taken maybe a day or two for it to pop up again

14   somewhere else, just as it was up until that date.

15   Q.    If Central Logic had -- by that time, you also knew or you

16   were gaining information about Steven Chase, right?

17   A.    Yes.

18   Q.    And you knew -- actually, by then you knew of where he

19   lived and what he was doing on the site?

20   A.    It was approximately around that time frame.  I don't

21   remember the exact day when Steven Chase was identified.

22   Q.    But in mid-January, so you have the site, you have the

23   administrator both in your sights, so to speak?

24   A.    Yes, that's fair to say.

25   Q.    So at that point you could have taken down the website;

1    you could have arrested Steven Chase for operating the website.

2    He can't move it around anyplace else.

3    A.    He can't, that's true.  Playpen had three administrators,

4    and at that point it was unknown whether or not other

5    administrators had backup copies of the website that they could

6    have put back up online.  So it is not accurate to say that we

7    had everything we needed to insure that we could have shut down

8    Playpen for good.

9    Q.    For good, but you could have shut it down in North

10   Carolina from people logging onto that IP address in North

11   Carolina that was Playpen?

12   A.    Yes, we could have shut down that particular copy of the

13   website in North Carolina, that is true.

14   Q.    And at that point you were aware that there was no copy

15   running someplace else?  There was no backup server someplace

16   else?

17   A.    Well, a Tor hidden service can only be running on one

18   server at any particular time.  Otherwise, there would be

19   conflicts and collisions within the network.  So that was the

20   only current place where the Playpen website was.

21   Q.    And you've certainly learned since then that that was the

22   only place that it was ever hosted was in North Carolina?

23   A.    That's not true.

24   Q.    Where else was Playpen hosted?

25   A.    It was hosted at at least one or two other service

1    providers prior to being hosted at Central Logic.

2    Q.    Correct, in the early days of Playpen, it was hosted in

3    other spots, right?

4    A.    Yes.

5    Q.    It moved to Central Logic when?

6    A.    I believe it was October, 2014.

7    Q.    So from October, 2014, right up to January, always

8    operated off of Central Logic in North Carolina?

9    A.    The website itself did.  Some features of the website

10   operated in other areas.

11   Q.    Some features meaning the hosting and the actual images?

12   A.    The file-hosting feature of the Playpen website was

13   located on a server in Canada.  The image-hosting feature of

14   the website was also located at Central Logic in North

15   Carolina.  And then the majority of the content, I would

16   estimate the majority of the content that was distributed

17   through the Playpen website over the course of its existence

18   was hosted at various providers, known and unknown.

19   Q.    And just to be sure, these are all adjuncts to the Playpen

20   site.  The Playpen site is the front end of it that leads you

21   to these other places that are portions of the site?

22   A.    The image uploader and the file uploader for Playpen, yes.

23   Q.    The website continued to run at that point, right?

24   A.    After we seized the copy in January?

25   Q.    Yes.

A.    Yes.

Q.    It ran all the way till March 4, right?

A.    Well, it ran in North Carolina through approximately
February 20.

Q.    And in the FBI in Virginia until March 4?

A.    Correct.

Q.    So during this time, you're continuing to go -- well, let
me back up.  When you seize it, it's not just the website.  You
get the back end of the website as well.  You get to see what
the administrator sees, right?

A.    Yes, that's true.

Q.    And so this includes sometimes IP addresses, right?  Some
of the administrators actually had their real IP addresses
within the site; is that true?

A.    So the primary administrator, his IP address did show up
in server logs.

Q.    And there were some other logs with actual IP addresses
that were recognizable, right?

A.    There were other logs that had real IP addresses, but they
were generally either Tor nodes or virtual private network IP
addresses, both of which generally are not actionable.  And so
even if you don't access a Tor hidden service, in the case of
Playpen, as I testified earlier, it was also available on the
regular Internet.  And so --

Q.    For a short period of time?

Appellate Case: 19-3068    Case 5:17-cr-40097-DDC    Document 25-5 *SEALED*    Document: 010110216507    Filed 02/01/18    Date Filed: 06/26/2019    Page 34 of 79    Page: 34 of 79    Sealed

34

```
 1   A.    Correct.

 2   Q.    Just to be clear, by the time you seized it in January,

 3   that misconfiguration had been fixed?

 4   A.    No, I don't believe it had been.  I don't believe the

 5   administrator, Steven Chase, I don't believe he ever actually

 6   fixed that glitch.  I think it was still present up until he

 7   was arrested.

 8   Q.    So just to be clear then, one could reach Playpen from

 9   December up until the time that the FBI finally shut it down,

10   one could reach that without using a Tor browser?

11   A.    If you knew its true IP address, yes, you could.

12   Q.    In addition, when you seized the copy of the server, you

13   had the back-end information that showed you where the links on

14   the site would take one for images and videos, right?

15   A.    Yes.   That information was contained in that database.

16   Q.    So because you now had the site from both the front end

17   and the back end, you could in fact go through and download

18   videos, all of the videos and all of the images that Playpen

19   referenced there, right?

20   A.    We were engaging in undercover activity on the Playpen

21   website for a while.  We could have always logged onto the

22   website and seen the links to the images and videos.   That

23   wasn't any specific capability that we gained after seizing a

24   copy of it.

25   Q.    That's true, but at that point you actually had the
```

1  website.  When you were looking at it before, right, you can't

2  do anything about it?  You'd love to shut that thing down, but

3  you can't do anything about it because you don't know it,

4  right?

5              THE COURT:  Because you don't know what?

6  Q.  You don't know where it is?

7  A.  The actual website, correct.

8  Q.  Once you did know the website in January, you could have

9  shut it down, right?

10  A.  As I testified earlier, we could have taken offline the

11  copy that was in North Carolina, that is true.

12  Q.  And indeed the FBI now has taken the whole thing down.

13  There's no Playpen left anywhere, right?

14  A.  That's correct.

15  Q.  So that could have also happened in January the same way

16  it happened in March?

17  A.  No.

18  Q.  Let me --

19              THE COURT:  Why not?

20              THE WITNESS:  Your Honor, as I testified earlier, the

21  administrator had hosted the Playpen website at various hosting

22  providers, not just in North Carolina.  And so we know that he

23  had multiple backup copies of the Playpen website in his

24  possession.  And so if we had just knocked the server offline

25  in January, it would have been a process of hours to lease

 1    server space at another company, put a copy of the Playpen

 2    website back online, and then it would have been running again

 3    just as it was before in North Carolina.

 4    Q.    But you arrested Mr. Chase later on, February?

 5    A.    Yes, we did.

 6    Q.    And he was the one with the backup copy, right?

 7    A.    Yes.  He had multiple backup copies of the website.

 8    Q.    And indeed, I think you already testified to this, but you

 9    had his information in January when you seized the site?

10    A.    Around that time frame we had identified Mr. Chase as our

11    primary suspect, yes.

12    Q.    So whether it was during the time that you were just

13    monitoring the website before you knew where it was, and then

14    after you found out that you did know where it was and could

15    seize it, did you download images or videos yourself to check

16    on victims?

17    A.    I'm not sure I understand the question.

18    Q.    Well, let me do it this way.  You're familiar with the

19    National Center for Missing & Exploited Children, right?

20    A.    Yes, I am.

21    Q.    And I'm going to refer to them as NCMEC, the acronym.  You

22    know that NCMEC keeps a database of hash values of images and

23    videos, right?

24    A.    Yes.

25    Q.    So if you had downloaded one or 10,000 or 100,000 of the

1   images that were up there, send them to NCMEC, NCMEC will give

2   you a report very quickly about whether those are known

3   children or not, right?

4   A.   Generally, yes.

5   Q.   And they will tell you where some are not, right?

6   A.   So NCMEC will tell you whether or not that particular hash

7   value has been seen before, and if that hash value or if the

8   image has never been altered since its initial submission to

9   NCMEC, then those results will be accurate.  So during the

10  course of our investigation, we did submit all of the images

11  and videos that we were able to capture to NCMEC.

12  Q.   When did you do that?

13  A.   I would estimate sometime in March, 2015.

14  Q.   So that was after the FBI had shut down Playpen?

15  A.   Yes.

16  Q.   And you've received the results of what you sent to NCMEC

17  at this point?

18  A.   Yes, we have.

19  Q.   And indeed there are many, many, many, many known victims

20  that were posted up on Playpen?

21  A.   Yes.

22  Q.   And were those --

23          THE COURT:  I don't know what you mean by victims.

24  You mean the Holly series?

25          THE WITNESS:  Yes, your Honor.  The majority of child

1    pornography that was distributed through the Playpen website

2    was existing series of child pornography.  There was -- the

3    actual section on the Playpen website, The Producer's Pen that

4    encouraged new production, that actually only was created, I

5    think it was a day or two before the FBI seized control of the

6    website, so the majority of child pornography that was

7    distributed through Playpen were existing series.

8    Q.    And moving back, because you had the copy of the website

9    already, there's no reason why you couldn't have sent those

10   images and videos to NCMEC in January?

11   A.    So, again, having a copy of the website is not the

12   equivalent of having copies of all of the images and videos

13   that were distributed through the website because the website

14   itself was generally not the storage location for the images

15   and videos; and so it's a lengthy manual process going through,

16   downloading everything, decrypting it, and so on.

17   Q.    Decrypting it means entering in a password, right?

18   A.    Yes, it does.

19   Q.    And the password was available on the website and you had

20   it?

21   A.    Yes.

22   Q.    So when you talk about decrypting, it's not a long,

23   involved process.  It's finding where that password is,

24   entering it in, and, bingo, you have a whole bunch of images?

25   A.    Which is a lengthy process if you repeat it numerous

```
 1   times.  Doing it on one occasion is not a lengthy process.
 2   Q.   Did you do it at all in the period between January and
 3   March while the FBI allowed the site to run?
 4   A.   Yes, there were some instances where there were questions
 5   about whether or not images that were distributed on the
 6   website were in fact new or were not new, so some information
 7   was sent to NCMEC during that period.
 8   Q.   And that's very concerning to you if it's new images
 9   because -- why is that concerning to you?
10   A.   Well, any images of child pornography are concerning, but
11   anytime that a new series pops up, that generally means that
12   there is a child somewhere who is actively being raped.
13   Q.   And if it's on Playpen that it first shows up, that is a
14   serious, serious issue, right?  It's serious if it shows up
15   anywhere.  It's serious to you because now the FBI can stop
16   that?
17   A.   Well, no, that's not an accurate statement.  The FBI at
18   that point still has no capability to identify that child or
19   stop the rape.
20   Q.   Stop the posting of the image that is identified as a new
21   image?
22   A.   Which time period are you referring to?
23   Q.   The time period where you talked about sending suspected
24   new images to NCMEC.
25   A.   Right.
```

```
 1   Q.    So if you start getting lots of responses from NCMEC, "We
 2   haven't seen that image or that video before," right, then
 3   Playpen is now posting brand-new content?
 4   A.    Playpen -- well, members -- under those circumstances,
 5   members are posting images and videos that NCMEC has never seen
 6   before.   That's not necessarily an indication that Playpen is
 7   the first place that it was posted.
 8   Q.    Absolutely, but it's a much different thing than something
 9   that -- it's all serious, but it's different from something
10   that NCMEC has seen over and over and over again, right?
11   A.    Yes.   It's different circumstances.
12            THE COURT:   So did that happen during that initial
13   January time period, new material being posted?
14            THE WITNESS:   I am aware of two instances where
15   confirmed new material was posted on the Playpen website after
16   the government had the capability to do anything, no matter how
17   limited that may be.   One of those instances was, the
18   individual who had posted in The Producer's Pen who I had
19   testified to earlier was identified; his victims were rescued.
20   The images that he had posted --
21            THE COURT:   Is that the foreign guy?
22            THE WITNESS:   Yes, your Honor.   After that material
23   was encountered, it was immediately removed from the Playpen
24   website to prevent distribution of a new series.   There was one
25   other individual during the FBI's operation who had similarly
```

1    claimed to either have access to a child or be producing child

2    pornography.  That posting was also removed from the website,

3    and a lead was sent to the country that that individual was

4    believed to be in.

5    Q.   And just to be clear, there have been declarations or

6    assertions before that the FBI was unable to monitor every

7    post, every download from Playpen during the course of this

8    investigation?

9    A.   I don't believe that's an accurate characterization.  If

10   there is a specific statement in a declaration you have a

11   question about, I can address that, but I don't believe the way

12   you've described it accurately reflects the declarations.

13   Q.   I'll get to that in a moment, but I still want --

14          THE COURT:  I'm just concerned about time.

15          MR. WATKINS:  I'm sorry?  Yes, I'll keep it --

16          THE COURT:  Because I'm not going to bring him back,

17   so I just want to make sure you get through what you've got to

18   get through.

19          MR. WATKINS:  We're moving, we're moving.

20   Q.   So talking again now of this period between mid-January,

21   perhaps the 15th or 16th, up through February 20 when the FBI

22   starts operating the website itself, the website is ongoing.

23   You talked -- there are other things happening in regard to the

24   investigation, right?  You're not just sitting on your hands at

25   that point?

1    A.   Correct.  We are conducting surveillance on Steven Chase
2    and preparing for our investigation of other members of the
3    Playpen website.
4    Q.   And at the same time, you and other members of the law
5    enforcement team are trying to decide whether to keep running
6    the site under government control?
7    A.   Well, during this time frame that you've described, it was
8    not under government control.
9    Q.   But I'm saying, there are discussions about whether it
10   should continue to operate, right?
11   A.   Whether the government should take control of it and
12   investigate other members of the website?
13   Q.   Yes.
14   A.   Yes, there were discussions had about that, about how to
15   best conduct that investigation.
16   Q.   Because one choice, though, always is just shut it down,
17   right?  Get everything we can and shut it down, right?
18   A.   We could have shut down the Playpen website, as I
19   testified to earlier.
20   Q.   And there was a decision made to keep it going and to use
21   the network investigative technique, right?
22   A.   Yes.
23   Q.   In regard to those discussions, who participated in those
24   discussions about whether to continue it on?
25        MR. TOBIN:  I'm going to object to that, your Honor.

1    Those are the internal deliberations of law enforcement that

2    aren't --

3              THE COURT:  Sustained.

4         MR. WATKINS:  Your Honor, I'm not asking what they

5    discussed.  I'm asking who participated, and it's not internal

6    deliberations.  I should say, where this is --

7              THE COURT:  For me, the issue is not so much who is

8    involved.  It was to use the NIT.  That's just beyond the scope

9    of what we're doing here.  If you want to limit it to who was

10   keeping it up and running it, I'm happy to have you do that.

11             MR. WATKINS:  That's what I was asking, whose decision

12   was it to keep it up and running in government control.

13             THE COURT:  It was a two-part question.  Anyway, so

14   we're just going to limit it to, who decided to keep it going?

15             THE WITNESS:  These were discussions that were had

16   between the FBI and the Department of Justice, and we

17   ultimately decided that we had a solid investigative plan, and

18   we executed it.

19   Q.   And when you talk about the Department of Justice, this

20   was Main Justice in Washington that was part of these

21   discussions?

22   A.   Yes.  We partner on this investigation with the Department

23   of Justice Child Exploitation and Obscenity Section.

24   Q.   And also with the Computer Crime and Intellectual Property

25   Section?

1  A.    Lawyers from CCIPS may have been consulted or involved at
2  some point in time.
3        THE COURT:  CCIPS?
4        THE WITNESS:  I'm sorry, your Honor.  The Computer
5  Crime and Intellectual Property Section at the Department of
6  Justice.
7  Q.    So several arms of Main Justice were involved in the
8  deliberations as to whether to continue the website with the
9  government operating it?
10  A.    Yes.  We worked very closely with the Department of
11  Justice on this operation.
12  Q.    At the same time that you're working very closely with
13  Main Justice about whether to keep it going, you are also
14  drafting or getting ready to draft the NIT warrant?
15  A.    Yes.
16  Q.    And the people you were consulting with at Main Justice
17  are also aware of the NIT warrant?  It goes hand in glove?
18        MR. TOBIN:  Objection.  Again, beyond the scope of the
19  focus here.  I mean, the NIT warrant is the NIT warrant.  It
20  was decided and they did it.  I don't know --
21        THE COURT:  Well, I don't know whether it is, but let
22  me just ask you, was the -- I don't want to go into the
23  techniques of the NIT at all.  It's just about the issue of why
24  did you decide to keep it open?
25        THE WITNESS:  We decided to keep the website running,

Appellate Case: 19-3068   Document: 010110256951   Date Filed: 02/06/2019   Page: 45 of 78   Sealed
Case 5:17-cr-40097-DDC   Document 25-5 *SEALED*   Filed 02/06/18   Page 45 of 79

45

1    your Honor, because we could have just shut it down and

2    hopefully removed Playpen from existence, but it would have

3    left us with no ability to identify the members of the Playpen

4    website, the individuals who were distributing child

5    pornography or the individuals who were actual contact

6    offenders who were members of the Playpen website.  And so

7    without going forward with this operation, we would have had no

8    capability to identify anyone other than the creator of the

9    Playpen website.

10   Q.    So just to be clear, when you say "we," it's much more

11   than you and Special Agent McFarland, who actually was the

12   affiant on the search warrant, right?  It's not just the two of

13   you talking about this, right?

14   A.    Correct.  It's both the FBI and the Department of Justice,

15   several individuals and levels of management from both

16   organizations.

17   Q.    There was an Assistant U.S. Attorney involved in the

18   Eastern District of Virginia to issue the NIT warrant, but this

19   went far beyond that as far as people having input?

20   A.    There was an AUSA in Virginia that we worked with, yes.

21   Q.    But it was not his or her decision either, right?  This

22   was a decision made higher up?

23         MR. TOBIN:  Again, your Honor, with regard to the

24   deliberative process at the Department of Justice --

25         THE COURT:  I'll allow that it was made higher up.

1          THE WITNESS:  It was, your Honor.  It was done with

2     the approval of executives in both the FBI and the Department

3     of Justice.

4     Q.    When you say executives, FBI general counsel?

5     A.    The FBI Office of General Counsel was aware of the

6     operation, yes.

7     Q.    I don't want to get into the details of the NIT, but I do

8     want to ask that you understood that the NIT would be deployed

9     from the server to whatever computer logged into and went

10    through the Playpen site, right?

11          MR. TOBIN:  Objection.  That essentially is a detail,

12    and it goes beyond the scope of this.

13          THE COURT:  Yes, let's just move ahead.

14          MR. WATKINS:  If I may just have two quick questions

15    on that.

16          THE COURT:  I don't know what they are, but that one

17    is just already established, so it --

18          MR. WATKINS:  I was trying to do it as background more

19    than anything.  I think this is background also.

20    Q.    So you knew it was going to be deployed domestically and

21    internationally both, right?

22    A.    Well, the NIT is installed on the server in the Eastern

23    District of Virginia, and but for someone logging into the

24    server in the Eastern District of Virginia, it would remain

25    there.  But, yes, we reasonably believed that there were

1    members of the Playpen website throughout the country and
2    throughout the world.
3    Q.    And this NIT, if it weren't the government doing it, it
4    would be identified as malware or hacking other computers?
5              MR. TOBIN:   Objection.
6              THE COURT:   Sustained.   We're just dealing with this.
7              MR. WATKINS:   I understand.
8    Q.    Are you aware of what the vulnerable equities --
9              MR. WATKINS:   I'm sorry?
10             THE COURT:   I just wondered, was there a specific
11   protocol for addressing the ethical issues that come with
12   keeping something like this alive?
13             THE WITNESS:   I don't know if there is a specific
14   protocol, your Honor, but we did have discussions on that very
15   topic.   It was decided that based on the population of the
16   Playpen website, based on historical analysis of investigations
17   of individuals who trade and distribute child pornography, that
18   this was a rare opportunity to not only identify a large number
19   of distributors of child pornography but to identify and rescue
20   a large number of victims, as that is the primary focus of our
21   work is to identify and rescue victims.   And so opportunities
22   such as the one presented in this case are incredibly rare, and
23   so the benefits of engaging in this operation, we determined
24   that they outweighed the option of just removing Playpen from
25   existence and waiting until another such website popped up

1    24 hours later.

2    Q.    I want to talk about the actual website as you found it.

3    You mentioned that there was a typo in the code that made it

4    misfigured, where actually it could be seen even if you didn't

5    have a Tor browser?

6    A.    Yes.

7    Q.    There are also other amateurish features to it?  The

8    log-in page, right, you talked about that in one of your

9    affidavits?

10   A.    What do you mean, amateurish?  I don't understand the

11   question.

12   Q.    Well, let me put it up on the screen, if I may.  Do I have

13   this -- I can move my computer over here.

14          THE CLERK:  I can switch it, no.  One second.  It's up

15   now.

16          MR. WATKINS:  Sorry, your Honor.  If I may just have a

17   moment.  Well, I'll just do it on the --

18          THE COURT:  What are you showing?

19          MR. WATKINS:  I'm going to the document camera.

20          THE CLERK:  Okay, I switched it to doc camera.

21   Q.    This log-in page, the administrator, Steven Chase, advised

22   people just to enter in a random e-mail address because the

23   software required it, but they weren't going to do anything

24   about it, right?

25   A.    Yes, that's correct.

1   Q.   And indeed when the site first started, that didn't have

2   to happen, right?  You didn't have to put in a user name or a

3   password, right?

4   A.   Uhm, during the first maybe two or three days, I think you

5   could access the website as a guest, but that functionality I

6   don't think lasted for more than a week.

7   Q.   And indeed that is functionality that Steven Chase could

8   have put in if he knew what he was doing?

9   A.   I don't know what that has to do with him knowing or not

10  knowing what he's doing.  That's just a configuration option on

11  the website.

12  Q.   Right, but instead of getting rid of this user name and

13  password, he just had people put in random e-mail addresses?

14  A.   I think you're confusing the registration page and the

15  log-in page.

16  Q.   Well, perhaps.  So tell me what the difference is.

17  A.   When you register an account on the Playpen website, you

18  have to choose your user name, and you also have to enter an

19  e-mail address.  Now, the website warned you:  Hey, don't enter

20  a real e-mail address.  Just enter something that looks like an

21  e-mail address like Bob@aol.com.  The website software is just

22  going to check to make sure it looks like a real e-mail

23  address:  Don't worry, we're not going to send you any actual

24  e-mails.  So create your user name, enter a fake e-mail

25  address, and then you get your account.

1    Q.    He was telling users that the software requires that?

2    A.    Correct.

3    Q.    But you've actually learned that the software didn't

4    require that?

5    A.    No, that's not accurate.

6    Q.    It could be configured so that you did not need to put in

7    an e-mail and --

8                THE COURT:  Why are we doing this?

9                MR. WATKINS:  I was just asking, your Honor.

10               THE COURT:  I know.  We've just got to finish up.  Are

11   you done?

12               MR. WATKINS:  I'm sorry?

13               THE WITNESS:  Are we done?

14               MR. WATKINS:  I've got a couple more questions, your

15   Honor, if I may.  I have till noon, I think.

16               THE COURT:  I know, but I don't want to stray off into

17   issues which may be relevant to the trial or something like

18   that.

19   Q.    When you started up the website under government control,

20   the file-hosting feature was not working?

21   A.    So the file-hosting feature was in Canada, and so we

22   learned that pursuant to the arrest of Steven Chase.  And so

23   when we took control of the website in its initial period, that

24   file-hosting feature was not available.

25   Q.    And how many days before you took control of the website

Appellate Case: 19-3068   Document: 010110255651   Date Filed: 02/01/2019   Page: 51
Case 5:17-cr-40097-DDC   Document 25-5 *SEALED*   Filed 02/01/18   Page 51 of 74   Sealed

51

1   was the file hosting not available?

2   A.    It was available up until we took control of the website.

3   Q.    I see, so it was available at that time.  It's whatever

4   happened that day when you took it that it went down?

5   A.    As soon as we learned that that feature of the website was

6   in Canada, we contacted Canadian authorities and alerted them

7   to it.

8            THE COURT:  To do what?

9            THE WITNESS:  To take it down, your Honor.

10  Q.    And why did you do that?

11  A.    Our operation was such that we were going to take control

12  of the Playpen website, move it to our own server in the

13  Eastern District of Virginia, and operate it from there.  We

14  couldn't just download code from a foreign country without

15  their permission and put it up on our server, so we alerted

16  Canada.  We told them this server is the Playpen file-hosting

17  feature, and then they eventually shut it down, seized a copy

18  of it, and sent us a copy of it.

19  Q.    So I just want to unpack that for a minute because, as I

20  understand it, you didn't move the actual server from North

21  Carolina to Virginia.  You made a copy of that server to move

22  to Virginia, right?

23  A.    Yes, that's correct.

24           THE COURT:  How do you make a copy of a server as

25  opposed to the software?

1    THE WITNESS:  So, your Honor, when we arrested Steven

2    Chase at his residence in Naples, Florida, he was actively

3    logged into the administrative account of the server that was

4    hosting the website, and so we had the administrative user name

5    and password for that server.  And so having that information,

6    we were able to remotely log into the server and download a

7    copy of the website that we --

8         THE COURT:  When you say copy the server, what you're

9    actually doing is copying the website?

10        THE WITNESS:  Yes, your Honor.

11        THE COURT:  That's a shorthand?

12        THE WITNESS:  Yes, your Honor.

13   Q.   The server is actually the physical thing that contains

14   the website, website's data, right?

15   A.   Yes.

16        THE COURT:  The server is the computer, the hardware?

17        THE WITNESS:  Yes, your Honor.

18        THE COURT:  I just want to make sure.

19   Q.   And so during that time actually Playpen is running, the

20   file-hosting service is up in Canada while you're getting the

21   copy and starting it up anew in Virginia, right?

22   A.   No.  So during the search of Steven Chase's residence, we

23   assessed the situation.  We find the usernames and passwords

24   for the Playpen website.  We determine that the file hoster is

25   in Canada, and from there, we put the website into what we call

Appellate Case: 19-3068    Document: 010110251856    Date Filed: 02/06/2019    Page: 53 of 796    Sealed
Case 5:17-cr-40097-DDC    Document 25-5 SEALED    Filed 02/06/18    Page 53 of 79    Sealed

53

1   "maintenance mode."  And so this makes it so that the front

2   page of the website just says, "Hey, website currently down for

3   maintenance.  Come back later."

4       So we immediately put it in the maintenance mode, and at

5   this point no features of the Playpen website are available.

6   And while it is in maintenance mode, we are transferring a copy

7   to our server in Virginia.  After that, it's done.  We power

8   off the server in North Carolina, and we bring the website up

9   on our server in Virginia.

10  Q.   How long did that maintenance period last?

11  A.   I would estimate eight to twelve hours.  I don't remember

12  exactly.

13  Q.   You talked about calling up the Canadian -- was it the

14  actual server company up there, or was it authorities in

15  Canada?

16  A.   I believe we contacted either the RCMP, the Royal Canadian

17  Mounted Police, or the Ontario National Police.  I don't

18  remember exactly where the server was hosted, but we reached

19  out to law enforcement in Canada.

20  Q.   Was that before or after the maintenance period?

21  A.   Around the same time.  While this process was going on, we

22  alerted Canadian officials.

23  Q.   And then once you started the server up again in Virginia,

24  you had to reboot that file-hosting service to put it back in

25  with Playpen to allow Playpen to access it?

1   A.   So we never enabled access back to that server in Canada

2   while the FBI had control of it.  That was not a part of our

3   operation.  We just enabled the file-hosting feature on the

4   server that we had in Virginia after we brought the website

5   back online.  We did not actually keep anything running in

6   Canada that anyone was accessing during our operation.

7   Q.   So you moved the file-hosting service feature which was in

8   Canada to the server in Virginia?

9   A.   No.  It was just incorporated into the existing website

10  copy that we had moved to Virginia.

11  Q.   And, as I understand it, there's also content up there in

12  Canada on that server?

13  A.   Yes, there was content on that server in Canada.

14  Q.   And that server in Canada, the content there, Playpen

15  users would not be able to get to it at that point, right,

16  while the government was operating it?

17  A.   Generally, yes.  I don't know exactly when Canada pulled

18  the plug, but, yes.

19  Q.   When you say Canada pulled the plug, I thought they pulled

20  the plug while you were doing the maintenance --

21  A.   So we alerted them during the maintenance.  I don't know

22  exactly when they got out there and actually disconnected

23  anything from the Internet, but that portion of the website,

24  the Canada file-hosting service, was not available during the

25  FBI operation.

1    Q.    And so if someone clicked on a link that was supposed to

2    get them the images up there, they wouldn't be able to go

3    there?

4    A.    Correct.  You couldn't just access links to the Playpen

5    image uploader or file uploader.  The servers were configured

6    in such a manner that just an external person with a link would

7    get an error trying to access them.  You had to actually access

8    them from within the Playpen website.

9    Q.    So when there is a message from the undercover to the

10    Playpen community saying "File hosting is up and running

11    again," what did that mean at the back end?  What had you all

12    done at that point to make that message?

13    A.    We just re-enabled that feature of the Playpen website on

14    the server in the Eastern District of Virginia, again, a

15    feature that existed prior to the FBI takeover of the website.

16    Q.    Sure.  File hosting, what does that feature permit on the

17    website?

18    A.    So Playpen had two different hosting features on their own

19    Tor hidden services.  One was image hosting, which generally

20    speaks for itself.  It allowed users to upload individual

21    images of child pornography.  File hosting allowed users to

22    upload larger files, generally encrypted archives that

23    contained either multiple images or larger videos.

24    Q.    So by re-enabling that file-hosting feature, you permitted

25    users to upload content to Playpen?

Appellate Case: 17-1303 Case 5:17-cr-40097-DDC Document 255-5 *SEALED* Filed 08/26/2019 Filed 02/01/18 Page 56 of 79 Page: 159 Sealed

56

1    A.    To the file-hosting service, yes, we maintained that

2    existing feature of the website.

3    Q.    And the file-hosting feature was the more active of the

4    two, right?  You can upload more there?

5    A.    I don't believe it was more active.  Its life span was

6    shorter, I believe, than the image uploading feature.  I think

7    it was used less frequently than the image uploading feature.

8    Q.    But during the period of time the government was running,

9    by doing the file-hosting service feature, re-enabling it, that

10   did enable people to upload large files or large amounts of

11   child pornography?

12   A.    As they could do before the government takeover, yes.

13   Q.    As there were discussions concerning whether to continue

14   the operation of the website, there was also discussion about

15   whether to shut down portions of the website?  You talked about

16   The Producer's Pen.

17   A.    Yes.  We did immediately shut down The Producer's Pen

18   after we assumed control of the website.

19   Q.    Following up on the Judge's question, was there any

20   criteria about which parts of the website you would shut down

21   versus keep going?

22   A.    There was never any time where we entertained the idea of

23   allowing a section or of operating a website that encouraged

24   active rape of children, so it was always understood that any

25   such features would be removed from the website when we assumed

1   control of it.

2   Q.   When you say it was always understood, was there a

3   protocol, a written protocol?

4   A.   Not that I'm aware of.

5   Q.   So, for example, the file-hosting feature, was there a

6   discussion about whether to re-enable that or to just keep it

7   down while you operated it?

8   A.   There may have been discussions along those lines.  I

9   don't recall specifics of them.  Obviously we came to the

10  conclusion that we were going to keep the feature alive as it

11  was before the takeover because we did.

12  Q.   Were there discussions about other portions of the

13  website, whether to close that down or to mitigate what was

14  going on in other portions of the website?

15  A.   So it was determined that if we had disabled features of

16  the website, shut down sections of the website, it generally

17  would have alerted people immediately to the FBI takeover, and

18  so we generally let the website continue as it was prior to the

19  FBI takeover.

20  Q.   But I think you just told us, for images that were in

21  Canada, somebody clicks on that, they get an error message.

22  A.   Yes, in some circumstances.

23  Q.   And there was quite a bit that was held on that Canadian

24  server, right, quite a bit of content?

25  A.   There were numerous images and videos.  I don't know the

1   exact number.

2   Q.   So because of that alone, people were going to get a lot

3   of error messages off of the website, right?

4   A.   Uhm, well, no, there was a message that was posted that

5   says "File hosting is temporarily down while we fix a bug," or

6   something of that nature, I believe.

7   Q.   And then file hosting was back up?

8   A.   Yes.   That feature was brought back to an active state as

9   it was prior to the FBI takeover.

10  Q.   And, as I understand it, but to get to that Canadian

11  content, you still wouldn't be able to do that?

12  A.   That's correct, you couldn't get to that Canadian content

13  after the FBI takeover.

14  Q.   And a user on Playpen would start to get error messages

15  anytime they tried to click on that content?

16  A.   You would get a "File not found" message, something of

17  that nature.

18  Q.   In discussing the criteria about what to shut down or what

19  to keep going, were there discussion about other ways to

20  mitigate downloading of child pornography or uploading of child

21  pornography?

22  A.   So the majority of the child pornography that was

23  distributed through the Playpen website was not actually on the

24  Playpen servers.   It was a minority of the content that was on

25  that server in Canada or the servers in North Carolina.   The

1    majority of the content that was distributed through the

2    Playpen website was hosted on external hosting providers,

3    generally outside of the United States.  So there is no action

4    that the FBI could have taken to remove that content.  It

5    wasn't under our control.

6    Q.    In previous pleadings, the government has indicated that

7    during a time they were operating Playpen, there was 67,000

8    links within the site that were accessed.  Is that accurate?

9    A.    I would have to read the pleading.  I don't know if that's

10   exactly what we stated in there, but if you have the document,

11   I can clarify.

12        (Pause.)

13   Q.    This is the United States' response to defendant's motion

14   to dismiss indictment as a response to a discovery order in the

15   *United States v. Michaud* that's been submitted to the Court

16   before.  I want you to look at the last paragraph on there.

17   A.    Okay.

18   Q.    And that indicates 67,000?

19   A.    Yes.

20   Q.    Does it also indicate how many links went out externally?

21        (Witness examining document.)

22   A.    That may be on the next page.  The sentence is cut off.

23        (Document passed to the witness.)

24   A.    Thank you.

25        (Witness examining document.)

1    A.    No, it doesn't have any indication about that.  I'm not

2    sure what line you're referencing.

3    Q.    So those 67,000 links, many thousand of them went to

4    external websites, right?

5    A.    Yes, that's fair to say.

6    Q.    And what would happen is, once somebody went to that

7    website, they might be able to download that content from that

8    website?

9    A.    Yes.  That's also accurate.

10   Q.    For links that went externally, unless you clicked on them

11   or some law enforcement agent clicked on them, you have no idea

12   what that content is, right?

13   A.    So links that were posted on the Playpen website were

14   generally posted in certain categories, Preteen Hard Core

15   Girls, Boys, things of that nature, so you generally have an

16   idea of what the link is going to lead to.  I'm not sure if

17   that answers your question.

18   Q.    That's the subject matter, but the specific picture, you

19   wouldn't know what that was?

20   A.    Depending on how the post was configured, if the image was

21   embedded in a particular post, you would see it when you opened

22   the post.  Sometimes you would have to actually click on the

23   image file or the link to download the content first.

24   Q.    And that's as opposed to the images that were hosted on

25   the North Carolina server, right, where you could actually take

Appellate Case: 19-3068    Document: 010110218567    Date Filed: 02/06/2019    Page: 61 of 79    Sealed
Case 5:17-cr-40097-DDC    Document 25-5 SEALED    Filed 02/01/18    Page 61 of 79

61

1    a look at the images immediately?

2    A.    I think you're drawing a distinction that doesn't exist on

3    the website.  You could post links to images that were hosted

4    on Playpen image uploader in the same manner that you could on

5    external websites.  The functionality was essentially the same.

6    Q.    But now you have access -- since January of 2015, you had

7    access to the back end, and you had access to the entire site

8    starting on February 20.  You can see exactly where the links

9    to North Carolina child porn is, and you can go directly there,

10   right?

11   A.    Well, wait.  You've just combined two completely different

12   dates and when we had different controls of the website.  So in

13   January we had a copy of the website itself.  I don't believe

14   we had copies of the image uploader or the file uploader.  I'm

15   not sure if those features existed at that particular point in

16   time.  When we took control of it in February, we did have

17   control of the website, as you said.

18   Q.    So in February, where someone clicked on a link, you could

19   have, for example, substituted adult pornography for that child

20   pornography image for images that were hosted in North

21   Carolina?

22   A.    We could have chosen not to put the images in North

23   Carolina back online, or we could have, I suppose, put adult

24   pornography in there; again, would have led people to

25   immediately acknowledge that there was clearly a law

Appellate Case: 19-1366 Case 5:17-cr-40097-DDC Document 255-5 *SEALED* Filed 08/25/2019 Filed 02/01/18 Page 62 of 79 Page: 165 Sealed

62

1    enforcement takeover of the website, so that was not done.

2    Q.    And, as I understand it, the NIT went out when you would

3    click on the link, regardless of whether the pornography was

4    actually viewed, right?  The NIT went out when the link went;

5    is that true?

6    A.    So generally, in order for the NIT to be utilized, a user

7    had to log into the website with the user name and password.

8    Then they had to go down to one of the various sub-forums of

9    the Web; for example, Preteen Girls Videos Hard Core.  After

10   they were in that sub-forum, they would have to open one of the

11   postings in that forum that was advertising child pornography,

12   and that's the point where the NIT would have been downloaded

13   to their computer.

14   Q.    Once on that thread, they can get to the actual content,

15   right?

16   A.    In some cases --

17          THE COURT:  We're beyond.

18          MR. WILKINS:  Yes.

19   Q.    But at that point, you could have substituted adult porn;

20   the NIT is already gone?

21   A.    Again, substituting adult pornography would have tipped

22   people off within minutes that there had been a law enforcement

23   takeover.

24          THE COURT:  Let's go.  I need to give an

25   opportunity -- do you have --

Appellate Case: 19-3068   Document: 010110218587   Date Filed: 02/06/2019   Page: 63   Sealed
Case 5:17-cr-40097-DDC   Document 25-3 SEALED   Filed 02/01/18   Page 63 of 96   Sealed

63

1       MR. TOBIN:  A few questions, your Honor.

2       MR. WATKINS:  May I just a couple more questions here,

3   your Honor?

4   Q.   As part of the monitoring, the site was monitored 24 hours

5   a day?

6   A.   Yes.

7   Q.   And that was by live agents in Maryland?

8   A.   Yes.

9   Q.   In the office that you were?

10  A.   Yes.

11  Q.   And, nevertheless, you can't say with any kind of

12  certainty how much child porn was downloaded or uploaded during

13  that period of time; is that true?

14  A.   We have provided statistics that we have available to us

15  in response to discovery requests.  If you have a specific

16  question, I can answer it in more detail.

17  Q.   But they are estimates, right?  In prior assertions, the

18  government can't say for sure because there was so much going

19  on, right?

20  A.   There again, I would --

21          THE COURT:  Actually, are you referring to the 67,000

22  links, or is there another number out there?

23          THE WITNESS:  I'm not sure what we're discussing, your

24  Honor.

25  Q.   So one can click on a link, right, and then one can

1  download the child pornography, right?

2  A.   So are you distinguishing between clicking a link and

3  downloading child pornography?  Because clicking on links to

4  navigate the website is one thing.  Clicking on links to child

5  pornography is another.  I want to make sure I'm answering the

6  questions accurately.

7  Q.   Sure.  So you click on the child pornography and it comes

8  up on the screen.  One can then download it to one's computer

9  as a separate step, right?

10 A.   Well, no.  If it's on your screen, it's already been

11 downloaded to your computer.

12 Q.   Sure, in cache, right?  It does not necessarily save to

13 your actual computer?

14       THE COURT:  In what?

15       MR. WATKINS:  Cache, c-a-c-h-e.

16 A.   If it's on your computer screen, it's stored on your

17 computer.  It may be stored in different folders, but if it's

18 on your screen, you've downloaded child porn.

19 Q.   Right.  And the government has no way to tell exactly how

20 much or even really an estimate of how many times that

21 happened?

22 A.   I believe we provided in response to a discovery order the

23 number of links that were clicked to external content.

24 Q.   And you've also provided here today that there were a

25 hundred thousand users during that two-week period?

1   A.   Approximately a hundred thousand unique user accounts

2   accessed the website during that time frame.

3   Q.   So if each one of those active users clicked on ten

4   photographs and they popped up on the screen, that would be a

5   million pictures?

6   A.   A hundred thousand times ten is a million, yes.

7   Q.   And if they did a hundred while they were on there, then

8   we're up to ten million?

9   A.   That math is also accurate.

10  Q.   So indeed that could be the amount of child porn that was

11  distributed during the period of time?

12        MR. TOBIN:   Objection.

13  A.   There is no basis for that statement.

14  Q.   It could have been, I think you just told us, right?

15        MR. TOBIN:   That's speculation.  It could have been a

16  thousand; it could have been five.  I mean, we don't know.

17        THE COURT:   Sustained.  I'm just trying to understand.

18  So there are 67,000 external links, but what is that number?

19  Is that the number of times clicked on an external link during

20  that two-week period?

21        THE WITNESS:   I -- sorry, now I'm confusing the

22  various numbers.  I'd have to look at the document again, but I

23  believe it was 67,000 external links that were clicked on.  I

24  believe that's what the document said.

25        THE COURT:   All right, and during the two weeks?

1          THE WITNESS:  Yes, your Honor.

2          THE COURT:  And, to your knowledge, was most of that

3     child porn?

4          THE WITNESS:  Yes, your Honor.

5          THE COURT:  Okay, thank you.  Mr. Tobin?

6          MR. TOBIN:  Very briefly.

7     REDIRECT EXAMINATION BY MR. TOBIN:

8     Q.    During your cross-examination, you have indicated that

9     this opportunity was incredibly rare.  What did you mean by

10    that?

11    A.    So the Playpen website, as described in various affidavits

12    and pleadings, existed on the Tor network.  When you create and

13    configure a website on the Tor network, it's called a hidden

14    service.  And so if you configure a Tor hidden service

15    properly, it's very difficult or impossible to find both it and

16    its users.  There are in fact hidden services dedicated to the

17    advertisement of child pornography that have been around for

18    years.  We know about them, but there's nothing we can

19    generally do about them.  We can log on, we can look at the

20    content, we can review the content, but we can't find the

21    creators or the users.

22          And so given the minor mistakes that Mr. Chase had

23    made in his creation of the Playpen website, it presented us

24    with an opportunity where we could both identify and arrest the

25    creator of the website, identify and arrest members of the

1   website, and rescue numerous victims from abuse.  That's what I

2   stated was a rare opportunity.

3   Q.   You indicated, as the Judge I think just went over again,

4   the 67,000 links, or at least many thousands went out to your

5   external websites, meaning that they used the website, they

6   used Playpen almost as a -- they clicked on something, and they

7   were transported to a different child porn website to see a

8   specific image or images?

9   A.    Not necessarily a child porn website.  So websites like

10  Playpen generally have lists of approved image and file

11  hosters.  These are the websites that are generally not in the

12  United States, and they generally do not respond to law

13  enforcement inquiries.  And so the creators of these websites

14  will say:  Hey, if you want to upload images or videos of child

15  pornography, the process generally is upload your images or

16  videos to this -- I'll throw out this website in Japan.  Make

17  sure you name the file something like innocuous like Sailboat.

18  Make sure that the password is good.  That way, that file

19  hoster in Japan, they don't actually know that they're hosting

20  child pornography, and generally the only people who will know

21  how to access and download it are the members of the Playpen

22  website.

23  Q.    But just so it's clear, at least so I understand, there

24  were images that folks using Playpen got to, images of child

25  pornography they got to after starting at Playpen that were

1    being hosted or that were residing or they were on other

2    websites?

3    A.    Yes.

4    Q.    And if you had shut down Playpen, abolished it entirely,

5    those other websites would not have been affected?  Is that the

6    accurate?

7    A.    That's correct.  Those images and videos would --

8    Q.    Those pictures of children would have still been on the

9    Internet?

10   A.    Yes.

11   Q.    Now, when Playpen was up and running, either without the

12   government's active involvement or with the government's active

13   involvement, as we've discussed now at some length, were there

14   other child pornography websites?

15   A.    Yes.

16   Q.    As we speak today, are there numerous --

17          THE COURT:  Yes, I know this, Mr. Tobin.

18          MR. TOBIN:  Huh?  General knowledge?  Okay, all right,

19   okay.

20   Q.    But this wasn't the only show in town?

21          THE COURT:  You say there were 67,000 links external.

22   Was there some on the website itself?

23          THE WITNESS:  So the actual website itself was not

24   hosting the images, but there was a separate website called the

25   Playpen Image and File Uploader that were parts of the website,

1    but they were technically their own websites.  So for those

2    images, I believe, yes, some of the images --

3             THE COURT:  So some were on the Playpen system?

4             THE WITNESS:  Yes, your Honor.

5             THE COURT:  But 67,000 of them were in foreign

6    countries or elsewhere?  Is that correct?

7             THE WITNESS:  I believe the 67,000 number may

8    encompass all of the content.

9             THE COURT:  So some of it was in-house and some of it

10   was external?

11            THE WITNESS:  Yes, your Honor.

12            THE COURT:  Okay, I just didn't get that distinction

13   before.  All right, anything else, Mr. Watkins?

14            MR. WATKINS:  No, your Honor.

15            MR. TOBIN:  Nothing for me.

16            THE COURT:  Thank you.  You may step down.

17            THE WITNESS:  Thank you, your Honor.

18            (Witness excused.)

19            THE COURT:  Okay, so anything else?

20            MR. TOBIN:  No, your Honor.

21            THE COURT:  Anything from your end?

22            MR. WATKINS:  Your Honor, I did file the motion to

23   compel discovery.

24            THE COURT:  Yes, yesterday.

25            MR. WATKINS:  Well, just to be clear that the Court

1  scheduled the evidentiary hearing late last week.  I discussed

2  with Mr. Tobin some of these items.  These are things that are

3  requested, some of them, at least, in the past.  I sent the

4  discovery letter to Mr. Tobin to make sure --

5      THE COURT:  I'm just saying, I just got the motion to

6  compel yesterday.

7      MR. WATKINS:  Okay.  And just to finish through, I

8  told Mr. Tobin that time was of the essence.  We're both very

9  busy, and he was not able to give me his definitive answer to

10  them till yesterday.  Probably 20 minutes after he gave me the

11  answer, I filed the motion, so that is why it is here at this

12  time.  But, still, I would press the items, given the kinds of

13  evidence that we have heard today or the testimony that we've

14  heard.

15      THE COURT:  I am not prepared to deal with it.  I'm

16  likely to refer this to the United States Magistrate Judge, or

17  at the very least want to see an opposition, but let's just

18  have oral argument right now.

19      MR. WATKINS:  Judge, I mean, I think the items I

20  requested are relevant to what --

21      THE COURT:  I don't want to have another oral

22  argument.  I mean, if something comes in that's newly

23  discovered and you want to argue later, we'll deal with it,

24  but, I mean, I've now dragged this out for a while.  And I told

25  you my initial instinct that based on what I had before, it

1   wasn't enough.  However, you then added an additional fact.

2          MR. WATKINS:  Right.

3          THE COURT:  Which is, well, they pumped up the numbers

4   essentially.  And so I agreed to sort of hear that.  It is

5   different.  And so that, at least based on what I'm hearing,

6   turns out not to be the case.  It's possible that something

7   else that you see changes your mind and it's newly discovered,

8   but I haven't seen it.

9          MR. WATKINS:  What's newly discovered is the testimony

10  we heard today about the deep involvement of Main Justice in

11  the decision to run the website, and also the lack of any kind

12  of controls and mitigation for distributing child pornography.

13  We don't know -- to the extent outrageous governmental conduct

14  depends on what shocks the conscience, what we're talking about

15  is a very, very reasoned, up-the-chain apparently decision -- I

16  don't know about reasoned but --

17         THE COURT:  I was thinking that cuts the other way.

18  It wasn't a rogue agent.  It was something done in a purposeful

19  way.  In other words, it wasn't some renegade here.  I guess

20  the way I'm thinking, all right, is, the mere fact that they

21  ran it was not enough for me.  I told you that already.  I

22  might have been concerned if they pumped up the numbers.  That

23  apparently hasn't happened.  I think I was worried, were they

24  encouraging production by posting new stuff?  That hasn't

25  happened.  You could have argued -- I actually learned

1    something here today.  It was actually longer than I thought.

2    It was actually not just two weeks.  There was another month in

3    January.  You could argue that they shouldn't have done it;

4    they should have done it sooner.  But that's not shocking and

5    outrageous.  That's just a law enforcement decision.

6         And the thing that really has got me going is saving

7    all these kids.  Two of them were people who had pornography

8    posted, but the rest were just, I guess, the correlation

9    between possession and touching.  They saved a bunch of kids.

10   I mean, I'm not -- I get your point, some of this, maybe they

11   could have done it quicker, or maybe there should have been a

12   protocol and there wasn't one.  I'm just not seeing it as

13   outrageous, not when we've now done the case research on what's

14   counted as outrageous.

15        So at this point I'm denying it, and if new stuff

16   comes in that changes something and you want to move for it,

17   let me know, but I need to move this case forward to trial.

18   There may be something that you produce that's -- I'm not

19   closing down discovery on it.  I need to get this to the point

20   of trial.

21        MR. WATKINS:  Before we move to that stage, your

22   Honor, if I can make just a couple of points.  One is, given

23   the testimony that there are 49 hands-on offenders that were

24   discovered, if the government can provide the names of the

25   prosecutions of those cases.  I have no reason to believe or

Appellate Case: 19-3068    Document: 010110218507    Date Filed: 08/26/2019    Page: 73    Sealed
Case 5:17-cr-40097-DDC    Document 25-5 *SEALED*    Filed 02/01/18    Page 73 of 96

73

1   disbelieve that there were 49 people discovered with hands-on

2   offenses.

3        THE COURT:  As long as it's not confidential in an

4   ongoing investigation, and under a protective order, and not

5   mentioning the children's names.  That's protected.  So if

6   there's a public prosecution, open complaint.

7        MR. TOBIN:  And I don't know specifically this.  I'd

8   be shocked if there are 49 prosecutions.

9        THE COURT:  There may not be.  Whatever is public, not

10  a private investigation.

11       MR. TOBIN:  Sure.

12       THE COURT:  And so what am I doing in terms of --

13       MR. WATKINS:  Just if the Court will indulge me, I

14  would like to orally move and follow up with a written motion

15  to reconsider the Court's decision on the Rule 41 motion.

16  We've now learned today that it was not just two agents and an

17  AUSA down in Eastern Virginia doing that stuff.  This was a

18  very calculated decision that went up to the highest levels of

19  the Department of Justice.  To suggest that there's some kind

20  of good faith at this point on those local officers in either

21  getting the affidavit or executing it once they have it, I

22  think that's brought severely into doubt today, where you've

23  got the same Department of Justice asking to get this warrant

24  in the Eastern District of Virginia at the same time that they

25  are trying to get the Supreme Court to amend Rule 41.  I think

1  it undercuts the good-faith argument, which is what the court

2  decided a matter on.  So I'm asking the Court orally today and

3  allow me to supplement with a motion to reconsider.

4          MR. TOBIN:  And, your Honor, I would object to that.

5  I mean --

6          THE COURT:  Enough already.  Denied.  All right, now

7  let me just -- when are we going to go to trial?

8          MR. TOBIN:  Soon.

9          MR. WATKINS:  Well, that would be nice, but what we

10  are now in is the middle of the forensic review of the --

11          THE COURT:  That's what I'm asking you, when?

12          MR. WATKINS:  Right, exactly.  So we are about perhaps

13  a third of the way through there.  Mr. Tobin was finally able

14  to get materials that I've been asking for for close to nine or

15  ten months.

16          THE COURT:  Give me a date.

17          MR. WATKINS:  For a trial?  I would say February.

18          THE COURT:  Fine.  Speedy Trial excluded, fine.  We'll

19  give you a pretrial order.

20          THE CLERK:  I'll give you a pretrial order.

21          THE COURT:  By the way, I have two questions that I

22  want to know.  Is any of this stuff -- I was fascinated by the

23  NIT case law that's already evolving.  Has any of it hit a

24  circuit yet?

25          MR. TOBIN:  I don't believe so.  There's been no

```
 1    circuit decisions.

 2              THE COURT:  So that may actually make a difference, if

 3    either our circuit in reviewing Judge Young --

 4              MR. TOBIN:  Judge, we are pursuing the appeal.

 5    Obviously, there have not been arguments.  I don't even think

 6    briefs have even been submitted by the government as of yet,

 7    but that's being pursued.  I don't believe there's been any

 8    arguments in any circuit on the actual issue.

 9              MR. WATKINS:  So the Solicitor General has okayed the

10    appeal in Levin?

11              MR. TOBIN:  Oh, gosh.  We are pursuing an appeal.  I

12    don't want to say any more than that.  I always get in trouble

13    if I start talking about internal negotiations.

14              THE COURT:  The local office wants to, but you don't

15    know if the SG has signed off yet?

16              MR. TOBIN:  I -- I'm not even saying that.  I'm saying

17    my office is pursuing an appeal.  It's an alive issue.  What's

18    available for public consumption as to the AG or the Solicitor,

19    I don't know.

20              THE COURT:  Okay.  Well, let me put it this way:  I am

21    going to schedule for February, and the reason I want to do

22    this is, this isn't my first rodeo, and these forensic exams

23    take --

24              MR. TOBIN:  A long time.

25              THE COURT:  -- a long time.  I know that.  They're
```

```
1   expensive.  I know they take a long time, so that's why I'm
2   giving you some leeway here.  Do you have a forensic examiner?
3          MR. TOBIN:  Well, yes, we have a case agent.  I might
4   bring somebody else in if we're actually going to trial.
5          THE COURT:  Someone I would consider an expert?
6          MR. TOBIN:  Well, I suspect, yes.
7          THE COURT:  All right, because you're going to both
8   have to exchange expert reports, so when you do the pretrial
9   order, you need to build that in because you may want to
10  challenge each other, or at least have the time to -- I mean,
11  it's complicated stuff -- to understand it.  So we're going to
12  give you a pretrial order, but, more importantly, what date do
13  you want in February?  We actually are starting to clog up in
14  February, so what --
15         (Discussion between the Court and Clerk.)
16         THE COURT:  Why don't we give you February 6?  On
17  February 6, I'm just simply saying that there's another case
18  there that may or may not plead, but basically I've got the
19  whole month open, so --
20         MR. WATKINS:  That's fine.
21         THE COURT:  Okay?  February 6.
22         The other question I have is, has anyone ruled on the
23  outrageous conduct thing?
24         MR. TOBIN:  Well, I don't know if there's been
25  rulings -- no, yes, of course, in our very own courthouse,
```

1    Judge Burroughs denied that motion.

2            THE COURT:  I did see that, but have there been any --

3            MR. TOBIN:  There have been no allowances of it

4    anywhere in the country.

5            THE COURT:  Anywhere in the country?

6            MR. TOBIN:  No.

7            MR. WATKINS:  Not that I'm aware of.

8            THE CLERK:  Pretrial two weeks in advance?

9            THE COURT:  Two weeks in advance, yes.

10           THE CLERK:  So we can do a pretrial, if you're

11    available, January 26, January 26 at 2:00 o'clock?

12           MR. TOBIN:  That's fine.

13           MR. WATKINS:  Very good.  Thank you.

14           THE COURT:  And, to your knowledge, is it pending in

15    any other circuit, an appeal?

16           MR. TOBIN:  This issue?  I don't know.  I don't know

17    if it's been brought up.  I know that it's my belief that no

18    district judge has dismissed the case for outrageous government

19    misconduct.  Whether or not it -- no, it couldn't be, it

20    couldn't be, right, because they don't know --

21           THE COURT:  Anyway, it's a more interesting question

22    than the NIT thing because it's all this interesting corner of

23    the law.

24           MR. TOBIN:  It's been making its way through various

25    appellate courts, as I understand.

 1          THE COURT:  It is.

 2          MR. WATKINS:  I understand that the Tenth Circuit is

 3     close to taking a case or two cases.  The cases would be

 4     *Arterbury*, and there's a second one whose name I can't

 5     remember.

 6          THE COURT:  That will be interesting to follow.

 7          MR. TOBIN:  Very much so, fascinating.

 8          THE COURT:  And do you envision a likely trial here?

 9          MR. TOBIN:  I don't have any say in that, Judge.

10          MR. WATKINS:  It's difficult to tell at this point.

11          THE COURT:  A lot of these kinds of cases hinge on the

12     legal issues, so I'll plan on it.

13          MR. TOBIN:  Well, I mean, as the Court knows as well,

14     you know, as we all do, it is very, very rare for a child

15     pornography case to go to trial, but that doesn't mean this one

16     won't.

17          THE COURT:  Well, there are some very important

18     cutting-edge legal issues here, so --

19          MR. TOBIN:  Exactly, exactly.

20          THE COURT:  Okay, all right, thank you.  I'm going to

21     count on it as a real trial, but you will be second to my other

22     trial, so keep calling us as it goes along, all right?

23          MR. TOBIN:  Thank you, Judge.

24          (Adjourned, 12:05 p.m.)

25

C E R T I F I C A T E

1

2

3

4      UNITED STATES DISTRICT COURT )
       DISTRICT OF MASSACHUSETTS    ) ss.
       CITY OF BOSTON               )

5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8      do hereby certify that the foregoing transcript, Pages 1

9      through 78 inclusive, was recorded by me stenographically at

10     the time and place aforesaid in Criminal No. 15-10347-PBS,

11     United States of America v. Vincent C. Anzalone, and thereafter

12     by me reduced to typewriting and is a true and accurate record

13     of the proceedings.

14          Dated this 16th day of October, 2016.

15

16

17

18

19          /s/ Lee A. Marzilli

20          _____
            LEE A. MARZILLI, CRR
21          OFFICIAL COURT REPORTER

22

23

24

25

Home | Help | Search | Profile | My Messages | Members | Logout

PlayPen

JavaScript is enabled in your browser. Why this might be a problem.

| Generel Category | | Unread Posts |
|---|---|---|
| Playpen information and rules | 33 Posts<br>3 Topics | **Last post** by baldoldperv<br>in Re: New Playpen Videos<br>on September 16, 2014, 06:53:02 PM |
| How to<br>Share what you know. | 56 Posts<br>17 Topics | **Last post** by Vitellius<br>in Windows Security Guide<br>on September 16, 2014, 12:04:08 PM |
| Request<br>Please all request go here. | 441 Posts<br>173 Topics | **Last post** by JuanAnatou<br>in Re: LS Models, and BD Co...<br>on **Today** at 05:04:25 AM |
| General Discussion<br>Talk about anything here. | 784 Posts<br>114 Topics | **Last post** by Squire<br>in Re: starting with 5yo ni...<br>on **Today** at 05:35:59 AM |

| Jailbait Videos | | Unread Posts |
|---|---|---|
| Girls | 384 Posts<br>44 Topics | **Last post** by pussyeater691<br>in Re: 1st studio Siberian ...<br>on **Today** at 05:38:17 AM |
| Boys | 47 Posts<br>19 Topics | **Last post** by cingy<br>in Re: HotBoys 1, 2 & 3 /<br>on September 12, 2014, 04:32:47 AM |

| Jailbait Photos | | Unread Posts |
|---|---|---|
| Girls | 194 Posts<br>32 Topics | **Last post** by thanatos<br>in Re: Sexting selfies<br>on **Today** at 04:09:32 AM |
| Boys | 29 Posts<br>12 Topics | **Last post** by plusminuszero<br>in Re: My Little Sister Is ...<br>on September 13, 2014, 04:08:01 AM |

**Pre-teen Videos** — **Unread Posts**

PlayPen - Index

| | | | |
|---|---|---|---|
| | **Feet**<br>Bare feet socks this is the place. | 15 Posts<br>4 Topics | in Re: FootJob<br>on September 15, 2014,<br>06:16:45 AM |
| | **Panties**<br>panty lovers videos and pictures. | 79 Posts<br>8 Topics | Last post by thepedolove<br>in Re: Something different<br>on September 16, 2014,<br>11:28:45 PM |
| | **Peeing**<br>Golden showers and stuff goes here. | 92 Posts<br>37 Topics | Last post by<br>zwergenbaendiger<br>in Re: Nablot - VTCAP 01 -<br>...<br>on September 16, 2014,<br>09:50:33 PM |
| | **Scat**<br>Interest in excrement, feces | 15 Posts<br>3 Topics | Last post by jose dupac<br>in Re: 14 yo eating shit<br>on September 14, 2014,<br>07:28:41 AM |
| | **Spanking** | 53 Posts<br>9 Topics | Last post by Gektor<br>in Re: Clip from 70s movie<br>on Today at 04:05:45 AM |
| | **Vintage**<br>Color Climax... Piccolo, Lolita, Child Love etc | 66 Posts<br>13 Topics | Last post by Phir LePhance<br>in ColorClimax - Tvg-08<br>on September 16, 2014,<br>11:30:35 PM |
| | **Voyeur** | 20 Posts<br>4 Topics | Last post by knickers<br>in Re: Hitosuji no Yuuwaka<br>on September 16, 2014,<br>08:51:17 PM |

## Stories

**Unread Posts**

| | | | |
|---|---|---|---|
| | Fiction | 26 Posts<br>17 Topics | Last post by knickers<br>in Playpen does Dragons<br>Den...<br>on September 12, 2014,<br>03:37:48 AM |
| | Non-fiction | 45 Posts<br>11 Topics | Last post by thanatos<br>in Re: Double Spanking<br>on Today at 04:52:29 AM |

✳ New Posts    ✳ No New Posts

---

### PlayPen - Info Center

#### Recent Posts

Re: **horny family (old vhs)** by muffd1ver (Family Play Pen)                        **Today** at 05:39:13 AM
Re: **1st studio Siberian Mouse MSH_45 (HD)** by pussyeater691 (Girls)           **Today** at 05:38:17 AM
Re: **starting with 5yo niece** by Squire (General Discussion)                        **Today** at 05:35:59 AM
Re: **Nicole** by clisu (Girls HC)                                                                      **Today** at 05:30:00 AM
Re: **Kinder Girl** by clisu (Girls HC)                                                               **Today** at 05:29:56 AM

#### Forum Stats

5551 Posts in 933 Topics by 59197 Members. Latest Member: **jumbojet**
Latest Post: **"Re: horny family (old vh..."** ( **Today** at 05:39:13 AM )
View the most recent posts on the forum.

#### Users Online

1 Guest, 608 Users (3 Hidden)
Users active in past 15 minutes:

file:///E:/soldiermike/UC%20Sessions%20-%20PlayPen/September%202014/Firefox%20Captures/PlayPen%20-%20Index.htm[10/18/2017 2:16:27 PM]

Sealed Supp App Vol 1 pg 182
03-000092

Appellate Case: 19-3062   Document: 01010235876SEALED*   Filed: 02/01/18   Page: 1 of 316   Sealed
Case 5:17-cr-40097-DDC   Document 255 *SEALED*   Filed 02/01/18   Page 1 of 316

Case 5:15-mj-05106-KGS *SEALED*   Document 1   Filed 09/15/15   Page 1 of 1

# THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF KANSAS

IN THE MATTER OF THE )
SEARCH OF: )
THE PREMISES KNOWN AS )     Case No. 15-mj-5106-KGS
800 ADOLPH STREET )
WHITE CITY, KANSAS )     **FILED UNDER SEAL**

## APPLICATION

I, Angie Jones, being duly sworn, depose and say:

I am a Task Force Officer with Federal Bureau of Investigation ("FBI") and have reason to believe that in the District of Kansas there is now concealed a certain person or property, namely:

**See accompanying Affidavit and Attachment A**

which is evidence concerning violations of Title 18 United States Code, Sections 2252, certain activities relating to material involving the sexual exploitation of minors, and 2252A, certain activities relating to material constituting or containing child pornography.

The facts to support a finding of Probable Cause are as follows:

**See accompanying Affidavit**

s/ Angie Jones
Task Force Officer Angie Jones
Federal Bureau of Investigation

Sworn and acknowledged before me this 15th day of September, 2015, at Topeka, Kansas.

s/ K. Gary Sebelius
Hon. K. Gary Sebelius
UNITED STATES MAGISTRATE JUDGE

1

02-000097

## ATTACHMENT A

### LIST OF ITEMS TO BE SEIZED

1.  Computer(s), computer hardware, computer software, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2.  Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs, including, but not limited to, P2P software.

3.  Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.  In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.  Any and all diaries, address books, names, and lists of names and addresses of

1

08-200098

individuals who may have been contacted by operator of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to whose with an interest in child pornography.

9.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and

2

02-000099

electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

     10.    Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

     11.    Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

     12.    Any and all cameras, film, videotapes or other photographic equipment.

     13.    Any and all visual depictions of minors.

     14.    Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in

3

02-B00100

sexually explicit conduct,  as defined in 18 U.S.C. § 2256(2).

15.     Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

16.     Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

4

## THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

IN THE MATTER OF THE )
SEARCH OF: )
THE PREMISES KNOWN AS )     **Case No. 15-mj-5106-KGS**
800 ADOLPH STREET )
WHITE CITY, KANSAS )     **FILED UNDER SEAL**

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Angie Jones, a Senior Special Agent (SSA) with the Kansas Bureau of Investigation (KBI), Lenexa, KS, being duly sworn, depose and state as follows:

1.     I have been employed as a sworn agent with the KBI since May 2001 and am currently assigned as a Task Force Officer (TFO) to the FBI Child Exploitation Task Force, Kansas City, Missouri. Since June 2003, I have been assigned to investigate computer crimes to include violations against children. I have gained expertise in the conduct of such investigations through training in seminars, classes, and everyday work related to conducting these types of investigations. I have attended multiple trainings on the investigation of child pornography and sexual exploitation of children such as Innocent Images provided by the FBI.

2.     As a TFO, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. At all times throughout this affidavit I use the term "child pornography" merely as shorthand to refer to visual depictions of actual minors engaged in sexually explicit conduct. I use the terms "visual depiction," "minor," and "sexually explicit conduct" as those terms are defined in 18 U.S.C. § 2256 (See Definition Section below).

1

02-000102

3.     I am investigating activities occurring at **800 Adolph Street, White City, Kansas**. As will be shown below, there is probable cause to believe Wesley Wagner, or another resident of **800 Adolph Street, White City, Kansas**, has been involved with distribution, receipt, possession, and access with intent to view child pornography, or a conspiracy or attempt to commit these crimes, in violation of Title 18, United States Code, Sections 2252 and 2252A. I am submitting this affidavit in support of a search warrant authorizing a search of the residence, located at **800 Adolph Street, White City, Kansas**, and is more particularly described in paragraph 48 below, for the items specified in Attachment A hereto, which items constitute instrumentalities, fruits, and evidence of the foregoing violations. I am requesting authority to search the entire Premises, including the residential dwelling, outbuildings, and any computer and computer media located therein where the items specified in Attachment A may be found, and to seize all items listed in Attachment A as instrumentalities, fruits, and evidence of crime.

4.     The statements in this affidavit are based on information received from the FBI Headquarters Major Case Coordination Unit and my investigation of this matter. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe evidence, fruits, and instrumentalities of the violation of Title 18, United States Code, Sections 2252 and 2252A, are presently located at **800 Adolph Street, White City, Kansas**.

### STATUTORY AUTHORITY

5.     This investigation concerns alleged violations of Title 18, United States Code, Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors. 18

2

U.S.C. § 2252(a) prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, or possessing any visual depiction of minors engaging in sexually explicit conduct when such visual depiction was either mailed or shipped or transported in interstate or foreign commerce by any means, including by computer, or when such visual depiction was produced using materials that had traveled in interstate or foreign commerce. 18 U.S.C. § 2252A(a) prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, or possessing any child pornography, as defined in 18 U.S.C. § 2256(8), when such child pornography was either mailed or shipped or transported in interstate or foreign commerce by any means, including by computer, or when such child pornography was produced using materials that had traveled in interstate or foreign commerce.

18 U.S.C. § 2252A(a)(3) prohibits a person from knowingly possessing or reproducing child pornography for distribution through the mail or in interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer.

**DEFINITIONS**

6.     The following definitions apply to this Affidavit and Attachment A to this Affidavit:

3

Case 5:17-cr-40097-DDC  Document 25-7 *SEALED*  Filed 02/01/18  Page 9 of 31
Appellate Case: 19-3068  Document: 010110218507  Date Filed: 08/26/2019  Page: 194  Sealed

Case 5:15-mj-05106-KGS *SEALED*  Document 1-2  Filed 09/15/15  Page 4 of 26

a.      "Bulletin Board" means an Internet-based website that is either secured
(accessible with a password) or unsecured, and provides members with the ability to view
postings by other members and make postings themselves.  Postings can contain text messages,
still images, video images, or web addresses that direct other members to specific content the
poster wishes.  Bulletin boards are also referred to as "internet forums" or "message boards."  A
"post" or "posting" is a single message posted by a user.  Users of a bulletin board may post
messages in reply to a post.  A message "thread," often labeled a "topic," refers to a linked series
of posts and reply messages.  Message threads or topics often contain a title, which is generally
selected by the user who posted the first message of the thread.  Bulletin boards often also
provide the ability for members to communicate on a one-to-one basis through "private
messages."  Private messages are similar to e-mail messages that are sent between two members
of a bulletin board.  They are accessible only by the user who sent/received such a message, or
by the Website Administrator.

b.      "Child Erotica," as used herein, means materials or items that are sexually
arousing to persons having a sexual interest in minors but that are not, in and of themselves,
obscene or that do not necessarily depict minors in sexually explicit poses or positions.

c.      "Child Pornography," as used herein, includes the definition in 18 U.S.C.
§ 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the
visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual
depiction is a digital image, computer image, or computer-generated image that is, or is
indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual
depiction has been created, adapted, or modified to appear that an identifiable minor is engaged

4

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 10 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 195   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 5 of 26

in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct (see 18 U.S.C. §§ 2252 and 2256(2)).

   d.  "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18 U.S.C. § 2256(5).

   e.  "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons.  See 18 U.S.C. § 2256(2).

   f.  "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users.  A web server, for example, is a computer which hosts the data associated with a website.  That web server receives requests from a user and delivers information from the server to the user's computer via the Internet.  A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser.  Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

   g.  "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

<div align="center">5</div>

02-000106

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 11 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 196   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 6 of 26

h.     "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

i.     "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

j.     "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

k.     "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that

6

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 12 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 197   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 7 of 26

creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

   l. "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet.  IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet.  IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

   m. The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

   7. Computers and computer technology have revolutionized the way in which

02-000108

Sealed Supp App Vol 1 pg 194

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 13 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 198   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 8 of 26

individuals interested in child pornography interact with each other.  Child pornography formerly

was produced using cameras and film (either still photography or movies).  The photographs

required darkroom facilities and a significant amount of skill in order to develop and reproduce

the images.  There were definable costs involved with the production of pornographic images.

To distribute these on any scale required significant resources.  The photographs themselves

were somewhat bulky and required secure storage to prevent their exposure to the public.  The

distribution of these wares was accomplished through a combination of personal contacts,

mailings and telephone calls.

8.      The development of computers has changed this.  Computers basically serve four

functions in connection with child pornography:  production, communication, distribution, and

storage.

9.      Child pornographers can now transfer photographs from a camera onto a

computer-readable format with a device known as a scanner.  With the advent of digital cameras,

the images can now be transferred directly onto a computer.  A device known as a modem allows

any computer to connect to another computer through the use of telephone, cable, or wireless

connection.  Electronic contact can be made to literally millions of computers around the world.

10.      The computer's ability to store images in digital form makes the computer itself

an ideal repository for child pornography.  The size of the electronic storage media (commonly

referred to as the hard drive) used in home computers has grown tremendously within the last

several years.  These drives can store thousands of images at very high resolution.

11.      The Internet and its World Wide Web afford collectors of child pornography

several different venues for obtaining, viewing and trading child pornography in a relatively

02-000109

Sealed Supp App Vol 1 pg 195

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 14 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 199   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 9 of 26

secure and anonymous fashion.

12.     Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others.  The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  Evidence of such online storage of child pornography is often found on the user's computer.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

13.  As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.  Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  A forensic examiner often can recover evidence suggesting whether a computer contains peer to peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded.  Such information is often maintained indefinitely until overwritten by other data.

02-000110
Sealed Supp App Vol 1 pg 196

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 15 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 200   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 10 of 26

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

14. Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Computer storage devices (like hard disks, diskettes, CDs, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its

02-000111

Sealed Supp App Vol 1 pg 197

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 16 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 201   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 11 of 26

complete and accurate analysis.

15.     In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU).  In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues.  In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

16.     In addition, there is probable cause to believe that the computer and its storage devices, the monitor, keyboard, and modem are all instrumentalities of the crime(s), within the meaning of 18 U.S.C. §§ 2251 through 2256, and should all be seized as such.

## SEARCH METHODOLOGY TO BE EMPLOYED

17.     The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a.      examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the

11

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 17 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 202   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 12 of 26

criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the

offenses specified above);

        c.      surveying various file directories and the individual files they contain;

        d.      opening files in order to determine their contents;

        e.      scanning storage areas;

        f.      performing key word searches through all electronic storage areas to

determine whether occurrences of language contained in such storage areas exist that are likely

to appear in the evidence described in Attachment A; and/or

        g.      performing any other data analysis technique that may be necessary to

locate and retrieve the evidence described in Attachment A.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

    18.    The majority of individuals who collect child pornography are persons who have

a sexual attraction to children. They receive sexual gratification and satisfaction from sexual

fantasies fueled by depictions of children that are sexual in nature.

        a.      The majority of individuals who collect child pornography collect sexually

explicit materials, which may consist of photographs, magazines, motion pictures, video tapes,

books, slides, computer graphics or digital or other images for their own sexual gratification.

The majority of these individuals also collect child erotica, which may consist of images or text

that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual

fantasies involving children.

        b.      The majority of individuals who collect child pornography often seek out

like-minded individuals, either in person or on the Internet, to share information and trade

02-000113

Sealed Supp App Vol 1 pg 199

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 18 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 203   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 13 of 26

depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, P2P, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles.

        c.     The majority of individuals who collect child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals rarely destroy these materials because of the psychological support they provide.

        d.     The majority of individuals who collect child pornography often collect, read, copy or maintain names, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

        e.     The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. They almost always maintain their collections in the privacy and security of their homes or other secure location.

02-000114

Sealed Supp App Vol 1 pg 200

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 19 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 204   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 14 of 26

## BACKGROUND OF THE INVESTIGATION

19.     Wesley Wagner or a user of the Internet account at *800 Adolph Street, White City, Kansas* has been linked to an online community of individuals who regularly send and receive child pornography via a website that operated on an anonymous online network.   The website is described below and referred to herein as "Website A."[1]   There is probable cause to believe that Wesley Wagner or a user of the Internet account at *800 Adolph Street, White City, Kansas* knowingly accessed with intent to view, receive, and/or distribute child pornography on "Website A."

### The Network[2]

20.     "Website A" operated on a network ("the Network") available to Internet users who are aware of its existence.  The Network is designed specifically to facilitate anonymous communication over the Internet.  In order to access the Network, a user must install computer software that is publicly available, either by downloading software to the user's existing web browser, downloading free software available from the Network's administrators, or downloading a publicly-available third-party application.[3]  Using the Network prevents someone

---

[1] The actual name of "Website A" is known to law enforcement.  Disclosure of the name of the site would potentially alert its members to the fact that law enforcement action is being taken against the site and its users, potentially provoking members to notify other members of law enforcement action, flee, and/or destroy evidence.  Accordingly, for purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the website will be identified as "Website A."

[2] The actual name of the Network is known to law enforcement.  The network remains active and disclosure of the name of the network would potentially alert its members to the fact that law enforcement action is being taken against the network, potentially provoking members to notify other members of law enforcement action, flee, and/or destroy evidence.  Accordingly, for purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the network will be identified as "the Network."

[3] Users may also access the Network through so-called "gateways" on the open Internet, however, use of those gateways does not provide users with the full anonymizing benefits of the Network.

14

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 20 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 205   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 15 of 26

attempting to monitor an Internet connection from learning what sites a user visits and prevents the sites the user visits from learning the user's physical location. Because of the way the Network routes communication through other computers, traditional IP identification techniques are not viable.

21.     Websites that are accessible only to users within the Network can be set up within the Network and "Website A" was one such website. Accordingly, "Website A" could not generally be accessed through the traditional Internet.[4] Only a user who had installed the appropriate software on the user's computer could access "Website A." Even after connecting to the Network, however, a user had to know the exact web address of "Website A" in order to access it. Websites on the Network are not indexed in the same way as websites on the traditional Internet. Accordingly, unlike on the traditional Internet, a user could not simply perform a Google search for the name of "Website A," obtain the web address for "Website A," and click on a link to navigate to "Website A." Rather, a user had to have obtained the web address for "Website A" directly from another source, such as other users of "Website A," or from online postings describing both the sort of content available on "Website A" and its location. Accessing "Website A" therefore required numerous affirmative steps by the user, making it extremely unlikely that any user could have simply stumbled upon "Website A" without first understanding its content and knowing that its primary purpose was to advertise and distribute child pornography.

---

[4] Due to a misconfiguration, prior to February 20, 2015, Website A was occasionally accessible through the traditional Internet. In order to access Website A in that manner, however, a user would have had to know the exact IP address of the computer server that hosted Website A, which information was not publicly available. As of on or about February 20, 2015, Website A was no longer accessible through the traditional Internet.

15

22.     The Network's software protects users' privacy online by bouncing their communications around a distributed network of relay computers run by volunteers all around the world, thereby masking the user's actual IP address which could otherwise be used to identify a user.

23.     The Network also makes it possible for users to hide their locations while offering various kinds of services, such as web publishing, forum/website hosting, or an instant messaging server.  Within the Network itself, entire websites can be set up which operate the same as regular public websites with one critical exception - the IP address for the web server is hidden and instead is replaced with a Network-based web address.  A user can only reach such sites if the user is using the Network client and operating in the Network.  Because neither a user nor law enforcement can identify the actual IP address of the web server, it is not possible to determine through public lookups where the computer that hosts the website is located. Accordingly, it is not possible to obtain data detailing the activities of the users from the website server through public lookups.

**Description of "Website A" and its Content**

24.     "Website A" was a child pornography bulletin board and website dedicated to the advertisement and distribution of child pornography and the discussion of matters pertinent to the sexual abuse of children, including the safety and security of individuals who seek to sexually exploit children online.  On or about February 20, 2015, the computer server hosting "Website A" was seized from a web-hosting facility in Lenoir, North Carolina.  The website operated in Newington, Virginia, from February 20, 2015, until March 4, 2015, at which time "Website A" ceased to operate.  Between February 20, 2015, and March 4, 2015, law

02-000117

Sealed Supp App Vol 1 pg 203

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 22 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 207   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 17 of 26

enforcement agents acting pursuant to an order of the United States District Court for the Eastern District of Virginia monitored electronic communications of users of "Website A." Before, during, and after its seizure by law enforcement, law enforcement agents viewed, examined and documented the contents of "Website A," which are described below.

25.     According to statistics posted on the site, "Website A" contained a total of 117,773 posts, 10,622 total topics, and 214,898 total members as of March 4, 2015. The website appeared to have been operating since approximately August 2014, which is when the first post was made on the message board. On the main page of the site, located to either side of the site name were two images depicting partially clothed prepubescent girls with their legs spread apart, along with the text underneath stating, "No cross-board reposts, .7z preferred, encrypt filenames, include preview, Peace out." Based on my training and experience, I know that: "no cross-board reposts" refers to a prohibition against material that is posted on other websites from being "re-posted" to "Website A;" and ".7z" refers to a preferred method of compressing large files or sets of files for distribution. Two data-entry fields with a corresponding "Login" button were located to the right of the site name. Located below the aforementioned items was the message, "Warning! Only registered members are allowed to access the section. Please login below or 'register an account' [(a hyperlink to the registration page)] with "[Website A]." Below this message was the "Login" section, consisting of four data-entry fields with the corresponding text, "Username, Password, Minutes to stay logged in, and Always stay logged in."

26.     Upon accessing the "register an account" hyperlink, there was a message that informed users that the forum required new users to enter an email address that looks to be valid. However, the message instructed members not to enter a real email address. The message

17

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 23 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 208   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 18 of 26

further stated that once a user registered (by selecting a user name and password) the user would be able to fill out a detailed profile. The message went on to warn the user "[F]or your security you should not post information here that can be used to identify you." The message further detailed rules for the forum and provided other recommendations on how to hide the user's identity for the user's own security.

27.     After accepting the above terms, registration to the message board then required a user to enter a username, password, and email account; although a valid email account was not required as described above.

28.     After successfully registering and logging into the site, the user could access any number of sections, forums, and sub-forums. Some of the sections, forums, and sub-forums available to users included: (a) How to; (b) General Discussion; (c) [Website A] information and rules; and (d) Security & Technology discussion. Additional sections, forums, and sub-forums included (a) Jailbait – Boy; (b) Jailbait – Girl; (c) Preteen – Boy; (d) Preteen – Girl; (e) Pre-teen Videos – Girl HC; (f) Pre-teen Videos – Boys HC; (g) Toddlers; and (h) Kinky Fetish – Scat. Based on my training and experience, I know that "jailbait" refers to underage but post-pubescent minors; the abbreviation "HC" means hardcore (i.e., depictions of penetrative sexually explicit conduct); and "scat" refers to the use of feces in various sexual acts, watching someone defecating, or simply seeing the feces.   An additional section and forum was also listed in which members could exchange usernames on a Network-based instant messaging service that I know, based upon my training and experience, to be commonly used by subjects engaged in the online sexual exploitation of children.

02-000119

Sealed Supp App Vol 1 pg 205

29.     A review of the various topics within the above forums revealed each topic contained a title, the author, the number of replies, the number of views, and the last post.  The "last post" section of a particular topic included the date and time of the most recent posting to that thread as well as the author.  Upon accessing a topic, the original post appeared at the top of the page, with any corresponding replies to the original post included in the post thread below it.  Typical posts appeared to contain text, images, thumbnail-sized previews of images, compressed files (such as Roshal Archive files, commonly referred to as ".rar" files, which are used to store and distribute multiple files within a single file), links to external sites, or replies to previous posts.

30.     A review of the various topics within the "[Website A] information and rules," "How to," "General Discussion," and "Security & Technology discussion" forums revealed that the majority contained general information in regards to the site, instructions and rules for how to post, and welcome messages between users.

31.     A review of topics within the remaining forums revealed the majority contained discussions about, and numerous images that appeared to depict, child pornography and child erotica depicting prepubescent girls, boys, and toddlers.  Examples of these are as follows:

> (a)     On February 3, 2015, a user posted a topic entitled "Buratino-06" in the forum "Pre-teen – Videos - Girls HC" that contained numerous images depicting child pornography of a prepubescent or early pubescent girl. One of these images depicted the girl being orally penetrated by the penis of a naked male;
>
> (b)     On January 30, 2015, a user posted a topic entitled "Sammy" in the forum

02-000120

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 25 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 210   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 20 of 26

"Pre-teen – Photos – Girls" that contained hundreds of images depicting

child pornography of a prepubescent girl.  One of these images depicted

the female being orally penetrated by the penis of a male; and

(c)   On September 16, 2014, a user posted a topic entitled "9yo Niece -

Horse.mpg" in the "Pre-teen Videos - Girls HC" forum that contained four

images depicting child pornography of a prepubescent girl and a hyperlink

to an external website that contained a video file depicting what appeared

to be the same prepubescent girl.  Among other things, the video depicted

the prepubescent female, who was naked from the waist down with her

vagina and anus exposed, lying or sitting on top of a naked adult male,

whose penis was penetrating her anus.

32.   A list of members, which was accessible after registering for an account, revealed that approximately 100 users made at least 100 posts to one or more of the forums. Approximately 31 of these users made at least 300 posts.  In total, "Website A" contained thousands of postings and messages containing child pornography images. Those images included depictions of nude prepubescent minors lasciviously exposing their genitals or engaged in sexually explicit conduct with adults or other children.

33.   "Website A" also included a feature referred to as "[Website A] Image Hosting." This feature of "Website A" allowed users of "Website A" to upload links to images of child pornography that are accessible to all registered users of "Website A."  On February 12, 2015, an FBI Agent accessed a post on "Website A" titled "Giselita" which was created by a particular "Website A" user.  The post contained links to images stored on "[Website A] Image Hosting."

02-000121

Sealed Supp App Vol 1 pg 207

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 26 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 211   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 21 of 26

The images depicted a prepubescent girl in various states of undress.  Some images were focused on the nude genitals of a prepubescent girl.  Some images depicted an adult male's penis partially penetrating the vagina of a prepubescent girl.

34.     Text sections of "Website A" provided forums for discussion of methods and tactics to use to perpetrate child sexual abuse.  For example:

On January 8, 2015, a user posted a topic entitled "should i proceed?" in the forum "Stories - Non-Fiction" that contained a detailed accounting of an alleged encounter between the user and a 5 year old girl.  The user wrote "...it felt amazing feeling her hand touch my dick even if it was through blankets and my pajama bottoms..."  The user ended his post with the question, "should I try to proceed?" and further stated that the girl "seemed really interested and was smiling a lot when she felt my cock."  A different user replied to the post and stated, "...let her see the bulge or even let her feel you up...you don't know how she might react, at this stage it has to be very playful..."

#### Court Authorized Use of Network Investigative Technique

35.     Websites generally have Internet Protocol ("IP") address logs that can be used to locate and identify the site's users.  In such cases, after the seizure of a website whose users were engaging in unlawful activity, law enforcement could  review those logs in order to determine the IP addresses used by users of "Website A" to access the site.  A publicly available lookup could then be performed to determine what Internet Service Provider ("ISP") owned the target IP address.  A subpoena could then be sent to that ISP to determine the user to which the IP address was assigned at a given date and time.

02-000122

Sealed Supp App Vol 1 pg 208

Case 5:17-cr-40097-DDC Document 25-7 *SEALED* Filed 02/01/18 Page 27 of 31
Appellate Case: 19-3068 Document: 010110218507 Date Filed: 08/26/2019 Page: 212 Sealed

Case 5:15-mj-05106-KGS *SEALED* Document 1-2 Filed 09/15/15 Page 22 of 26

36.     However, because of the Network software utilized by "Website A," any such logs of user activity would contain only the IP addresses of the last computer through which the communications of "Website A" users were routed before the communications reached their destinations. The last computer is not the actual user who sent the communication or request for information, and it is not possible to trace such communications back through the Network to that actual user. Such IP address logs therefore could not be used to locate and identify users of "Website A."

37.     Accordingly, on February 20, 2015, the same date "Website A" was seized, the United States District Court for the Eastern District of Virginia authorized a search warrant to allow law enforcement agents to deploy a Network Investigative Technique ("NIT") on "Website A" in an attempt to identify the actual IP addresses and other identifying information of computers used to access "Website A." Pursuant to that authorization, between February 20, 2015, and approximately March 4, 2015, each time any user or administrator logged into "Website A" by entering a username and password, the FBI was authorized to deploy the NIT which would send one or more communications to the user's computer. Those communications were designed to cause the receiving computer to deliver to a computer known to or controlled by the government data that would help identify the computer, its location, other information about the computer, and the user of the computer accessing "Website A." That data included: the computer's actual IP address, and the date and time that the NIT determined what that IP address was; a unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish the data from that of other computers; the type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and

22

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 28 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 213   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 23 of 26

architecture (e.g., x 86); information about whether the NIT had already been delivered to the computer; the computer's Host Name; the computer's active operating system username; and the computer's MAC address.

### "soldiermike" ON "Website A"

38.     According to data obtained from logs on "Website A" monitored by law enforcement, and the deployment of a NIT, a user with the username "soldiermike" originally registered an account on "Website A" on January 31, 2015.  According to the user "soldiermike's" profile, this user was a Normal Member of "Website A."  According to the Statistics section of this user's profile, between the dates of January 31, 2015 and March 4, 2015, the user "soldiermike" had been actively logged into the website for a total of eight hours and 59 minutes.

### IP Address and Identification of User misused on "Website A"

39.     According to data obtained from logs on "Website A" monitored by law enforcement, and the deployment of a NIT, on February 28, 2015, after logging into "Website A" with a username and password, "soldiermike" engaged in the following activity on "Website A" from IP address 205.214.245.193.

40.     On February 28, 2015, the user "soldiermike" with IP address 205.214.245.193 accessed post entitled Dad Trains Two Little Sisters, in the forum Pre-teen Videos/Girls HC. Among other things, this post contained links to a video.  Users on the site commented the video contained two young girls and an adult male put his penis in the mouth of at least one of the girls.

02-000124
Sealed Supp App Vol 1 pg 210

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 29 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 214   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 24 of 26

41.     During the following additional sessions, the user "soldiermike" also browsed "Website A" after logging into "Website A" with a username and password.  The IP address was not captured during these additional sessions.

42.     On March 3, 2015, the user "soldiermike" accessed the post 19246, in the forum Girls HC, thread "Quickie.. But goodie", that contained a link to a multiple image photo, commonly referred to as a contact sheet, depicting a prepubescent female performing oral sex on a male's penis.

43.     On March 2, 2015, the user "soldiermike" accessed the post 15627, in the forum Girls, thread "The Producers: Unwanted Advertising aka UA", that contained a link to a multiple image photo commonly referred to as a contact sheet, depicting a minor female removing her clothing and touching her vagina with her finger.

44.     Using publicly available websites, FBI Special Agents were able to determine the above IP Address was operated by the ISP, The Tri-County Telephone Association.

45.     In March 2015, an administrative subpoena/summons was served on The Tri-County Telephone Association requesting information related to the user who was assigned to the above IP address.  According to the information received from The Tri-County Telephone Association, the subscriber, Wesley Wagner, is receiving Internet service at *800 Adolph Street, White City, Kansas*.  Internet service was current as of April 2, 2015 at the aforementioned premises.

46.     A search of CLEAR information database (a public records database that provides names, dates of birth, addresses, associates, telephone numbers, email addresses, etc.) was conducted for *800 Adolph Street, White City, Kansas*.  The results confirmed the address as

24

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 30 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 215   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 25 of 26

Wesley Wagner's current residence.

47.    On July 15, 2015, KBI Crime Analyst Jeff Muckenthaler, provided some identifying information on Wesley Wagner:

    a.  Wagner has a valid Kansas Driver's License with an address of ***800 Adolph Street, White City, Kansas.***

    **b.**  Wagner has multiple vehicles registered in his name at ***800 Adolph Street, White City, Kansas,*** bearing Kansas license plates.

### DESCRIPTION OF THE PREMISES TO BE SEARCHED

48.    The location, 800 Adolph Street, White City, Kansas, is a two story residence, green in color.  The residence is accessed by a long drive that is entered at the intersection of Grant and Adolph Streets.  There are several out buildings located on the property.

### CONCLUSION

49.    Based on the aforementioned factual information, your affiant respectfully submits that there is probable cause to believe that an individual who resides at the residence described above is in possession of child pornography.  Your Affiant respectfully submits that there is probable cause to believe that an individual residing in the residence described above has violated 18 U.S.C. §§ 2252 and 2252A.  Additionally, there is probable cause to believe that evidence of the commission of criminal offenses, namely, violations of 18 U.S.C. §§ 2252 and 2225A, is located in the residence described above, and this evidence, listed in Attachment A to this affidavit, which is incorporated herein by reference, is contraband, the fruits of crime, or things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

<center>25</center>

Case 5:17-cr-40097-DDC   Document 25-7 *SEALED*   Filed 02/01/18   Page 31 of 31
Appellate Case: 19-3068     Document: 010110218507     Date Filed: 08/26/2019     Page: 216     Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 26 of 26

50.    Your Affiant, therefore, respectfully requests that the attached warrant be issued

authorizing the search and seizure of the items listed in Attachment A.


s/ Angie Jones
Task Force Officer Angie Jones
Federal Bureau of Investigation


Sworn and subscribed before me
this 15th day of September, 2015.

s/ K. Gary Sebelius
HONORABLE K. GARY SEBELIUS
UNITED STATES MAGISTRATE JUDGE

02-000127

Sealed Supp App Vol 1 pg 213

Appellate Case: 19-3068    Document: 010110218507    Date Filed: 08/26/2019    Page: 218    Sealed

Monnat & Spurrier, Chartered
200 West Douglas, Suite 830
Olive W. Garvey Building
Wichita, Kansas 67202
Telephone: (316) 264-2800
Facsimile: (316) 264-4785

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 17-40097-DDC |
| | ) | |
| WESLEY WAGNER,<br>Defendant | ) | |

MR. WAGNER'S MOTION TO SUPPRESS EVIDENCE OBTAINED
FROM THE EXECUTION OF THE SEARCH WARRANT FOR
THE RESIDENCE AT 800 ADOLPH AND
MEMORANDUM OF LAW IN SUPPORT THEREOF

COMES NOW the Defendant, Wesley Wagner, by and through his attorney of

record, Trevor D. Riddle of Monnat & Spurrier, Chartered, and respectfully moves this

Court for an order suppressing any and all evidence obtained directly or indirectly from

the searches and seizures conducted pursuant to the search warrant issued on September

15, 2015, authorizing the search of Mr. Wagner's residence at 800 Adolph St., White

City, Kansas, that occurred on or about September 17, 2015. In support thereof, Mr.

Wagner states as follows:

## PRELIMINARY INFORMATION

### *Factual Statement*

Mr. Wagner's first motion to suppress evidence focuses on a prior warrant issued in the Eastern District of Virginia authorizing FBI agents located in Virginia to secretly deploy a malware program, described by the Government as a Network Investigative Technique ("NIT"), on Mr. Wagner's computer and the computers of countless other individuals, for the purpose of seizing private identifying information, at some unspecified date and time after February 20, 2015.

This motion to suppress addresses evidence obtained through the execution of a second search warrant issued over six months later to search Mr. Wagner's home. Mr. Wagner has fully set forth the factual background of the "investigation" that led to the issuance of this search warrant in his contemporaneously filed Motion to Suppress Evidence Obtained as a Result of the "NIT" Warrant and Memorandum in Support Thereof, and incorporates that factual statement herein by reference.

## SUMMARY OF ARGUMENT

Mr. Wagner respectfully moves this Court for an order suppressing the following evidence:

A.  All physical evidence seized, on or about September 17, 2015, pursuant to the search warrant issued in the United States District Court for the District of Kansas, Case No. 15-mj-5106-KGS, from the defendant, or from or near the premises commonly

described as 800 Adolph, White City, Kansas, in which the defendant alleges a reasonable

expectations of privacy;

   B.  All statements made by Mr. Wagner on or about September 17, 2015, at 800

Adolph, White City, Kansas;

   C.  All observations made by law enforcement officers on or about September 17,

2015, of the defendant or the premises at 800 Adolph, White City, Kansas; and

   D.  Any tangible or intangible evidence of any kind derived directly or indirectly

from the evidence described in paragraphs A through C.

   As set forth fully *infra*, Mr. Wagner asserts that said evidence is the fruit of illegal,

unreasonable and unconstitutional searches and seizures in the following respects:

   (1)    probable cause to search the residence was lacking because the information

          contained in FBI Task Force Officer Angie Jones's affidavit[1] was stale;

   (2)    probable cause to search the residence was lacking independent of any

          finding that the information contained in the affidavit was stale because

          there were insufficient grounds to believe that any evidence of criminal

          activity would be found in the home;

   (3)    the warrant[2] was overly broad and therefore violated the Fourth

          Amendment's particularity requirements;

---

   [1] The Application and Affidavit in support of the September 15, 2015, search
warrant is attached hereto as <u>Exhibit A</u>.

   [2] The September 15, 2015, search warrant is attached hereto as <u>Exhibit B</u>.

(4)     the warrant failed to set forth a methodology to employ the search and

        seizure in violation of the Fourth Amendment's particularity requirements;

(5)     notwithstanding that the warrant violated the particularity requirements of

        the Fourth Amendment, the government will be unable to bear its burden in

        demonstrating that the search methodologies employed to actually carry out

        the searches and seizures in this case were "reasonable" under the Fourth

        Amendment;

(6)     the "good faith" exception to the Fourth Amendment exclusionary rule of

        *United States v. Leon*, <u>468 U.S. 897</u> (1984), does not apply to the search

        warrant for Mr. Wagner's residence; and

(7)     any and all evidence derived directly or indirectly from the execution of the

        warrant for Mr. Wagner's residence issued on September 15, 2015,

        including any statements and/or admissions made by Mr. and Mrs. Wagner

        on or about September 17, 2015, are fruit of constitutional violations, and

        must be suppressed. *Wong Sun v. United States*, <u>371 U.S. 471</u> (1963).

## ARGUMENTS AND AUTHORITIES

At the outset, Mr. Wagner prefaces his arguments by noting that the warrant in this

case and the claims he raises are particularly salient for at least the following two reasons:

First, the warrant application sought authorization to search Mr. Wagner's

4

home—the "first among equals" when it comes to the Fourth Amendment. *See Florida v. Jardines*, __U.S.__, 133 S.Ct. 1409, 1414 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable government intrusion.'") (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

Second, "the scope of the permissible search depends on the specific spaces in which the object of the search might be found." *See Maryland v. Garrison*, 480 U.S. 79, 84-85 (1987). As set forth *infra*, the FBI sought and obtained authorization to continue their searches and seizures until they found every computer and all computer media located on Mr. Wagner's property:

> the entire Premises, including the residential dwelling, outbuildings, and
> any computer and computer media located therein where the items specified
> in Attachment A may be found, and to seize all items listed in Attachment
> A as instrumentalities, fruits, and evidence of crime.

(Exh. A, ¶3.) This case therefore involves "especially invasive" searches and seizures within an "especially protected place." *United States v. Griffith*, 867 F.3d 1265, 1271-72 (D.C. Cir. 2017) (recognizing that "[a]uthorization to search for an item fitting in the palm of a hand, like a cell phone, thus can entail an intrusive inspection of all corners of a home"—"an especially protected place"); *see also United States v. Christie*, 717 F.3d 1156, 1164 (10th Cir. 2013) ("In today's world, if any place or thing is especially vulnerable to a worrisome exploratory rummaging by the government, it may be our personal computers.").

5

I.     **Probable cause to search the residence was lacking because the information contained in FBI Task Force Officer Angie Jones's Affidavit was stale and failed to provide a sufficient nexus that evidence of a crime would be found in a particular place.**

For the purposes of establishing probable cause under the Fourth Amendment, "it is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause [that contraband or evidence of a crime will be found in the place searched] *at that time*." ***Sgro v. United States***, 287 U.S. 206, 210 (1932) (emphasis added) (citing U.S. Const. amend. IV); *see also **Steagald v. United States***, 451 U.S. 204, 212-13 (1981) (to be valid, a search warrant is grounded in "probable cause to believe that the legitimate object of a search is located in a particular place" in order to "safeguard[] an individual's interest in the privacy of his home and possession against the unjustified intrusion of the police.").

Thus, to safeguard one's fundamental right against unreasonable searches and seizures, probable cause to search cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched. ***United States v. Snow***, 919 F.2d 1458, 1459 (10th Cir. 1990). The staleness doctrine is based on the idea that probable cause may likely dissipate over time. ***United States v. Griffith***, 362 F.Supp. 2d 1263, 1269 (D. Kan. 2005) (citing to ***United States v. Miles***, 772 F.2d 613, 616 (10th Cir. 1985)). For these crucial reasons, time is undoubtedly a critical element to a court's determination of whether probable cause existed. ***United States v. Rahn***, 511 F.2d 290,

6

292 (10th Cir. 1972).

Here, the information provided by the FBI in their application for a warrant was stale and wholly insufficient under the circumstances to support a probable-cause finding. Officer Jones's affidavit alleges that user "soldermike" first accessed "Website A"—a website containing both legal and illegal content—from an IP address associated with Mr. Wagner's residence on January 31, 2015, but provides no evidence that the visitor, "soldiermike," engaged in illegal activity on that date. (Exh. A at ¶38; *see also* Exh. C (screenshots of "Website A" demonstrating that it offered a mix of chat forums, private messaging services, as well as illegal pictures and videos).)[3] The affidavit also alleges that "soldiermike" accessed Website A on February 28, 2015, from an IP address associated with Mr. Wagner's residence, but it does *not* allege that the visitor "soldiermike" accessed illegal content on that date. Rather, the affidavit alleges only that the post that "soldiermike" did access contained *another* link to content of an illegal nature, but did not assert that "soldermike" had actually clicked on or accessed that link:

> On February 28, 2015, the user "soldiermike" with IP address 205.214.245.193 accessed the post entitled Dad Trains Two Little Sisters, in the forum Pre-teen Videos/Girls HC. Among other things, this post contained links to a video. Users on the site commented the video contained two young girls and an adult male put his penis in the mouth of at least one of the girls.

---

[3] In Mr. Wagner's Motion to Suppress Evidence Obtained as a Result of the "NIT" Warrant and Memorandum of Law in Support Thereof, he has set forth why merely entering a username and password to enter the Playpen's home website cannot establish probable-cause of illegal conduct under the facts of this case. He incorporates those arguments herein by reference.

(Exh. A, ¶40.)

The allegations regarding March 2 and March 3 were that the user "soldiermike" accessed posts that contained photographs of a potentially illegal nature. (Exh. A, ¶ ¶42, 43.) But the affidavit acknowledges that on these dates, "[t]he IP address was *not* captured . . . ." (Exh. A, ¶41 (emphasis added).) Moreover, the affidavit did not allege that on these two dates "soldiermike" took any of the additional steps needed to intentionally download, copy, and save posts, such as clicking on the "save as" option. The affidavit also does not claim that the user posted any pictures; communicated with anyone about sharing pictures; or otherwise indicated that he or she possessed pornography. The affidavit also contends that between January 31, 2015, and March 4, 2015, "soldiermike" had been "actively logged into the website for a total of eight hours and 59 minutes." (Exh. A at ¶38.) The affidavit does not, however, provide a definition for, or any information clarifying, what "actively logged into" signifies.

According to Officer Jones's Affidavit, FBI Special Agents were able to determine that the IP address from which "soldiermike" accessed Website A on February 28, 2015, was operated by the ISP, Tri-County Telephone Association, and in March 2015—that is, within the same month of seizing the IP address and other information from Mr. Wagner's computer via the NIT Warrant—issued an administrative subpoena on Tri-County Telephone Association from which the government obtained Mr. Wagner's name and residence as the subscriber associated to that IP address. (Exh. A at ¶ ¶ 44-45.)

8

Despite having searched and seized this personal information in March 2015 that led to Mr. Wagner's identification and the location of his residence, the FBI did not apply for a warrant to search Mr. Wagner's residence until nearly six months later—on September 15, 2015. (*See* Exh. A.) Thus, the most recent information obtained regarding the conduct related to an IP address associated with Mr. Wagner's residence was in early March 2015. The FBI did nothing further for nearly *six months later*.

This presents a situation similar to that in ***United States v. Grant***, 108 F. Supp. 1172 (D. Kan. 2000). In that case, United States District Court Judge Rogers found that there was insufficient information to support the search of a residence. In the application for search warrant the officer alleged that, in April of 1999 and again in June of 1999, an informant had purchased rock cocaine from the defendant in the defendant's house. The defendant had been arrested for possession of cocaine, marijuana and paraphernalia in July of 1999. The defendant also had a number of drug possession arrests prior to the time the informant bought the crack cocaine from him in 1999. The application for search warrant was made in October of 1999—four months after the last sale to this informant.

The court held that it could not find that this was an "ongoing and continuing" offense:

> There is no allegation that the defendant was involved in an ongoing conspiracy or continuous illegal drug activity over a substantial period of time . . . . The court has looked at a great number of cases where the staleness of information presented for a search warrant is argued. In the vast majority of these cases, courts have held that the information is not stale. However, these cases involve ongoing criminal activity, long-running

conspiracies, or proof that evidence of a much earlier crime was still present
at the place to be searched.  That kind of proof is not contained in the
affidavit for the search warrant.

*Id.* at 1175.

The court went on to quote from LaFave's treatise:

Absent additional facts tending to show otherwise, a one-shot type of
crime, such as a single instance of possession or sale or some form of
contraband, will support a finding of probable cause only for a few days at
best.

*Id.* (citing 2 LaFave, SEARCH AND SEIZURE§3.7(a) at p. 342).

In ***Grant***, Judge Rogers then found that "[t]he affidavit in issue described more

than a one-shot crime, but not much more . . . . On the whole, the situation presented to

the court does not establish probable cause that evidence of a crime was going to be

found at 632 *on October 19,1999.*" *Id*. at 1176 ("There is no indication, for instance, that

defendant had recently kept a supply of drugs at his house or that he was receiving more

contraband in the future or that he was continuing to use or sell illegal drugs or that it

was likely that he still kept records or other evidence of drug sales at his house.")

(emphasis added).

The same is true here. There is simply no indication that any illegal activity, let

alone continuing illegal activity, occurred from Mr. Wagner's residence at any point on

or after February 28, 2015. The Affidavit alleged that user "soldiermike" accessed posts

on Website A containing photographs of an illegal nature on two instances—March 2

and March 3 of 2015—but stated that "soldiermike's" IP address was entirely unknown

10

during these sessions.[4] Thus, there was no evidence, or suggestion, that any illegal conduct actually occurred from the IP address associated with Mr. Wagner's residence, let alone during the six-plus months leading up to the issuance of the search warrant on September 17, 2015.

It is foreseen that the government will argue that the nature of the crime here distinguishes it from the sale or purchase of drugs such that there was evidence of an "ongoing" crime. But such an argument is untenable given that here, the FBI did not know *who* they were investigating, and had no evidence that *illegal* conduct took place on the date "soldiermike" engaged in activity on "Website A" from the IP address associated with Mr. Wagner's residence. (*See, e.g.,* Exh. A, at ¶3 ("There is probable cause to believe Wesley Wagner, or another resident of 800 Adolph Street, White City, Kansas, has been involved with . . . ."; *see also id.* at ¶48 (acknowledging that "there are several buildings located on the property"). Law enforcement had no knowledge of what IP address "soldiermike" accessed "Website A" from on March 2 and 3.

Courts across the nation are recognizing that due to today's technology, subscribers to an IP address are too frequently "not the individuals who carried out the complained of [or illegal] acts":

> The Court is concerned about the possibility that many of the names and addresses produced . . . will not in fact be those of the

---

[4] An IP address is unique to a specific computer, and only one computer is assigned a particular IP address. *See generally,* Barbara Esbin, *Internet Over Cable: Defining the Future in Terms of the Past,* 7 CommLaw Conspectus 37, 46-47 (1999).

individuals who downloaded "My Little Panties # 2." The risk is not purely speculative; Plaintiff's counsel estimated that 30% of the names turned over by ISPs are not those of individuals who actually downloaded or shared copyrighted material. Counsel stated that the true offender is often the "teenaged son . . . or the boyfriend if it's a lady." Alternatively, the perpetrator might turn out to be a neighbor in an apartment building that uses shared IP addresses or a dormitory that uses shared wireless networks. This risk of false positives gives rise to the potential for coercing unjust settlements from innocent defendants such as individuals who want to avoid the embarrassment of having their names publicly associated with allegations of illegally downloading "My Little Panties # 2."

Another court noted:

the ISP subscriber to whom a certain IP address was assigned may not be the same person who used the Internet connection for illicit purposes ... By defining Doe Defendants as ISP subscribers who were assigned certain IP addresses, instead of the actual Internet users who allegedly engaged in infringing activity, Plaintiff's sought-after discovery has the potential to draw numerous innocent internet users into the litigation, placing a burden upon them that weighs against allowing the discovery as designed.

In sum, although the complaints state that IP addresses are assigned to "devices" and thus by discovering the individual associated with that IP address will reveal "defendants' true identity," this is unlikely to be the case. Most, if not all, of the IP addresses will actually reflect a wireless router or other networking device, meaning that while the ISPs will provide the name of its subscriber, the alleged infringer could be the subscriber, a member of his or her family, an employee, invitee, neighbor or interloper.

***In re BitTorrent Adult Film Copyright Infringement Cases***, 296 F.R.D. 80, 85

(E.D.N.Y.) (citations omitted), report and recommendation adopted sub nom. Patrick

Collins, *Inc. v. Doe* 1, 288 F.R.D. 233 (E.D.N.Y. 2012).

Here, it stands to reason that if the facts underlying this investigation would

12

support a finding of probable cause at all, they could do so for only a very short period of time, and certainly not half of a year. The affidavit does not allege that there was any "continuing pattern" or recent activity that might "freshen" the otherwise stale information.

Additionally, for the reasons as set forth above, Mr. Wagner respectfully asserts that the application and affidavit for the search of the entire premises and all computers and computer media located therein lacked probable cause to believe that contraband or evidence of a crime would be found within computers and computer media on his property on September 15, 2015, regardless of whether the Court finds that the information provided within Officer Jones's affidavit was stale or not.

Because the application for the search warrant was devoid of any information from which the judge could have determined that there was probable cause to believe that evidence of a crime would be found on Mr. Wagner's property on September 15, 2015, the warrant ought not have been issued, the searches and seizures carried out pursuant thereto were unconstitutional, and Mr. Wagner's Motion to Suppress should therefore be sustained.

## II.   The warrant was overly broad and therefore violated the Fourth Amendment's particularity requirements.

The warrant failed to confine its scope to particularly described evidence with a sufficient nexus to a specific crime for which there was demonstrated probable cause.

To protect against unreasonable searches and seizures, the Fourth Amendment

mandates two requirements for search warrants: a warrant must be supported by probable cause, and it must describe with particularity "the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).

As the Tenth Circuit has held, "[i]t is not enough that the warrant makes reference to a particular offense; the warrant must 'ensure[] that [the] search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause." *Cassady v. Goering*, 567 F.3d 628, 636 (10th Cir. 2009) (quoting *Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir. 1985)). In that way, "the requirement of particularity is closely tied to the requirement of probable cause." 2LaFave, *Search & Seizure* § 4.6(a). A warrant that describes the objects in unduly "general terms . . . raises the possibility that there does not exist a showing of probable cause to justify a search for them." *Id.*; *see also Cassady*, 567 F.3d at 636 ("The difference between a valid warrant an overbroad warrant lies in whether the government could have phrased the warrant more specifically.") (internal quotations omitted) (quoting *United States v. Le*, 173 F.3d 1258, 1275 (10th Cir. 1999)).

Recently the Tenth Circuit reaffirmed these principles in *United States v. Dunn*, No. 15-1475, 2017 WL 6349439, at *2 (10th Cir. Dec. 12, 2017) (unpublished), holding that a warrant that effectively authorizes the search of everything in a defendant's residence is invalid under the Fourth Amendment's particularity requirement:

14

The warrant here listed particular items to be searched, but prefaced the list with a catch-all phrase, stating that the items to be searched "include but are not limited to" the listed items. A similar catch-all phrase was addressed in *Cassady v. Goering*, 567 F.3d 628 (10th Cir. 2009). There we invalidated a warrant that listed items but contained a catch-all phrase authorizing officers to search for "all other evidence of criminal activity." *Cassady*, 567 F.3d at 635.

The warrant here is even broader than the one in *Cassady*. Unlike the warrant in *Cassady*, the warrant here includes items that do not necessarily constitute evidence or fruits of a crime. For example, when listing the purposes for the search, the warrant authorized a search not only for evidence involving the means of committing a crime, but also for the all-encompassing reason "other." In this way, the warrant effectively authorized a search of everything in the apartment for any reason. Under *Cassady*, the warrant lacks particularity.

Even today the particularity requirement remains a critical safeguard against "wide-ranging exploratory searches," and ensures that intrusions into our fundamental privacy interests are "carefully tailored to [their] justifications." **Maryland v. Garrison**, 480 U.S. 79, 84 (1987). And this is especially true in the context of searches into every crevice of a person's home in search of electronic devices (such as personal computers) that "can contain (or at least permit access to) our diaries, calendars, files, and correspondence" and therefore may be "especially vulnerable to a worrisome exploratory rummaging by the government." **United States v. Christie**, 717 F.3d 1156, 1164 (10th Cir. 2013).

Here, the warrant violated the Fourth Amendment's particularity requirements because it impermissibly allowed a general search by the FBI.

As set forth *supra*, the search warrant in this case authorized the FBI to conduct a

15

very invasive search of *any* computer and/or computer media located on Mr. Wagner's property:

> the entire Premises, including the residential dwelling, outbuildings, and **any computer and computer media located therein where the items specified in Attachment A may be found**, and to seize all items listed in Attachment A as instrumentalities, fruits, and evidence of crime.
> . . .
> The location, 800 Adolph Street, White City, Kansas, is a two story residence, green in color. The residence is accessed by a long drive that is entered at the intersection of Grant and Adolph Streets. There are several out buildings located on the property.

(Exh. A, ¶3; *see also* Exh. B (Attachment A).) But the warrant did not stop with computers and computer media belonging to Mr. Wagner. It also did not stop with computers and computer media belonging to those who reside at or have used a computer linked to Mr. Wagner's IP address. Rather, the warrant authorized a search of any computers and/or computer media where the laundry list of items in Attachment A "may be found"—i.e., it authorized a search of *any* computer and computer media without regard to ownership or use because items in Attachment A's listicle may be found on every computer. (*See, e.g.,* Exh. B. (Attachment A, ¶¶2, 11).) It also authorized the *seizure* of every item within Attachment A's listicle "as instrumentalities, fruits, and evidence of crime" without regard to ownership.

This warrant is similar to one that the United States Circuit Court for the District of Columbia held unconstitutionally overbroad. ***United States v. Griffith***, 867 F.3d 1265, 1276 (D.C. Cir. 2017). In ***Griffith***, while intending to search and seize the electronic

16

devices of only the defendant, the warrant actually authorized law enforcement to search

for and seize all electronic devices without regard to the owner of such devices. *Id.* at

1276. The D.C. Circuit found the warrant was impermissibly overbroad and therefore

lacked probable cause to enable officers to seize all electronic devices in the home:

> Indeed, the terms of the warrant allowed officers unfettered access to any
> electronic device in the apartment even if police knew the device belonged
> to someone other than Griffith. He shared the apartment with Lewis, his
> girlfriend, and the warrant authorized police to search for and seize all of
> her electronic devices. For instance, if officers executing the warrant had
> seen Lewis using her cell phone in her apartment, the warrant would have
> authorized them to seize that phone. Yet the police unsurprisingly offered
> no explanation of why Lewis's devices could have been appropriately
> seized.
>
> The warrant's overbreadth is particularly notable because police sought to
> seize otherwise lawful objects: electronic devices. Courts have allowed
> more latitude in connection with searches for contraband items like
> "weapons [or] narcotics." *Stanford* [*v. Texas*], 379 U.S. [476,] 486, <u>85
> S.Ct. 506</u> [(1965)] (internal quotation marks omitted). But the
> understanding is different when police seize "innocuous" objects. *See
> Andresen v. Maryland*, <u>427 U.S. 463, 482</u> n.11, <u>96 S.Ct. 2737</u>, <u>49 L.Ed.2d
> 627</u> (1976). Those circumstances call for special "care to assure [the search
> is] conducted in a manner that minimizes unwarranted intrusions upon
> privacy." *Id.*; see also 2 LaFave, Search & Seizure § 4.6(d).

*Id.* at 1276.

The ***Griffith*** court also dismissed as untenable the government's assertions as to

why the warrant should be read more narrowly, finding that the warrant very easily could

have been more particularized, even under circumstances where the government is

unsure of the make or the model of the electronic device that they are searching for, or

who owns the device:

17

But even then, it is no answer to confer a blanket authorization to search for and seize all electronic devices. The warrant must be tailored to the justifications for entering the home. In this case, the warrant should have limited the scope of permissible seizure to devices owned by Griffith, or devices linked to the shooting. The Department of Justice in fact encourages use of that sort of approach in certain situations. *See* Office of Legal Educ., Searching and Seizing Computers and Obtaining Electronic

Evidence in Criminal Investigations, Crim. Div., Dep't of Justice 69-72 (2015) . . . .

Such a warrant would have enabled police to sweep more broadly when executing the search, but would have disabled them from seizing devices plainly unrelated to the crime. Officers, for example, could have examined a device they initially thought might belong to Griffith, but they could not have seized the device if they became aware it belonged to Lewis. That sort of approach would "minimize[ ] unwarranted intrusions upon privacy." *Andresen*[ *v. Maryland*], 427 U.S. [463,] 482 n.11, <u>96 S.Ct. 2737</u>[, (1976)].

*Id.* at 1276–77.

In Mr. Wagner's case, the warrant was unconstitutionally overbroad because the FBI lacked probable cause to (1) search any and all computers and computer media—and to seize information therefrom, including cloud storage—that just so happened to be found on Mr. Wagner's property on September 17, 2015, and (2) to seize all of the information from such computers as set forth in Attachment A, as well as all cameras, film, and videotapes found on the property, for example, without regard to ownership. *See, e.g., **Ybarra v. Illinois***, <u>444 U.S. 85, 91</u> (1979 ("[M]ere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause.").

For these reasons, the warrant for Mr. Wagner's residence was unconstitutionally overbroad in violation of the Fourth Amendment's particularity requirements. *See, e.g,* **Dunn**, *supra* at \*2 ("In this way, the warrant effectively authorized a search of everything in the apartment for any reason."); *see also* **Griffith**, 867 F.3d at 1277 ("To the extent the officers showed restraint when executing the search, 'this restraint was imposed by the agents themselves, not by a judicial officer . . . . The police lacked probable cause to *seize* all electronic devices from the home in the first place" and therefore the "warrant was invalidly overboard in enabling officers to do so.") (quoting **Groh**, 540 U.S. at 561).

### III.    The warrant failed to set forth a sufficient methodology to employ the search and seizure, which rendered the warrant a general one that violated the Fourth Amendment's particularity requirements.

As already discussed, the Fourth Amendment's particularity requirement mandates that a search warrant sufficiently describe both the place(s) to be searched and the thing(s) to be seized. U.S. Const. amend. IV. The particularity requirement ensures that the warrant supplies enough information to guide and control the law enforcement officer's discretion, and also to ensure that the category of items to be seized is not so broad as to include items that should *not* be seized. *See, e.g,* **Marron v. United States**, 275 U.S. 192, 196 (1927).

The constitutionality of searches and seizures of electronic devices, as well as the validity of any application and affidavit for a new search warrant, to ensure that they

19

conform to the particularity requirements of the Fourth Amendment must be viewed in light of the Supreme Court's holding in ***Riley v. California***, ___U.S.___, 134 S.Ct. 2473 (2014), and its progeny. That is, courts across the nation are now recognizing that the Fourth Amendment's particularity requirements require that search warrants seeking authorization to conduct forensic testing on electronic devices must not only specify the information to be seized with particularity in addition to the probable-cause basis to do so, but also must sufficiently describe the search methodology the government plans to employ to lawfully execute the search.

For example, in ***In re Nextel Cellular Telephone***, No. 14-MJ-8005-DJW, 2014 WL 2898262, at *11 (D. Kan. June 26, 2014) (unpublished) (attached hereto in accordance with Kan. Ct. R. 7.04(g)(C)), the government sought a search warrant to conduct forensic testing on the defendant's cell phone—i.e., a "minicomputer"—seized after his arrest. *Id*. at *1-2. The Honorable David Waxse denied the government's request for a search warrant to conduct a "full and complete forensic telephone examination of the [] cellular phone" that set forth a non-exhaustive list of search-methodology techniques that the government "may" employ to conduct the search. *Id*. at *2 ("It is true that in one sense, the government describes a place to be searched—a cellular telephone, its computer software, and/or memory storage devices. Certainly this describes the actual *thing* to be searched. But, an electronic search is not as simple.").

Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 238   Sealed

Applying the well-established constitutional protections to the government's application for a search warrant to conduct forensic testing on a cell phone, Judge Waxse relied on **Riley's** dicta, Tenth Circuit precedent regarding the search of digital electronic devices, as well as other persuasive authority to hold that the government's application for the search warrant to conduct a search of an electronic device must not only affirmatively limit the search of the evidence to the specific type of electronic files or types of materials where there is a probable-cause basis to locate the thing it intends to seize from the cell phone, but also set forth a sufficient search protocol that provides an explanation of the scientific methodology the government will use to separate what is permitted to be seized from what is not. *Id*. at \*9; *see also id*. at \*6 n.37 (listing cases in which cell-phone search warrants were denied because warrants violate the Fourth Amendment's particularity requirements).

Judge Waxse found the government's warrant in **In re Nextel** failed to comport with the Fourth Amendment's probable-cause and particularity requirements because, for one, the warrant was "overly broad" in that it failed to "contain sufficiently particularized language that create[d] a nexus between the suspected crime and the things to be seized" from the cell phone. **In re Nextel**, *supra* at \*10. While the warrant did limit the data it sought to the alleged crimes, the methodology provided by the government to conduct its search lacked "any guidance on *how* the government intend[ed] to determine what data has a nexus to the suspected crime and what data does

21

not":

> To begin with, the government does not indicate whether it will be imaging the device. Like IMEI, supra Section B. 2(c), this Court agrees that "if the device will be imaged, then there will be a complete copy of all its data—including the data for which there is no probable cause to seize—that must be accounted for and which ultimately must be purged of data outside the scope of the warrant." The failure to clarify this point cannot allay this Court's fears that it is authorizing an unlawful search in which the government lacks probable cause to search or seize the data. Ultimately, that omission alone is fatal . . . .

*Id.*

In short, a blanket request to conduct a full forensic examination of all data from an electronic device cannot pass constitutional muster. *See In re Nextel*, 2014 WL 2898262 at *10 (the Fourth Amendment does not permit a "general, exploratory rummaging in a person's belongings") (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). The search of a computer must be confined in scope to particularly describe the evidence relating to a specific crime for which there is demonstrated probable cause. If police have probable cause for electronic data stored on one specific type of application, for example, then it is the judge's neutral and detached duty to issue a search warrant that authorizes a limited search of only that particularly described evidence that is supported by probable cause. *See United States v. Phua*, No. 2:14-cr-00249-APG-PAL, 2015 WL 1281603, at *6-7 (D. Nev. Mar. 20, 2015) (unpublished) (); *In re Nextel*, *supra* at *12-13 ("An acceptable search protocol educates (1) the Court as to what the government is doing when it searches a cell phone, and (2) the executing

officer as to what places and things may or may not be searched and/or seized . . . . The

government should not be afraid to use terms like 'MD5 hash values,' 'metadata,'

'registry,' 'write blocking' and 'status marker,' nor should it shy away from explaining

what kinds of third party software are used and how they are used to search for particular

types of data."); *In re Search of Black iPhone 4*, 27 F. Supp. 3d 74, *4-5 (D.D.C. Mar.

11, 2014) (unpublished) (listing questions that a valid search protocol must address

including: will the device be imaged; how long the images will be stored; who will

perform as well as who will be involved in the search; what procedures will be employed

to avoid viewing material outside the scope of the warrant; etc.).

In *Christie*, the Tenth Circuit reaffirmed that "[a] warrant isn't ever supposed to

be a license for just a general rummaging" and that "[n]o doubt the particularity

requirement and its underlying purposes are fully engaged when investigators seek to

search a personal computer." 717 F.3d at 1164.

Here, the property search warrant failed to set forth a sufficient protocol for the

searches and seizures of electronic devices and electronic information—whether stored

in the computer or in "online storage or other remote computer storage." (Exh. B

(Attachment A, ¶11).) More specifically, the search warrant lacked the scientific

methodology that constitutionally limited the breadth of the permissible searches and

seizures. (Exh. A, ¶17 (under "Search Methodology to be Employed," providing a "non-

exclusive list, as other search procedures may be used").

23

Because the warrant was so lacking in particularity with regard to the search methodology to be employed, the warrant constituted a general search warrant that violated the Fourth Amendment's particularity and probable-cause guarantees, rendering the search warrant fatally defective. *See generally **United States v. Williamson**,* 1 F.3d 1134, 1135-36 (10th Cir. 1993) (reaffirming that an executing officer's knowledge of the warrant's intent cannot replace the Fourth Amendment's requirement of a particularized written warrant).

Notwithstanding that the warrant violated the particularity clause of the Fourth Amendment, the government will be unable to bear its burden in demonstrating that the search methodologies employed to actually carry out the searches and seizures in this case were "reasonable" under the Fourth Amendment. *See **Christie**,* 717 F.3d at 1166 (holding that Fourth "Amendment's protection against 'unreasonable' searches surely allows courts to assess the propriety of the government's search methods (the *how*) *ex post* in light of the specific circumstances of each case.") (emphasis in original)(citing **United States v. Ramirez**, 523 U.S. 65, 71 (1998) ("The general touchstone of reasonableness . . . governs the method of execution of the warrant.")).

### III.   *Leon's* **good-faith doctrine cannot salvage the unlawfully obtained evidence under the circumstances of this case.**

In **United States v. Leon**, 468 U.S. 897, 905 (1984), the United States Supreme Court held that "evidence seized in reasonable, good-faith reliance on a search warrant" need not be excluded, even if the warrant turns out to have been unsupported by probable

cause. *Leon's* standard is an objective one—that is, it is one based on what a reasonably well trained officer should have known, not merely whether the particular officer was aware of the search and seizure law under consideration. *Id.* at 919, n. 20 ("We emphasize that the standard of reasonableness we adopt is an objective one . . . . The objective standard we adopt, moreover, requires officers to have a reasonable knowledge of what the law prohibits . . . .").

The Court in *Leon* set forth certain situations in which the good faith exception would not apply:

> Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Franks v. Delaware*, <u>438 U.S. 154</u>, <u>98 S.Ct. 2674</u>, <u>57 L.Ed.2d 667</u> (1978). The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, <u>442 U.S. 319</u>, <u>99 S.Ct. 2319</u>, <u>60 L.Ed.2d 920</u> (1979); in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown v. Illinois*, 422 U.S., at 610-611, 95 S.Ct., at 2265-2266 (POWELL, J., concurring in part); see *Illinois v. Gates*, *supra*, 462 U.S., at 263-264, 103 S.Ct., at 2345-2346 (WHITE, J., concurring in the judgment). Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient - i.e., in failing to particularize the place to be searched or the things to be seized - that the executing officers cannot reasonably presume it to be valid. *Cf. Massachusetts v. Sheppard*, 468 U.S., at 988-991, <u>104 S.Ct. at 3428-3430</u>.

<u>468 U.S. at 923</u>.

If the ***Leon*** good-faith doctrine is asserted in this case in an effort to salvage the

unlawfully obtained evidence, it is the government's burden of proving the doctrine's

applicability under the facts of this case. *See, e.g., **United States v. Gant**,* 759 F.2d 484,

487 (5th Cir. 1985); *see also **United States v. Vigeant**,* 176 F.3d 565, 572 (1st Cir.1999).

> A.   *Here, the affidavits were so deficient in showing probable cause*
> *that no law enforcement officer could harbor an objectively*
> *reasonable belief that probable cause existed.*

As ***Leon*** explains, the good-faith exception is not applicable if a warrant is "based

on an affidavit so lacking in indicia of probable cause as to render official belief in its

existence entirely unreasonable." 468 U.S. at 923.

The infirmity of the warrant at issue here was palpable on its face. As argued

above, there were no facts in the affidavits which would lead to a reasonable belief that

contraband or evidence of a crime was present at 800 Adolph Street, White City, Kansas,

in March 2015, at the time the warrant was sought six months later, or any time

thereafter. This complete absence of facts, as well as the staleness of the information

provided in the affidavit in support of a probable-cause determination renders ***Leon***

inapplicable in this case.

One factor the Court should consider in determining whether a warrant was

obtained reasonably is the time pressure under which the law enforcement officer was

operating when he prepared the warrant application. *See **United States v. Weber**,* 923

F.2d 1338, 1346 (9th Cir. 1990). When there is nothing to suggest that a "hurried

26

judgment" had to be made to seek the warrant, which might excuse a reasonable mistake, the failure of the affidavit to contain the requisite indicia of probable cause cannot be remedied by *Leon. See, e.g., **United States v. Zimmerman**,* 277 F.3d 426, 437 (3rd Cir. 2002). When law enforcement has complete control over the timing in seeking a warrant, the "hurried judgment" rationale of *Leon* does not apply. *Id.*

In *Griffith,* the Circuit Court for the District of Columbia "fell short to an extent precluding good-faith reliance on the warrant" both because of "the failings as to probable cause and overbreadth":

> We conclude that the affidavit in this case fell short to an extent precluding good-faith reliance on the warrant. As explained, the government's theory of probable cause to search the apartment runs as follows: (i) Griffith might own a cell phone; (ii) if so, his phone might be found in the residence; and (iii) if so, the phone might retain incriminating communications or other information about a crime committed more than one year earlier. Whatever may be the reasonableness of any of those inferences standing on its own, demonstrating probable cause required adequately establishing all three in combination. The affidavit did not approach doing so. It provided no explanation at all of whether Griffith might own a phone or whether any such phone might be in his home. And with regard to whether any phone would retain any incriminating information about a shooting occurring more than one year beforehand, it observed only that gang members often stay in contact about their activities.
>
> Additionally, the affidavit sought, and the warrant granted, authorization to search for and seize every electronic device found in the home. The warrant's material overbreadth in that regard underscored the police's unawareness of the existence of any such devices in the first place (much less the existence of any belonging to Griffith): given that police did not know whether Griffith owned a cell phone or any other electronic device, they could not describe ex ante the devices they would search for and seize. But it was no solution to rely on a catchall provision authorizing

> seizure of every device they might happen to find in the house. Nothing in
> the affidavit or warrant supported—or could have supported—probable
> cause to seize any and all phones, tablets, computers, and other electronic
> devices in the apartment.
>
> . . . .
>
> Taken together, those failings as to probable cause and overbreadth bring
> the warrant beyond the good-faith exception's reach.

867 F.3d at 1278-79 (reversing and vacating defendant's conviction) (stressing that the

Court's inquiry "is an objective one" and, as in *Leon*, the Court has "no occasion to

suspect any ill motive or subjective bad faith on the part of the officers who prepared and

executed the warrant" and the Court "do[es] the same here") (citing *Groh*, 540 U.S. at

563-65 & n.8); *see also Williamson*, 1 F.3d at 1135-36 (an executing officer's

knowledge of the warrant's intent cannot replace the Fourth Amendment's requirement

of a particularized written warrant); *Groh*, 540 U.S. at 563 ("Given that the particularity

requirement is set forth in the text of the Constitution, no reasonable officer could

believe that a warrant that plainly did not comply with that requirement was valid.").

The same is true in the instant case. The lack of sufficient showing as to probable-

cause, as well as the unconstitutional overbreadth of the warrant in violation of the

Fourth Amendment's particularity requirements bring the warrant beyond the reach of

the good-faith exception in this case, as well.

> B.   *The Magistrate Judge issuing the search warrant wholly abandoned*
>      *his judicial role under the facts here presented.*

Another situation in which the good faith exception does not apply is that in

which:

28

Appellate Case: 19-3068 Document: 010110218507 Date Filed: 08/26/2019 Page: 246 Sealed

the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); in such circumstances, no reasonably well trained officer should rely on the warrant.

*Leon*, 468 U.S. at 923.

The *Lo-Ji Sales* case involved a situation in which a magistrate signed a warrant with no description of things to be seized and then accompanied the investigating officers to an adult bookstore and viewed numerous allegedly obscene videotapes, hundreds of which were seized. The itemization of things to be seized was filled in by law enforcement officers after the termination of the search. The Court determined that the magistrate "did not manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application for a search and seizure." *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326 (1979).

Participation in the execution of a search warrant is not the only way in which a judicial officer can fail to manifest neutrality and detachment. As noted in *United States v. Schauble*, 647 F.2d 113, 116 (10th Cir. 1981):

> We add a note of caution to law enforcement officials. Police officers will not be permitted to undermine the warrant application process, and the important Fourth Amendment interests it is intended to protect, through resort to boilerplate, vague, or unduly brief affidavits. It takes but a few minutes more of the affiant's time to ask the informant about, for example, the amount or form of drugs seen, and to include such information in the affidavit. This kind of information is essential "if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police."

(Quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)). Thus, a magistrate who issues a search warrant upon "boilerplate, vague, or unduly brief affidavits" cannot be said to have performed his neutral and detached function.

In the present case, the Magistrate Judge issued a search warrant based upon an affidavit that, as set forth above, wholly failed to set forth specific factual allegations supporting the assertion that the items either existed or constituted fruits or evidence of the specified crime, and that any such evidence would be located within the highly private confines of Mr. Wagner's home. The Magistrate Judge who issued the warrant could not have been exercising the neutrality required of his position, but, regrettably, served merely as rubber stamps for the actions desired to be taken by law enforcement. Under these circumstances, no reasonably well trained officer should rely on the warrant, and the *Leon* good faith doctrine does not apply.

For all of the foregoing reasons, it is clear that the government cannot claim the protection of the *Leon* good faith exception to the exclusionary rule. "Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble." *United States v. Zimmerman*, 277 F.3d 426, 437 (3rd Cir. 2002) (quoting *United States v. Reilly*, 76 F.3d 1271, 1280 (2nd Cir. 1996)). The evidence seized as a result of the defective search warrants issued in this case must be suppressed.

**IV.    All evidence derived from the unlawful searches and seizures must also be suppressed.**

Mr. Wagner respectfully asserts that any and all evidence derived directly or

30

Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 248   Sealed

indirectly from the execution of the warrant for Mr. Wagner's residence issued on

September 15, 2015, including any statements and/or admissions made by Mr. and Mrs.

Wagner on or about September 17, 2015, are fruit of the unlawful searches and seizures,

and must be suppressed. *Wong Sun v. United States*, 371 U.S. 471 (1963).

WHEREFORE, Mr. Wagner respectfully prays that the Court issue an order

suppressing the aforesaid evidence for the reasons set forth herein, any memorandum of

law that may later be submitted, and all other matters that may be presented prior to or at

the time of the hearing of said motion, and for such other and further relief as seems just

to the Court.

<div style="text-align:right">

Respectfully submitted,

By:   MONNAT & SPURRIER, CHARTERED

</div>

s/ Trevor Riddle
TREVOR RIDDLE, #22224
Attorney for Defendant Wesley Wagner
Monnat & Spurrier, Chartered
200 West Douglas, Suite 830
Wichita, Kansas 67202
(316) 264-2800
Fax: (316) 264-4785
trevor.riddle@monnat.com

Sealed Supp App Vol 1 pg 245

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2018, I electronically filed the foregoing with the clerk fo the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Christine Kenney
christine.kenney@usdoj.gov

<div align="right">

s/ Trevor Riddle
TREVOR RIDDLE, #22224
Attorney for Defendant Wesley Wagner
Monnat & Spurrier, Chartered
200 West Douglas, Suite 830
Wichita, Kansas 67202
(316) 264-2800
Fax: (316) 264-4785
trevor.riddle@monnat.com

</div>

Sealed Supp App Vol 1 pg 246

*United States v. Wesley Wagner*, **Case No. 17-40097-DDC**
**APPENDIX TABLE OF CONTENTS**

<u>**Exhibit**</u>   <u>**Document**</u>

A.   Search Warrant application, Case No. 15-mj-5106-KGS (D. Kan. Sept. 15, 2015).

B.   Search Warrant, Case No. 15-mj-5106-KGS (D. Kan. Sept. 15, 2015).

C.   Screenshots of Playpen.

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 1 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 251   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1   Filed 09/15/15   Page 1 of 1

## THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF KANSAS

| | |
|---|---|
| IN THE MATTER OF THE ) | |
| SEARCH OF: ) | |
| THE PREMISES KNOWN AS ) | **Case No. 15-mj-5106-KGS** |
| 800 ADOLPH STREET ) | |
| WHITE CITY, KANSAS ) | **FILED UNDER SEAL** |

### APPLICATION

I, Angie Jones, being duly sworn, depose and say:

I am a Task Force Officer with Federal Bureau of Investigation ("FBI") and have reason to believe that in the District of Kansas there is now concealed a certain person or property, namely:

**See accompanying Affidavit and Attachment A**

which is evidence concerning violations of Title 18 United States Code, Sections 2252, certain activities relating to material involving the sexual exploitation of minors, and 2252A, certain activities relating to material constituting or containing child pornography.

The facts to support a finding of Probable Cause are as follows:

**See accompanying Affidavit**

s/ Angie Jones
Task Force Officer Angie Jones
Federal Bureau of Investigation

Sworn and acknowledged before me this 15th day of September, 2015, at Topeka, Kansas.

s/ K. Gary Sebelius
Hon. K. Gary Sebelius
UNITED STATES MAGISTRATE JUDGE

1

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 2 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 252   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-1   Filed 09/15/15   Page 1 of 4

## ATTACHMENT A

### LIST OF ITEMS TO BE SEIZED

1.      Computer(s), computer hardware, computer software, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2.      Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs, including, but not limited to, P2P software.

3.      Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.      In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.      Any and all diaries, address books, names, and lists of names and addresses of

1

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 3 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 253   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-1   Filed 09/15/15   Page 2 of 4

individuals who may have been contacted by operator of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to whose with an interest in child pornography.

9.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and

02-000099

Sealed Supp App Vol 1 pg 250

electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.     Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

11.     Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.     Any and all cameras, film, videotapes or other photographic equipment.

13.     Any and all visual depictions of minors.

14.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in

3

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 5 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 255   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-1   Filed 09/15/15   Page 4 of 4

sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

15.     Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

16.     Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

02-000101
Sealed Supp App Vol 1 pg 252

## THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF KANSAS

| | |
|---|---|
| IN THE MATTER OF THE ) | |
| SEARCH OF: ) | |
| THE PREMISES KNOWN AS ) | **Case No. 15-mj-5106-KGS** |
| 800 ADOLPH STREET ) | |
| WHITE CITY, KANSAS ) | **FILED UNDER SEAL** |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Angie Jones, a Senior Special Agent (SSA) with the Kansas Bureau of Investigation (KBI), Lenexa, KS, being duly sworn, depose and state as follows:

1.       I have been employed as a sworn agent with the KBI since May 2001 and am currently assigned as a Task Force Officer (TFO) to the FBI Child Exploitation Task Force, Kansas City, Missouri.  Since June 2003, I have been assigned to investigate computer crimes to include violations against children.  I have gained expertise in the conduct of such investigations through training in seminars, classes, and everyday work related to conducting these types of investigations.  I have attended multiple trainings on the investigation of child pornography and sexual exploitation of children such as Innocent Images provided by the FBI.

2.       As a TFO, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.  At all times throughout this affidavit I use the term "child pornography" merely as shorthand to refer to visual depictions of actual minors engaged in sexually explicit conduct.  I use the terms "visual depiction," "minor," and "sexually explicit conduct" as those terms are defined in 18 U.S.C. § 2256 (See Definition Section below).

1

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 7 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 257   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 2 of 26

3.     I am investigating activities occurring at *800 Adolph Street, White City, Kansas*. As will be shown below, there is probable cause to believe Wesley Wagner, or another resident of *800 Adolph Street, White City, Kansas*, has been involved with distribution, receipt, possession, and access with intent to view child pornography, or a conspiracy or attempt to commit these crimes, in violation of Title 18, United States Code, Sections 2252 and 2252A.  I am submitting this affidavit in support of a search warrant authorizing a search of the residence, located at *800 Adolph Street, White City, Kansas*, and is more particularly described in paragraph 48 below, for the items specified in Attachment A hereto, which items constitute instrumentalities, fruits, and evidence of the foregoing violations.  I am requesting authority to search the entire Premises, including the residential dwelling, outbuildings, and any computer and computer media located therein where the items specified in Attachment A may be found, and to seize all items listed in Attachment A as instrumentalities, fruits, and evidence of crime.

4.     The statements in this affidavit are based on information received from the FBI Headquarters Major Case Coordination Unit and my investigation of this matter.  Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe evidence, fruits, and instrumentalities of the violation of Title 18, United States Code, Sections 2252 and 2252A, are presently located at *800 Adolph Street, White City, Kansas*.

## STATUTORY AUTHORITY

5.     This investigation concerns alleged violations of Title 18, United States Code, Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors.  18

U.S.C. § 2252(a) prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, or possessing any visual depiction of minors engaging in sexually explicit conduct when such visual depiction was either mailed or shipped or transported in interstate or foreign commerce by any means, including by computer, or when such visual depiction was produced using materials that had traveled in interstate or foreign commerce. 18 U.S.C. § 2252A(a) prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, or possessing any child pornography, as defined in 18 U.S.C. § 2256(8), when such child pornography was either mailed or shipped or transported in interstate or foreign commerce by any means, including by computer, or when such child pornography was produced using materials that had traveled in interstate or foreign commerce.

18 U.S.C. § 2252A(a)(3) prohibits a person from knowingly possessing or reproducing child pornography for distribution through the mail or in interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

6. The following definitions apply to this Affidavit and Attachment A to this Affidavit:

3

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 9 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 259   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 4 of 26

a.　　　"Bulletin Board" means an Internet-based website that is either secured (accessible with a password) or unsecured, and provides members with the ability to view postings by other members and make postings themselves. Postings can contain text messages, still images, video images, or web addresses that direct other members to specific content the poster wishes. Bulletin boards are also referred to as "internet forums" or "message boards." A "post" or "posting" is a single message posted by a user. Users of a bulletin board may post messages in reply to a post. A message "thread," often labeled a "topic," refers to a linked series of posts and reply messages. Message threads or topics often contain a title, which is generally selected by the user who posted the first message of the thread. Bulletin boards often also provide the ability for members to communicate on a one-to-one basis through "private messages." Private messages are similar to e-mail messages that are sent between two members of a bulletin board. They are accessible only by the user who sent/received such a message, or by the Website Administrator.

b.　　　"Child Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

c.　　　"Child Pornography," as used herein, includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged

4

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 10 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 260   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 5 of 26

in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct (see 18 U.S.C. §§ 2252 and 2256(2)).

        d.     "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

        e.     "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. See 18 U.S.C. § 2256(2).

        f.     "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users. A web server, for example, is a computer which hosts the data associated with a website. That web server receives requests from a user and delivers information from the server to the user's computer via the Internet. A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

        g.     "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 11 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 261   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 6 of 26

h.      "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

i.      "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

j.      "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

k.      "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that

02-000107
Sealed Supp App Vol 1 pg 258

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 12 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 262   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 7 of 26

creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

        l.     "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet.  IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet.  IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

        m.     The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

        7.     Computers and computer technology have revolutionized the way in which

02-000108

Sealed Supp App Vol 1 pg 259

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 13 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 263   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 8 of 26

individuals interested in child pornography interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. There were definable costs involved with the production of pornographic images. To distribute these on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings and telephone calls.

8.     The development of computers has changed this. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

9.     Child pornographers can now transfer photographs from a camera onto a computer-readable format with a device known as a scanner. With the advent of digital cameras, the images can now be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

10.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution.

11.     The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively

02-000109
Sealed Supp App Vol 1 pg 260

secure and anonymous fashion.

12.     Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others.  The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  Evidence of such online storage of child pornography is often found on the user's computer.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

13.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.  Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  A forensic examiner often can recover evidence suggesting whether a computer contains peer to peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded.  Such information is often maintained indefinitely until overwritten by other data.

02-000110

Sealed Supp App Vol 1 pg 261

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 15 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 265   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 10 of 26

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

14.     Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment.  This is almost always true because of the following:

a.     Computer storage devices (like hard disks, diskettes, CDs, and others) can store the equivalent of thousands of pages of information.  Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.  This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

b.     Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data.  The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 16 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 266   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 11 of 26

complete and accurate analysis.

15.     In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU).  In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues.  In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

16.     In addition, there is probable cause to believe that the computer and its storage devices, the monitor, keyboard, and modem are all instrumentalities of the crime(s), within the meaning of 18 U.S.C. §§ 2251 through 2256, and should all be seized as such.

## SEARCH METHODOLOGY TO BE EMPLOYED

17.     The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a.     examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

b.     searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the

11

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 17 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 267   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 12 of 26

criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

      c.      surveying various file directories and the individual files they contain;

      d.      opening files in order to determine their contents;

      e.      scanning storage areas;

      f.      performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment A; and/or

      g.      performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment A.

## <u>CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS</u>

18.     The majority of individuals who collect child pornography are persons who have a sexual attraction to children.  They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

      a.     The majority of individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. The majority of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.

      b.     The majority of individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade

02-000113
Sealed Supp App Vol 1 pg 264

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 18 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 268   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 13 of 26

depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, P2P, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles.

   c. The majority of individuals who collect child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals rarely destroy these materials because of the psychological support they provide.

   d. The majority of individuals who collect child pornography often collect, read, copy or maintain names, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

   e. The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. They almost always maintain their collections in the privacy and security of their homes or other secure location.

02-000114

Sealed Supp App Vol 1 pg 265

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 19 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 269   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 14 of 26

## BACKGROUND OF THE INVESTIGATION

19.     Wesley Wagner or a user of the Internet account at *800 Adolph Street, White City, Kansas* has been linked to an online community of individuals who regularly send and receive child pornography via a website that operated on an anonymous online network.   The website is described below and referred to herein as "Website A."[1]   There is probable cause to believe that Wesley Wagner or a user of the Internet account at *800 Adolph Street, White City, Kansas* knowingly accessed with intent to view, receive, and/or distribute child pornography on "Website A."

### The Network[2]

20.     "Website A" operated on a network ("the Network") available to Internet users who are aware of its existence.  The Network is designed specifically to facilitate anonymous communication over the Internet.  In order to access the Network, a user must install computer software that is publicly available, either by downloading software to the user's existing web browser, downloading free software available from the Network's administrators, or downloading a publicly-available third-party application.[3]  Using the Network prevents someone

---

[1] The actual name of "Website A" is known to law enforcement.  Disclosure of the name of the site would potentially alert its members to the fact that law enforcement action is being taken against the site and its users, potentially provoking members to notify other members of law enforcement action, flee, and/or destroy evidence.  Accordingly, for purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the website will be identified as "Website A."

[2] The actual name of the Network is known to law enforcement.  The network remains active and disclosure of the name of the network would potentially alert its members to the fact that law enforcement action is being taken against the network, potentially provoking members to notify other members of law enforcement action, flee, and/or destroy evidence.  Accordingly, for purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the network will be identified as "the Network."

[3] Users may also access the Network through so-called "gateways" on the open Internet, however, use of those gateways does not provide users with the full anonymizing benefits of the Network.

14

attempting to monitor an Internet connection from learning what sites a user visits and prevents the sites the user visits from learning the user's physical location. Because of the way the Network routes communication through other computers, traditional IP identification techniques are not viable.

21.    Websites that are accessible only to users within the Network can be set up within the Network and "Website A" was one such website. Accordingly, "Website A" could not generally be accessed through the traditional Internet.[4] Only a user who had installed the appropriate software on the user's computer could access "Website A." Even after connecting to the Network, however, a user had to know the exact web address of "Website A" in order to access it. Websites on the Network are not indexed in the same way as websites on the traditional Internet. Accordingly, unlike on the traditional Internet, a user could not simply perform a Google search for the name of "Website A," obtain the web address for "Website A," and click on a link to navigate to "Website A." Rather, a user had to have obtained the web address for "Website A" directly from another source, such as other users of "Website A," or from online postings describing both the sort of content available on "Website A" and its location. Accessing "Website A" therefore required numerous affirmative steps by the user, making it extremely unlikely that any user could have simply stumbled upon "Website A" without first understanding its content and knowing that its primary purpose was to advertise and distribute child pornography.

---

[4] Due to a misconfiguration, prior to February 20, 2015, Website A was occasionally accessible through the traditional Internet. In order to access Website A in that manner, however, a user would have had to know the exact IP address of the computer server that hosted Website A, which information was not publicly available. As of on or about February 20, 2015, Website A was no longer accessible through the traditional Internet.

15

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 21 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 271   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 16 of 26

22.     The Network's software protects users' privacy online by bouncing their communications around a distributed network of relay computers run by volunteers all around the world, thereby masking the user's actual IP address which could otherwise be used to identify a user.

23.     The Network also makes it possible for users to hide their locations while offering various kinds of services, such as web publishing, forum/website hosting, or an instant messaging server.  Within the Network itself, entire websites can be set up which operate the same as regular public websites with one critical exception - the IP address for the web server is hidden and instead is replaced with a Network-based web address.  A user can only reach such sites if the user is using the Network client and operating in the Network.  Because neither a user nor law enforcement can identify the actual IP address of the web server, it is not possible to determine through public lookups where the computer that hosts the website is located. Accordingly, it is not possible to obtain data detailing the activities of the users from the website server through public lookups.

### Description of "Website A" and its Content

24.     "Website A" was a child pornography bulletin board and website dedicated to the advertisement and distribution of child pornography and the discussion of matters pertinent to the sexual abuse of children, including the safety and security of individuals who seek to sexually exploit children online.  On or about February 20, 2015, the computer server hosting "Website A" was seized from a web-hosting facility in Lenoir, North Carolina.  The website operated in Newington, Virginia, from February 20, 2015, until March 4, 2015, at which time "Website A" ceased to operate.  Between February 20, 2015, and March 4, 2015, law

16

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 22 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 272   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 17 of 26

enforcement agents acting pursuant to an order of the United States District Court for the Eastern District of Virginia monitored electronic communications of users of "Website A." Before, during, and after its seizure by law enforcement, law enforcement agents viewed, examined and documented the contents of "Website A," which are described below.

25.     According to statistics posted on the site, "Website A" contained a total of 117,773 posts, 10,622 total topics, and 214,898 total members as of March 4, 2015. The website appeared to have been operating since approximately August 2014, which is when the first post was made on the message board. On the main page of the site, located to either side of the site name were two images depicting partially clothed prepubescent girls with their legs spread apart, along with the text underneath stating, "No cross-board reposts, .7z preferred, encrypt filenames, include preview, Peace out." Based on my training and experience, I know that: "no cross-board reposts" refers to a prohibition against material that is posted on other websites from being "re-posted" to "Website A;" and ".7z" refers to a preferred method of compressing large files or sets of files for distribution. Two data-entry fields with a corresponding "Login" button were located to the right of the site name. Located below the aforementioned items was the message, "Warning! Only registered members are allowed to access the section. Please login below or 'register an account' [(a hyperlink to the registration page)] with "[Website A]." Below this message was the "Login" section, consisting of four data-entry fields with the corresponding text, "Username, Password, Minutes to stay logged in, and Always stay logged in."

26.     Upon accessing the "register an account" hyperlink, there was a message that informed users that the forum required new users to enter an email address that looks to be valid. However, the message instructed members not to enter a real email address. The message

02-000118

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 23 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 273   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 18 of 26

further stated that once a user registered (by selecting a user name and password) the user would be able to fill out a detailed profile. The message went on to warn the user "[F]or your security you should not post information here that can be used to identify you." The message further detailed rules for the forum and provided other recommendations on how to hide the user's identity for the user's own security.

27.     After accepting the above terms, registration to the message board then required a user to enter a username, password, and email account; although a valid email account was not required as described above.

28.     After successfully registering and logging into the site, the user could access any number of sections, forums, and sub-forums. Some of the sections, forums, and sub-forums available to users included: (a) How to; (b) General Discussion; (c) [Website A] information and rules; and (d) Security & Technology discussion. Additional sections, forums, and sub-forums included (a) Jailbait – Boy;  (b) Jailbait – Girl; (c) Preteen – Boy; (d) Preteen – Girl; (e) Pre-teen Videos – Girl HC; (f) Pre-teen Videos – Boys HC; (g) Toddlers; and (h) Kinky Fetish – Scat. Based on my training and experience, I know that "jailbait" refers to underage but post-pubescent minors; the abbreviation "HC" means hardcore (i.e., depictions of penetrative sexually explicit conduct); and "scat" refers to the use of feces in various sexual acts, watching someone defecating, or simply seeing the feces.   An additional section and forum was also listed in which members could exchange usernames on a Network-based instant messaging service that I know, based upon my training and experience, to be commonly used by subjects engaged in the online sexual exploitation of children.

02-000119

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 24 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 274   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 19 of 26

29.     A review of the various topics within the above forums revealed each topic contained a title, the author, the number of replies, the number of views, and the last post.  The "last post" section of a particular topic included the date and time of the most recent posting to that thread as well as the author.  Upon accessing a topic, the original post appeared at the top of the page, with any corresponding replies to the original post included in the post thread below it.  Typical posts appeared to contain text, images, thumbnail-sized previews of images, compressed files (such as Roshal Archive files, commonly referred to as ".rar" files, which are used to store and distribute multiple files within a single file), links to external sites, or replies to previous posts.

30.     A review of the various topics within the "[Website A] information and rules," "How to," "General Discussion," and "Security & Technology discussion" forums revealed that the majority contained general information in regards to the site, instructions and rules for how to post, and welcome messages between users.

31.     A review of topics within the remaining forums revealed the majority contained discussions about, and numerous images that appeared to depict, child pornography and child erotica depicting prepubescent girls, boys, and toddlers.  Examples of these are as follows:

(a)     On February 3, 2015, a user posted a topic entitled "Buratino-06" in the forum "Pre-teen – Videos - Girls HC" that contained numerous images depicting child pornography of a prepubescent or early pubescent girl. One of these images depicted the girl being orally penetrated by the penis of a naked male;

(b)     On January 30, 2015, a user posted a topic entitled "Sammy" in the forum

19

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 25 of 31
Appellate Case: 19-3068    Document: 010110218507    Date Filed: 08/26/2019    Page: 275    Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 20 of 26

"Pre-teen – Photos – Girls" that contained hundreds of images depicting child pornography of a prepubescent girl. One of these images depicted the female being orally penetrated by the penis of a male; and

(c)   On September 16, 2014, a user posted a topic entitled "9yo Niece - Horse.mpg" in the "Pre-teen Videos - Girls HC" forum that contained four images depicting child pornography of a prepubescent girl and a hyperlink to an external website that contained a video file depicting what appeared to be the same prepubescent girl. Among other things, the video depicted the prepubescent female, who was naked from the waist down with her vagina and anus exposed, lying or sitting on top of a naked adult male, whose penis was penetrating her anus.

32.    A list of members, which was accessible after registering for an account, revealed that approximately 100 users made at least 100 posts to one or more of the forums. Approximately 31 of these users made at least 300 posts. In total, "Website A" contained thousands of postings and messages containing child pornography images. Those images included depictions of nude prepubescent minors lasciviously exposing their genitals or engaged in sexually explicit conduct with adults or other children.

33.    "Website A" also included a feature referred to as "[Website A] Image Hosting." This feature of "Website A" allowed users of "Website A" to upload links to images of child pornography that are accessible to all registered users of "Website A." On February 12, 2015, an FBI Agent accessed a post on "Website A" titled "Giselita" which was created by a particular "Website A" user. The post contained links to images stored on "[Website A] Image Hosting."

02-000121
Sealed Supp App Vol 1 pg 272

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 26 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 276   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 21 of 26

The images depicted a prepubescent girl in various states of undress. Some images were focused on the nude genitals of a prepubescent girl. Some images depicted an adult male's penis partially penetrating the vagina of a prepubescent girl.

34.     Text sections of "Website A" provided forums for discussion of methods and tactics to use to perpetrate child sexual abuse. For example:

On January 8, 2015, a user posted a topic entitled "should i proceed?" in the forum "Stories - Non-Fiction" that contained a detailed accounting of an alleged encounter between the user and a 5 year old girl. The user wrote "...it felt amazing feeling her hand touch my dick even if it was through blankets and my pajama bottoms..." The user ended his post with the question, "should I try to proceed?" and further stated that the girl "seemed really interested and was smiling a lot when she felt my cock." A different user replied to the post and stated, "...let her see the bulge or even let her feel you up...you don't know how she might react, at this stage it has to be very playful..."

**Court Authorized Use of Network Investigative Technique**

35.     Websites generally have Internet Protocol ("IP") address logs that can be used to locate and identify the site's users. In such cases, after the seizure of a website whose users were engaging in unlawful activity, law enforcement could review those logs in order to determine the IP addresses used by users of "Website A" to access the site. A publicly available lookup could then be performed to determine what Internet Service Provider ("ISP") owned the target IP address. A subpoena could then be sent to that ISP to determine the user to which the IP address was assigned at a given date and time.

02-000122

Sealed Supp App Vol 1 pg 273

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 27 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 277   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 22 of 26

36.     However, because of the Network software utilized by "Website A," any such logs of user activity would contain only the IP addresses of the last computer through which the communications of "Website A" users were routed before the communications reached their destinations. The last computer is not the actual user who sent the communication or request for information, and it is not possible to trace such communications back through the Network to that actual user.  Such IP address logs therefore could not be used to locate and identify users of "Website A."

37.     Accordingly, on February 20, 2015, the same date "Website A" was seized, the United States District Court for the Eastern District of Virginia authorized a search warrant to allow law enforcement agents to deploy a Network Investigative Technique ("NIT") on "Website A" in an attempt to identify the actual IP addresses and other identifying information of computers used to access "Website A."  Pursuant to that authorization, between February 20, 2015, and approximately March 4, 2015, each time any user or administrator logged into "Website A" by entering a username and password, the FBI was authorized to deploy the NIT which would send one or more communications to the user's computer.  Those communications were designed to cause the receiving computer to deliver to a computer known to or controlled by the government data that would help identify the computer, its location, other information about the computer, and the user of the computer accessing "Website A."  That data included: the computer's actual IP address, and the date and time that the NIT determined what that IP address was; a unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish the data from that of other computers; the type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and

22

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 28 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 278   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 23 of 26

architecture (e.g., x 86); information about whether the NIT had already been delivered to the computer; the computer's Host Name; the computer's active operating system username; and the computer's MAC address.

### "soldiermike" ON "Website A"

38.     According to data obtained from logs on "Website A" monitored by law enforcement, and the deployment of a NIT, a user with the username "soldiermike" originally registered an account on "Website A" on January 31, 2015.  According to the user "soldiermike's" profile, this user was a Normal Member of "Website A."  According to the Statistics section of this user's profile, between the dates of January 31, 2015 and March 4, 2015, the user "soldiermike" had been actively logged into the website for a total of eight hours and 59 minutes.

### IP Address and Identification of User misused on "Website A"

39.     According to data obtained from logs on "Website A" monitored by law enforcement, and the deployment of a NIT, on February 28, 2015, after logging into "Website A" with a username and password, "soldiermike" engaged in the following activity on "Website A" from IP address 205.214.245.193.

40.     On February 28, 2015, the user "soldiermike" with IP address 205.214.245.193 accessed post entitled Dad Trains Two Little Sisters, in the forum Pre-teen Videos/Girls HC. Among other things, this post contained links to a video.  Users on the site commented the video contained two young girls and an adult male put his penis in the mouth of at least one of the girls.

02-000124

Sealed Supp App Vol 1 pg 275

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 29 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 279   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 24 of 26

41.     During the following additional sessions, the user "soldiermike" also browsed "Website A" after logging into "Website A" with a username and password.  The IP address was not captured during these additional sessions.

42.     On March 3, 2015, the user "soldiermike" accessed the post 19246, in the forum Girls HC, thread "Quickie.. But goodie", that contained a link to a multiple image photo, commonly referred to as a contact sheet, depicting a prepubescent female performing oral sex on a male's penis.

43.     On March 2, 2015, the user "soldiermike" accessed the post 15627, in the forum Girls, thread "The Producers: Unwanted Advertising aka UA", that contained a link to a multiple image photo commonly referred to as a contact sheet, depicting a minor female removing her clothing and touching her vagina with her finger.

44.     Using publicly available websites, FBI Special Agents were able to determine the above IP Address was operated by the ISP, The Tri-County Telephone Association.

45.     In March 2015, an administrative subpoena/summons was served on The Tri-County Telephone Association requesting information related to the user who was assigned to the above IP address.  According to the information received from The Tri-County Telephone Association, the subscriber, Wesley Wagner, is receiving Internet service at *800 Adolph Street, White City, Kansas*.  Internet service was current as of April 2, 2015 at the aforementioned premises.

46.     A search of CLEAR information database (a public records database that provides names, dates of birth, addresses, associates, telephone numbers, email addresses, etc.) was conducted for *800 Adolph Street, White City, Kansas*.  The results confirmed the address as

24

Case 5:17-cr-40097-DDC Document 26-2 *SEALED* Filed 02/01/18 Page 30 of 31
Appellate Case: 19-3068 Document: 010110218507 Date Filed: 08/26/2019 Page: 280 Sealed

Case 5:15-mj-05106-KGS *SEALED* Document 1-2 Filed 09/15/15 Page 25 of 26

Wesley Wagner's current residence.

47. On July 15, 2015, KBI Crime Analyst Jeff Muckenthaler, provided some identifying information on Wesley Wagner:

    a. Wagner has a valid Kansas Driver's License with an address of ***800 Adolph Street, White City, Kansas.***

    b. Wagner has multiple vehicles registered in his name at ***800 Adolph Street, White City, Kansas,*** bearing Kansas license plates.

### DESCRIPTION OF THE PREMISES TO BE SEARCHED

48. The location, 800 Adolph Street, White City, Kansas, is a two story residence, green in color. The residence is accessed by a long drive that is entered at the intersection of Grant and Adolph Streets. There are several out buildings located on the property.

### CONCLUSION

49. Based on the aforementioned factual information, your affiant respectfully submits that there is probable cause to believe that an individual who resides at the residence described above is in possession of child pornography. Your Affiant respectfully submits that there is probable cause to believe that an individual residing in the residence described above has violated 18 U.S.C. §§ 2252 and 2252A. Additionally, there is probable cause to believe that evidence of the commission of criminal offenses, namely, violations of 18 U.S.C. §§ 2252 and 2225A, is located in the residence described above, and this evidence, listed in Attachment A to this affidavit, which is incorporated herein by reference, is contraband, the fruits of crime, or things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

02-000126

Sealed Supp App Vol 1 pg 277

Case 5:17-cr-40097-DDC   Document 26-2 *SEALED*   Filed 02/01/18   Page 31 of 31
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 281   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 1-2   Filed 09/15/15   Page 26 of 26

50.     Your Affiant, therefore, respectfully requests that the attached warrant be issued

authorizing the search and seizure of the items listed in Attachment A.


                                        s/ Angie Jones
                                        _____
                                        Task Force Officer Angie Jones
                                        Federal Bureau of Investigation


Sworn and subscribed before me
this 15th day of September, 2015.

s/ K. Gary Sebelius
_____
HONORABLE K. GARY SEBELIUS
UNITED STATES MAGISTRATE JUDGE

02-000127
Sealed Supp App Vol 1 pg 278

# THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

**SEALED**

| | |
|---|---|
| IN THE MATTER OF THE ) | |
| SEARCH OF: ) | |
| THE PREMISES KNOWN AS ) | Case No. 15-mj-5106-KGS |
| 800 ADOLPH STREET ) | |
| WHITE CITY, KANSAS ) | **FILED UNDER SEAL** |

## SEARCH WARRANT

TO: Task Force Officer Angie Jones, FBI, and any Authorized Officer of the United States:

Affidavit(s) having been made before me by Task Force Officer Jones, FBI, who has reason to believe that here in the District of Kansas, located as above-described, there is concealed property or evidence hereby ordered seized, namely

### See Attachment A

I am satisfied that the attached affidavit establishes probable cause to believe that the property so described is now concealed on the premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _September 29, 2015_ (not to exceed 14 days) the person or place named above for the person or property specified, serving this warrant and making the search in the daytime — 6:00 A.M. to 10:00 P.M., and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this to United States Magistrate Judge as required by law. After the initial search and/or imaging of any electronically stored information or data, the examiner and agents will not further save or copy information or data unrelated to the violations alleged.   They will minimize the review of unrelated data as much as possible.

Issued on the _15th_ day of September, 2015, at _12:10 p.m._ o'clock, in the District of Kansas.

_____
Hon. K. Gary Sebelius
United States Magistrate Judge

Case 5:17-cr-40097-DDC   Document 26-3 *SEALED*   Filed 02/01/18   Page 2 of 5
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 283   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 4   Filed 11/05/15   Page 3 of 7

## ATTACHMENT A

### LIST OF ITEMS TO BE SEIZED

1.      Computer(s), computer hardware, computer software, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2.      Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs, including, but not limited to, P2P software.

3.      Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.      In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.      Any and all diaries, address books, names, and lists of names and addresses of

1

Case 5:17-cr-40097-DDC   Document 26-3 *SEALED*   Filed 02/01/18   Page 3 of 5
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 284   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 4   Filed 11/05/15   Page 4 of 7

individuals who may have been contacted by operator of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.       Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.       Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.       Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to whose with an interest in child pornography.

9.       Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and

2

Case 5:17-cr-40097-DDC   Document 26-3 *SEALED*   Filed 02/01/18   Page 4 of 5
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 285   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 4   Filed 11/05/15   Page 5 of 7

electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.   Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

11.   Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.   Any and all cameras, film, videotapes or other photographic equipment.

13.   Any and all visual depictions of minors.

14.   Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in

3

Case 5:17-cr-40097-DDC   Document 26-3 *SEALED*   Filed 02/01/18   Page 5 of 5
Appellate Case: 19-3068   Document: 010110218507   Date Filed: 08/26/2019   Page: 286   Sealed

Case 5:15-mj-05106-KGS *SEALED*   Document 4   Filed 11/05/15   Page 6 of 7

sexually explicit conduct,  as defined in 18 U.S.C. § 2256(2).

15.    Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

16.    Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

4

PlayPen - Index



Home   **Help   Search   Profile   My Messages   Members   Logout**

PlayPen

## JavaScript is enabled in your browser. Why this might be a problem.

### Generel Category

**Unread Posts**

Playpen information and rules

33 Posts
3 Topics

**Last post** by baldoldperv
in Re: New Playpen Videos
on September 16, 2014,
06:53:02 PM

How to
Share what you know.

56 Posts
17 Topics

**Last post** by Vitellius
in Windows Security Guide
on September 16, 2014,
12:04:08 PM

Request
Please all request go here.

441 Posts
173 Topics

**Last post** by JuanAnatou
in Re: LS Models, and BD
Co...
on **Today** at 05:04:25 AM

General Discussion
Talk about anything here.

784 Posts
114 Topics

**Last post** by Squire
in Re: starting with 5yo ni...
on **Today** at 05:35:59 AM

### Jailbait Videos

**Unread Posts**

Girls

384 Posts
44 Topics

**Last post** by pussyeater691
in Re: 1st studio Siberian ...
on **Today** at 05:38:17 AM

Boys

47 Posts
19 Topics

**Last post** by cingy
in Re: HotBoys 1, 2 & 3 /
on September 12, 2014,
04:32:47 AM

### Jailbait Photos

**Unread Posts**

Girls

194 Posts
32 Topics

**Last post** by thanatos
in Re: Sexting selfies
on **Today** at 04:09:32 AM

Boys

29 Posts
12 Topics

**Last post** by plusminuszero
in Re: My Little Sister Is ...
on September 13, 2014,
04:08:01 AM

### Pre-teen Videos

**Unread Posts**

file:///E/soldiermike/UC%20Sessions%20-%20PlayPen/September%202014/Firefox%20Captures/PlayPen%20-%20Index.htm[10/18/2017 2:16:27 PM]

02-000090
Sealed Supp App Vol 1 pg 284

| Board | Posts / Topics | Last post |
|---|---|---|
| Girls HC | 1202 Posts<br>131 Topics | **Last post** by posterposter<br>in Re: 5yo and 11yo daughte...<br>on **Today** at 04:56:07 AM |
| Girls SC/NN | 134 Posts<br>21 Topics | **Last post** by CrazyCrazy<br>in Re: Gartenparty<br>on **Today** at 04:37:37 AM |
| Boys HC | 26 Posts<br>7 Topics | **Last post** by friendtoyouall<br>in Australia Blows<br>on September 16, 2014, 03:49:25 AM |
| Boys SC/NN | 0 Posts<br>0 Topics | |

## Pre-teen Photos

**Unread Posts**

| Board | Posts / Topics | Last post |
|---|---|---|
| Girls HC | 817 Posts<br>95 Topics | **Last post** by clisu<br>in Re: Nicole<br>on **Today** at 05:30:00 AM |
| Girls SC/NN | 347 Posts<br>49 Topics | **Last post** by lolivan69<br>in Re: The [Un]Official Sel...<br>on **Today** at 05:20:41 AM |
| Boys HC | 123 Posts<br>26 Topics | **Last post** by boylover59<br>in Théo<br>on **Today** at 01:09:57 AM |
| Boys SC/NN | 50 Posts<br>26 Topics | **Last post** by Barin<br>in 2 Blond boys<br>on September 16, 2014, 03:51:07 AM |

## Toddlers

**Unread Posts**

| Board | Posts / Topics | Last post |
|---|---|---|
| Toddlers<br>Babies, Toddlers Pictures and videos. | 142 Posts<br>15 Topics | **Last post** by hunsmalllover<br>in Re: Mom Licks her 4 mont...<br>on September 16, 2014, 04:41:15 PM |

## Family Incest

**Unread Posts**

| Board | Posts / Topics | Last post |
|---|---|---|
| Family Play Pen<br>Families that play together stick together. | 219 Posts<br>20 Topics | **Last post** by muffd1ver<br>in Re: horny family (old vh...<br>on **Today** at 05:39:13 AM |
| Animated Incest | 43 Posts<br>13 Topics | **Last post** by Barin<br>in Girl 3D rape<br>on **Today** at 03:24:20 AM |

## Kinky Fetish

**Unread Posts**

| Board | Posts / Topics | Last post |
|---|---|---|
| Bondage<br>Light bondage only. | 33 Posts<br>7 Topics | **Last post** by scoobydooby<br>in Re: Falco<br>on **Today** at 12:29:20 AM |
| Chubby<br>Gotta love chubby girls | 36 Posts<br>3 Topics | **Last post** by jaxy<br>in Re: A DELICIOUS CHUBBY<br>on September 16, 2014, 12:13:25 AM |

**Last post** by heydude

PlayPen - Index

| | Feet<br>Bare feet socks this is the place. | 15 Posts<br>4 Topics | In Re: Footjob<br>on September 15, 2014,<br>06:16:45 AM |
|---|---|---|---|
| | Panties<br>panty lovers videos and pictures. | 79 Posts<br>8 Topics | **Last post** by thepedolove<br>In Re: Something different<br>...<br>on September 16, 2014,<br>11:28:45 PM |
| | Peeing<br>Golden showers and stuff goes here. | 92 Posts<br>37 Topics | **Last post** by<br>zwergenbaendiger<br>In Re: Nablot - VTCAP 01 -<br>...<br>on September 16, 2014,<br>09:50:33 PM |
| | Scat<br>Interest in excrement, feces | 15 Posts<br>3 Topics | **Last post** by jose dupac<br>In Re: 14 yo eating shit<br>on September 14, 2014,<br>07:28:41 AM |
| | Spanking | 53 Posts<br>9 Topics | **Last post** by Gektor<br>In Re: Clip from 70s movie<br>on **Today** at 04:05:45 AM |
| | Vintage<br>Color Climax... Piccolo, Lolita, Child Love etc | 66 Posts<br>13 Topics | **Last post** by Phir LePhance<br>in ColorClimax - Tvg-08<br>on September 16, 2014,<br>11:30:35 PM |
| | Voyeur | 20 Posts<br>4 Topics | **Last post** by knickers<br>in Re: Hitosuji no Yuuwaka<br>on September 16, 2014,<br>08:51:17 PM |

## Stories                                                **Unread Posts**

| | Fiction | 26 Posts<br>17 Topics | **Last post** by knickers<br>in Playpen does Dragons<br>Den...<br>on September 12, 2014,<br>03:37:48 AM |
|---|---|---|---|
| | Non-fiction | 45 Posts<br>11 Topics | **Last post** by thanatos<br>in Re: Double Spanking<br>on **Today** at 04:52:29 AM |

New Posts      No New Posts

### PlayPen - Info Center

#### Recent Posts

**Re: horny family (old vhs)** by muffd1ver (Family Play Pen)              **Today** at 05:39:13 AM
**Re: 1st studio Siberian Mouse MSH_45 (HD)** by pussyeater691 (Girls)      **Today** at 05:38:17 AM
**Re: starting with 5yo niece** by Squire (General Discussion)             **Today** at 05:35:59 AM
**Re: Nicole** by clisu (Girls HC)                                         **Today** at 05:30:00 AM
**Re: Kinder Girl** by clisu (Girls HC)                                    **Today** at 05:29:56 AM

#### Forum Stats

5551 Posts in 933 Topics by 59197 Members. Latest Member: **jumbojet**
Latest Post: **"Re: horny family (old vh..."** ( **Today** at 05:39:13 AM )
View the most recent posts on the forum.

#### Users Online

1 Guest, 608 Users (3 Hidden)
Users active in past 15 minutes:

## <u>CERTIFICATE OF SERVICE</u>
## <u>AND</u>
## <u>CERTIFICATIONS</u>

I hereby certify that a supplemental appendix has been filed on the 26th day of August, 2018, electronically via CM/ECF, and that two written copies of this document, including any attachments(s), will be submitted to FedEx for delivery within two business days of the filing, addressed to Ms. Elisabeth A. Shumaker, Clerk of the Court, U.S. Court of Appeals, Byron White U.S. Courthouse, 1823 Stout Street, Denver, CO 80257. Because opposing counsel (Sarah Johnson, Esq.) is a registered CM/ECF user, she will also be served by the CM/ECF system. 10th Cir. R. 31.5.

**Privacy Redactions**.  I further certify that all required privacy redactions, if any, have been made.

**Paper Copies**.  I further certify that any paper copies required to be submitted to the Court are exact copies of the version submitted electronically.

**Virus Scan**.  I further certify that the electronic submission was scanned for viruses with the most recent version of a commercial virus scanning program, McAfee Endpoint Security version 10.5, which is updated continuously and, according to the program, is free of viruses.

/s/ **Stephen R. McAllister**
STEPHEN R. MCALLISTER